**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EASTERN REGION HELICOPTER COUNCIL, VERTICAL AVIATION INTERNATIONAL, and VICTORIA SESKIN,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>THE CITY OF NEW YORK,<br><br>               Defendant. | Civil Action No.  25-cv-_____<br><br>**COMPLAINT** |

Plaintiffs Eastern Region Helicopter Council (hereinafter referred to as "ERHC"), Vertical Aviation International (hereinafter referred to as "VAI") and Victoria Seskin, by and through their undersigned counsel, for their Complaint against Defendant The City of New York (hereinafter referred to as the "City") allege as follows:

**INTRODUCTION**

1.      This case concerns the City's blatant infringement on the federal government's exclusive authority to regulate the operation of aircraft at heliports located on property owned or leased by the City.

2.      There are three publicly owned heliports in the City available for public use: (1) the East 34th Street Heliport, (2) the West 30th Street Heliport, and (3) the Downtown Manhattan Heliport.

3.      The Downtown Manhattan and East 34th Street Heliports are owned by the City and managed by the New York City Economic Development Corporation (hereinafter referred to as "NYCEDC").

4.      These heliports support the City's economy, emergency services, and security network, and they are integral to sustaining businesses across industries, including helicopter tour companies and commuter transportation.

5.      Notwithstanding that crucial role, and in derogation of federal and state law, the City recently passed legislation (hereinafter referred to as "Res. No. 26-A") prohibiting all non-essential helicopter operations at the Downtown Manhattan and East 34th Street Heliports that exceed certain noise thresholds defined by the Federal Aviation Administration (hereinafter referred to as the "FAA").

6.      For over six decades, the FAA has exercised exclusive authority to regulate the use of American airspace under the Federal Aviation Act, 49 U.S.C. § 40101, *et seq*.

7.      Since 1990, the Airport Noise and Capacity Act, 49 U.S.C. § 47521 *et seq*. (hereinafter referred to as "ANCA"), has affirmatively preempted local laws that impose restrictions on aircraft noise levels and access to airports.  49 U.S.C. § 47524(c)(1)(A), (c)(1)(D). Through ANCA, Congress tasked the FAA with establishing a national aviation noise policy that would balance community and aviation interests.

8.      The FAA struck this balance by establishing regulations that prevent airports from implementing noise-related restrictions on aircraft operations, such as limiting certain types of aircraft, unless they comply with certain requirements for review, notice, and, in many cases, FAA approval.  See 14 C.F.R. Part 161.

9.      In relevant part, the FAA requires that airport proprietors examine the impacts of a proposed noise or access restriction within an airport noise study area.  The regulations distinguish between noise and access restrictions for aircraft that meet higher noise thresholds

(hereinafter referred to as "Stage 2 aircraft") and lower noise thresholds (hereinafter referred to as "Stage 3 aircraft").[1]

10.    Under ANCA, noise abatement policy is the exclusive province of the FAA.

11.    Res. No. 26-A impermissibly circumvents the FAA's plenary regulatory authority under ANCA by mandating that the heliport fixed base operators (hereinafter referred to as "FBOs") impose a total ban on the vast majority of non-essential helicopter operations in Manhattan.

12.    Res. No. 26-A purports to precondition the enactment of the ban on the FBOs' compliance with ANCA procedures applicable to restrictions on Stage 2 aircraft.  But this belated attempt to delegate the City's own obligations under federal law makes clear that Res. No. 26-A is nothing more than an attempted end-run around ANCA.

13.    ANCA requires that an airport proprietor seeking to impose any restriction on the operations of Stage 2 aircraft perform a detailed study prior to implementation.  The proprietor's obligations under ANCA include compliance with specific notice, economic cost-benefit analysis, and public comment requirements, as well as an assessment of less restrictive alternatives to the proposed restriction.

14.    Only if the proposed restriction passes muster after the completion of the ANCA study, and after an extensive public comment period, can the proprietor proceed to implement it.

15.    This comprehensive process, which takes significant time and comes at great cost to the airport proprietor, is intended to ensure that any restrictions on Stage 2 aircraft operations strike the appropriate balance between mitigating noise, maintaining access, and ensuring safety and are, in all events, well-considered.

---

[1] The noise standards for most aircraft are defined by the FAA in its regulations in terms of "stages" ranging from Stage 1, the noisiest aircraft class, to Stage 5, the quietest aircraft class.  See 14 C.F.R. Part 36.

16.     Here, the City has dictated by fiat its predetermined outcome: to ban all non-essential flights of a certain noise threshold in light of mounting political pressure and based on evidence that is tenuous at best.

17.     Restrictions on Stage 2 aircraft are subject to a deliberative process that emphasizes alternatives to outright bans for a reason.

18.     By enacting Res. No. 26-A, the City has reduced ANCA to an academic exercise. The FBOs have no discretion under the law, as written, to modify the City's proposed restriction based on the outcome of the deliberative process or public comment period.  Rather, the FBOs *must* impose the total ban envisioned by the City at the expiration of the deadline for public comment, if not before.

19.     The City has also improperly delegated its own duties under ANCA.

20.     The applicable regulations promulgated by the FAA mandate that the study, which requires an opportunity for public comment, be commissioned by the "airport operator." See 14 C.F.R. Part 161.

21.     Those regulations define an "airport operator" as an "airport proprietor."  See 14 C.F.R. § 161.5.

22.     In previously attempting to claim the benefit of the so-called proprietor exception to the FAA's plenary authority in the aviation sphere, the City has made clear that it considers itself the proprietor of the Downtown Manhattan and the East 34th Street Heliports.

23.     The City has also acknowledged that it is the proprietor of the Downtown Manhattan and the East 34th Street Heliports in applying for (and, in the case of the Downtown Manhattan Heliport, accepting) Airport Improvement Program (hereinafter referred to as "AIP") grants from the FAA.

24.     However, the City has elected to abdicate its obligations under ANCA to the FBOs of the subject heliports, in derogation of ANCA and its implementing regulations.

25.     The City, as an airport proprietor, must abide by the applicable procedures of ANCA and only then implement an appropriate, narrowly tailored restriction if that conclusion accords with the thorough and fulsome study that ANCA requires.

26.     What the City cannot do is codify a blanket ban on "non-essential" flights, a term of its own creation with no foundation in ANCA or any other FAA regulation and which curiously does not include newsgathering or commercial production activities, and then delegate to its FBOs the responsibility to conduct a post-hoc analysis with a pre-ordained conclusion.

27.     While Res. No. 26-A is ambiguous on its face as to whether it prohibits non-essential flights by aircraft that meet Stage 3 standards, it nevertheless runs afoul of ANCA.

28.     If Res. No. 26-A intends to prohibit non-essential helicopter flights by Stage 3 aircraft, it fails on its face to comply with ANCA and its implementing regulations, including affirmative approval of the restriction by either all operators or the FAA—which has *never* approved such a restriction.

29.     The law of this Circuit is clear that where a proposed restriction of this type violates ANCA, the proprietor exception, which requires that the restriction be reasonable and non-discriminatory, cannot save it.

30.     The necessary effect is that the restriction is federally preempted.

31.     Res. No. 26-A likewise runs afoul of the Federal Aviation Act.

32.     The Federal Aviation Act and relevant jurisprudence have made clear that aviation safety and aircraft operations are intended to be the exclusive province of the FAA, not local governments.

33.     49 U.S.C. § 40103(e) specifically precludes airports that have accepted any form of federal funding, which includes the Downtown Manhattan and the East 34th Street Heliports, from granting exclusive rights, including constructively.

34.     Res. No. 26-A is thus independently preempted under each of these federal statutes.

35.     To preserve the power of the federal government and the FAA, and based on the Court's equitable powers, Plaintiffs seek a declaratory judgment by this Court that Res. No. 26-A is preempted by federal law.

36.     In addition, Res. No. 26-A fails to comply with state environmental law requiring the City to properly assess the environmental impacts of legislation that will inevitably divert air traffic from the facilities in question.  No environmental assessment was even undertaken by the City.

37.     Among other things, Res. No. 26-A is likely to exacerbate congestion on helicopter flight paths to nearby John F. Kennedy International Airport (hereinafter referred to as "JFK") and LaGuardia Airport (hereinafter referred to as "LaGuardia").  Residents of the towns directly under those flight paths, where helicopters and other aircraft already fly overhead several times a day, will experience corresponding increases in noise and pollution.  Such residents, including Ms. Seskin, will be uniquely and adversely impacted by the City's legislation.

38.     Thus, Res. No. 26-A should be annulled as arbitrary and capricious pursuant to N.Y. C.P.L.R. (hereinafter referred to as "CPLR") § 7803(3).

## JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction over the first through third claims for relief, as those claims for relief arise under federal law.  28 U.S.C. § 1331.

40. Specifically, those claims for relief arise under the Supremacy Clause of the Constitution of the United States, U.S. CONST. art. VI, cl. 2, and federal statutes.

41. This Court has subject matter jurisdiction over the fourth claim for relief pursuant to 28 U.S.C. § 1367(a), as the claim is so related to the first through third claims for relief that it forms part of the same case or controversy under Article III of the United States Constitution.

42. Because an actual controversy within the Court's jurisdiction exists, this Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

43. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

44. A notice of claim pursuant to New York City Administrative Code § 7-201 or N.Y. Gen. Mun. Law § 50-e is not required.

## THE PARTIES

45. Plaintiff ERHC is a New Jersey non-profit organization incorporated in 1979 that represents the interests of helicopter pilots. The ERHC has an active outreach program to address concerns raised by residents relating to helicopters in New York. The ERHC has also established an email network focused on safety issues, airspace flight restrictions, noise abatement issues, and regulatory issues regarding helicopters in and around the New York metropolitan area.

46. Plaintiff VAI is a Virginia non-profit organization originally established as the California Helicopter Association in 1948. VAI represents all aspects of the vertical take-off and

7

landing industry and considers itself the global voice in promoting safety, community

compatibility, professionalism, innovation, and the economic viability of the industry.

47.     Plaintiff Victoria Seskin is an individual who resides in the Town of Hempstead,

Village of Garden City.  Her home is directly under a helicopter flight path to JFK and

LaGuardia Airports, and helicopters (and other aircraft) fly overhead several times a day.  She

will be uniquely and adversely impacted by air traffic diverted to JFK and LaGuardia Airports

caused by any restrictions on non-essential flights imposed at the East 34th Street and Downtown

Manhattan Heliports.

48.     Defendant City is a political subdivision of the State of New York.  The

legislative power of the City is vested in the 51-member New York City Council (hereinafter

referred to as the "City Council").

## FACTUAL ALLEGATIONS

### A.  Public-Use Heliports in New York City

49.     For the past fifty years, the City has been served by three publicly owned

heliports.[2]

50.     Two of those heliports, the East 34th Street and Downtown Manhattan Heliports,

are owned by the City.

51.     These heliports support the City's aviation network, providing economic, public

safety, and environmental benefits to the City and its residents.

52.     According to NYCEDC's Economic and Research Group, these heliports generate

an annual economic impact of, at minimum, $70 million and employ approximately 175 workers.

53.     The City's public-use heliports are a vital component of New York's economy.

---

[2] A fourth publicly owned heliport, located at East 60th Street, was closed in 1997.

8

54.     Together, they provide critical infrastructure as part of a much larger transportation network that supports emergency medical services, news gathering, educational services, non-profit organizations, law enforcement, tourism, and non-governmental organizations from across the globe.

55.     In 2012, a study authored by the director of the New York University Rudin Center for Transportation Policy and Management found that the three New York City-area heliports were crucial to the City's economy.

56.     A survey of corporate helicopter users estimated that an approximate "1 percent reduction in New York City-based employment by firms that regularly use helicopter services would result in a loss of 1,300 jobs and a reduction in the City's overall economic output of approximately $520 million."

**(i)     Downtown Manhattan Heliport**

57.     The Downtown Manhattan Heliport was established in 1960 by the New York City Department of Marine and Aviation and was originally operated by the Port Authority of New York and New Jersey.

58.     In 1983, following significant investment from the FAA, the Downtown Manhattan Heliport experienced a major rehabilitation.

59.     The Downtown Manhattan Heliport has received federal funding in the form of AIP grants and money from the Federal Emergency Management Agency (hereinafter referred to as "FEMA").

60.     In 2008, NYCEDC, a non-profit corporation, took over management of the heliport.

61.     In November 2024, NYCEDC announced a second major overhaul of the Downtown Manhattan Heliport and opened a Request for Proposals for a new FBO.

62.     In December 2024, NYCEDC announced Downtown Skyport, LLC as the new FBO to operate the Downtown Manhattan Heliport.

**(ii)     East 34th Street Heliport**

63.     The East 34th Street Heliport, a 40,400-square-foot facility located on a concrete wharf at East 34th Street and FDR Drive, opened in 1972.

64.     The East 34th Street facility has two terminal buildings and an underground fuel storage tank.

65.     Tourism activity at the East 34th Street Heliport ceased in 1997 after the City evicted the former tenant, National Helicopter.

66.     The East 34th Street Heliport is operated by its FBO, Atlantic Aviation FBO Inc.

67.     The East 34th Street Heliport has received federal funding from FEMA.

**(iii)     West 30th Street Heliport**

68.     The West 30th Street Heliport is owned by the Hudson River Park Trust, a public benefit corporation established in 1998.

69.     The West 30th Street Heliport is operated by its FBO, Air Pegasus Heliport, Inc.

**B.   *Int. No. 0026-2024***

**(i)     Original Legislation**

70.     On February 8, 2024, the City Council introduced Int. No. 0026-2024, sponsored by Majority Leader Amanda Farías, that would restrict non-essential helicopter operations at

City-owned heliports to helicopters powered fully by electric engines.

71.    That legislation defined a covered helicopter as "a rotary-wing aircraft powered by a combustion engine capable of vertical takeoff and landing," but excluded "helicopters powered fully by electric engines."  There are presently no electric powered helicopters in commercial use in New York.

72.    It further required that the "commissioner [] require any contracted entity operating, managing or otherwise responsible for a heliport on any property owned by the city of New York to prohibit covered helicopters from conducting non-essential flights to or from any city-owned heliport."

73.    The proposed legislation was referred to the Committee on Economic Development.

74.    The "Summary of Int. No. 26," dated January 10, 2024, stated that the effective date of the legislation was 180 days after enactment, and no report to the City Council was required.

75.    The summary did not classify the legislation as requiring an analysis under the New York State Environmental Quality Review Act (hereinafter referred to as "SEQRA").

76.    Numerous organizations and members of the aviation community submitted testimony to the City Council opposing the legislation, including the ERHC, the National Business Aviation Association (hereinafter referred to as "NBAA"), and the Aircraft Owners and Pilots Association (hereinafter referred to as "AOPA").

77.    As highlighted in AOPA's written testimony, reducing accessibility to the City's heliports would have significant adverse environmental, economic, and social impacts on the

City and would likely have a chilling effect on investment in aviation industries and infrastructure in New York.

78.     AOPA noted that attempts to ban non-essential helicopters would likely have a chilling effect on investment in aviation industries and infrastructure in New York.

79.     AOPA also explained that the proposed legislation was preempted by federal legislation and the FAA's exclusive oversight authority over noise generated by aircraft.

**(ii)    April 16, 2024, Hearing**

80.     Despite significant opposition, on April 16, 2024, the Committee on Economic Development held a Helicopter Noise and Safety Oversight Hearing to consider the proposed legislation.

81.     Prior to the hearing, the City Council issued a briefing paper and committee report titled "Oversight: Helicopter Noise and Safety."

82.     According to the report, at the hearing, the committee "w[ould] hear what efforts the City has made to mitigate noise and safety issues regarding corporate, charter, and tour flights by helicopters in our airspace," as well as consider "areas where federal or regional entities have jurisdiction over helicopter noise and safety regulations."

83.     At the hearing, Ms. Farías claimed that the legislation aimed to mitigate noise pollution, particularly its impacts on health and quality of life, and protect the safety of New Yorkers.

84.     According to Ms. Farías, "[m]ore need[ed] to be done to protect the health and safety of New Yorkers," which is why the City Council was "considering a . . . package of legislations [sic] today to address this problem from multiple angles."

85.    However, Ms. Farías failed to provide any environmental studies or other evidence to support her claims.

86.    Instead, Ms. Farías simply pointed to alleged noise complaints and safety concerns, claiming that "[o]ver the past five years, 3-1-1 has seen a staggering 2,329 percent increase in helicopter noise complaints" and, "[i]n addition to the noise issue, we have unfortunately seen several tragic helicopter accidents over the years that have raised major safety concerns."

87.    According to Jennifer Sun, NYCEDC's Executive Vice President, "about 4 percent of the [noise] complaints [we]re coming from the City-owned heliports, meaning that 96 percent of the complaints [we]re attributed to flights originating from other heliports outside of those that are City-operated."

88.    Of that 4%, NYCEDC's Director of Aviation added that only "1 percent of all flights [we]re tours from the heliport."

89.    Ms. Sun also testified that:

primary responsibility for the regulation of U.S. aviation and air transportation, including the establishment of a national aviation noise policy, and ultimate oversight of local airport noise and access restrictions, is vested in the FAA. As a result, the City and [NYC]EDC have limited ability to regulate traffic, access, and noise in New York City airspace. Where the City does have the ability to influence the industry is through our concession agreements with our operators where we can incentivize the industry to adopt cleaner and quieter technologies and promote diverse uses at the heliport.

90.    Ms. Sun further testified as follows:

Both [the Downtown Manhattan] and the East 34th Street heliports are already critical NYC facilities used by a wide range of entities and for a broad array of purposes, including hospitals for organ transplants, news outlets for reporting, the New York City Police and Fire Departments responding to emergency calls and other critical City operations as well as chartered, private, and tour flights. As the largest U.S. city and the U.S.

capital for international business, our City-operated heliports are essential to maintaining corporate competitiveness, ensuring life-sustaining and emergency operations, and maintaining our tourism sector. The heliports are also significant drivers of economic activity, providing a total economic impact of 78 million in the city and employing approximately 175 workers. As we envision the future role of our heliports in supporting the City's goals, it remains crucial to uphold their essential economic and logistical functions.

91.     Brittany Davies, Northeast Regional Director of NBAA, testified that "[a]s designated under . . . ANCA, only the [FAA] has authority to regulate aeronautical operations."

92.     Ms. Farías admitted that "the FAA has jurisdiction over flight paths and much of the airspace."

93.     Nonetheless, she indicated that the City Council sought to "use the tools at its disposal" to "leverag[e] the City's control over its heliports" and circumvent the FAA's authority.

94.     At the hearing, Int. No. 0026-2024 was laid over by committee.

**C.  _Res. No. 26-A_**

95.     On April 10, 2025, an aircraft operated by New York Helicopter Charter Inc. crashed, killing the pilot and a family of five tourists from Spain.

96.     On April 14, 2025, the FAA issued an emergency order suspending the company's operations.

**(i)     The Legislation**

97.     Using the outcry from the incident to its advantage, the City Council pushed through a swath of legislation aimed at curbing helicopter use across the City.

98.     On April 17, 2025, the City Council introduced Res. No. 26-A.

14

99.     Res. No. 26-A differs from the original version of the bill introduced on February 8, 2024, in several respects.

100.    Section 1 of Res No. 26-A takes effect on December 1, 2029.

101.    It defines "heliport" as a "designated land area used for helicopter operations and any appurtenant areas, including fueling facilities, terminal buildings and maintenance and repair facilities that is on property owned or leased by the city."

102.    It excludes from that definition "any heliport located at an airport operated by the port authority of New York and New Jersey."

103.    The legislation no longer restricts "non-essential" helicopter operations to electric aircraft.

104.    Instead, a "covered helicopter" is defined as follows:

a rotary-wing aircraft capable of vertical takeoff and landing. Such term does not include any helicopter with calculated noise levels, as indicated in appendix 10 or 11 to federal aviation administration advisory circular 36-1H, or any such successor document, that are not higher than the stage 3 noise limits[3] for the maximum takeoff weight of such helicopter set by the federal aviation administration, pursuant to section H36.305 of appendix H or section J36.305 of appendix J to part 36 of title 14 of the code of federal regulations.

---

[3] The FAA's Stage 3 noise limits are as follows:

  i)      For takeoff—For a helicopter having a maximum certificated takeoff weight of 176,370 pounds (80,000 kg) or more, the noise limit is 106 EPNdB, which decreases linearly with the logarithm of the helicopter weight (mass) at a rate of 3.0 EPNdB per halving of the weight (mass) down to 86 EPNdB, after which the limit is constant.
  ii)     For flyover—For a helicopter having a maximum certificated takeoff weight of 176,370 pounds (80,000 kg) or more, the noise limit is 104 EPNdB, which decreases linearly with the logarithm of the helicopter weight (mass) at a rate of 3.0 EPNdB per halving of the weight (mass) down to 84 EPNdB, after which the limit is constant.
  iii)    For approach—For a helicopter having a maximum certificated takeoff weight of 176,370 pounds (80,000 kg) or more, the noise limit is 109 EPNdB, which decreases linearly with the logarithm of the helicopter weight (mass) at a rate of 3.0 EPNdB per halving of the weight (mass) down to 89 EPNdB, after which the limit is constant.

14 C.F.R. § H36.305.

105.    Specifically, Section 1, subdivision (b) requires that "[t]he operator of any heliport [] prohibit covered helicopters from conducting non-essential flights to or from any such heliport, except as otherwise directed by an aviation control tower or air traffic control center or in emergency circumstances where such operation is necessary to protect life, property or the public health and safety."

106.    However, subsection (c) provides that "[p]rior to implementing the restrictions set forth in subdivision b of this section, the airport operator shall follow the procedure outlined in subsection (b) of section 47524 of title 49 of the United States code and subpart C of part 36 of title 14 of the code of federal regulations."

107.    Subsection (c) further dictates that "[s]uch restrictions shall not be implemented until 180 days after the publishing and public comment period required by such procedure have commenced."

108.    Section 2 of Res. No. 26-A also requires NYCEDC to submit to the Mayor and the City Council a report detailing the percentage of non-essential flights by covered helicopters during the previous calendar year, notwithstanding that NYCEDC has no authority to require operators to disclose whether their flights were "non-essential."   See, e.g., Helicopter Ass'n Int'l v. State of Hawai'i, 2024 WL 3509769 (D. Haw. July 22, 2024).

**(ii)    The Response and Enactment**

109.    On April 21, 2025, the ERHC, VAI, NBAA, AOPA, the General Aviation Manufacturers Association, and the National Air Transportation Association sent a joint letter on behalf of the aviation community to Ms. Farías and other sponsors and committee members

strongly opposing Res. No. 26-A.

110.     That letter outlined the "significant negative impacts" the legislation will have on the aviation community, including the "devastating economic and safety ramifications on New York City and the surrounding areas that rely on these heliports for air transportation, including emergency and medical transportation."

111.     The letter also counseled that Res. No. 26-A is preempted by the FAA's exclusive authority over aircraft operations and violated, *inter alia*, ANCA and SEQRA.

112.     On April 22, 2025, the City Council's Finance Division prepared a Fiscal Impact Statement to assess the economic impact of Res. No. 26-A.

113.     The statement concluded only that "that there would be a $210,000 reduction in annual permitting fees collected beginning in Fiscal [Year] 2030."

114.     On April 24, 2025, the Committee on Economic Development held a hearing to consider the package of proposed legislation aimed at regulating helicopter use.

115.     Ms. Farías made clear that Res. No. 26-A was specifically intended to target helicopter tours and commuter flights, stating that "[i]ntro 26 prohibits non-essential helicopter flights from operating out of city owned heliports unless they meet the most stringent FAA noise standards known as Stage 3. These restrictions apply to luxury sightseeing and commuter flights which use the loudest[,] most outdated aircrafts, and which overwhelmingly fly over neighborhoods like Lower Manhattan and Queens and in Brooklyn."

116.     Ms. Farías summarily concluded that the legislation "use[d] the power [the City Council] ha[s], our city contracts and heliport permits, our noise code and jurisdiction to raise the bar on safety and sustainability."

117.     Once again, the City conducted no environmental review of any type.

118.    Despite staunch opposition from the aviation community and blatant violations of federal and state law, the City Council passed Res. No. 26-A that same day and sent the bill to the Mayor's desk for signature.

119.    When the Mayor took no action on the legislation, on May 24, 2025, Res. No. 26-A became law.

120.    The ERHC's members include helicopter tour operators, charter services, and commuter air carriers who regularly use the Downtown Manhattan and East 34th Street Heliports for non-essential flights.

121.    Likewise, VAI has more than 17,000 members, which include both operators and suppliers in the vertical aviation industry.

122.    As a consequence of the City's legislation, ERHC and VAI members will be limited in conducting their current flights from City-owned heliports, resulting in loss of revenues, cancellation of scheduled services, and forced relocation to more distant facilities.

## FIRST CLAIM FOR RELIEF

### *(For Declaratory Judgment that Res. No. 26-A is Preempted by ANCA)*

123.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

124.    The Supremacy Clause mandates that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST. art. VI, cl. 2.

125.    "Under this principle, Congress has the power to preempt state law."  Arizona v. United States, 567 U.S. 387, 399 (2012) (internal citations omitted).

126.    "State law must also give way to federal law in at least two other circumstances." Id.

127. "First, the [s]tates are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." Id.

128. Field preemption lies where Congress has enacted a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it" or where there is a "federal interest [that] is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)

129. "Second, state laws are preempted when they conflict with federal law." Arizona, 567 U.S. at 399.

130. "This includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. at 399–400 (internal quotations omitted) (citing Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000); Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142–43 (1963); Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

131. The Court has held that "the pervasive nature of the scheme of federal regulation of aircraft noise [] leads us to conclude that there is pre-emption." City of Burbank v. Lockheed Air Terminal Inc., 411 U.S. 624, 633 (1973).

132. "[F]ederal courts have recognized federal preemption over the regulation of aircraft and airspace, subject to a complementary[,] though more limited[,] role for local airport proprietors in regulating noise levels at their airports." Nat'l Helicopter Corp. of Am. v. City of New York, 137 F.3d 81, 88 (2d Cir. 1998) (internal citations and quotations omitted).

19

133.    "Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxies onto a runway it is caught up in an elaborate and detailed system of controls."  Nw. Airlines v. State of Minnesota, 322 U.S. 292, 303 (1944) (Jackson, J., concurring).

134.    The proprietor exception to the general supremacy of federal regulation vests the proprietor "only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs." Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton, 841 F.3d 133, 139 (2d Cir. 2016) (citing Br. Airways Bd. v. Port Auth. of New York, 558 F.2d 75, 84 (2d Cir. 1977)).

135.    Those regulations "must be consistent with federal policy; other, noncomplementary exercises of local prerogative are forbidden."  Friends of the E. Hampton Airport, Inc., 841 F.3d at 139 (internal citations and quotations omitted); see also Br. Airways Bd., 558 F.2d at 82 ("Implicit in the federal scheme of noise regulation . . . is the assumption that this responsibility will be exercised in a fair, reasonable and nondiscriminatory manner."); Nat'l Helicopter Corp. of Am., 137 F.3d at 84–85.

136.    Put differently, "actions taken in violation of legal mandates are, by their nature, unreasonable and arbitrary."  Friends of the E. Hampton Airport, 841 F.3d at 153.

137.    On November 5, 1990, Congress passed ANCA to establish a "national aviation noise policy" that includes "a national program for reviewing airport noise and access restrictions on the operation of stage 2 and stage 3 aircraft."  See 47 U.S.C. § 47523(a) and 49 U.S.C. § 47524(a).

138.    The Congressional findings underpinning ANCA demonstrate that Congress viewed it as a means of increasing national aviation capacity while accommodating reasonable local noise concerns if they were consistent with that national purpose.

139.    Congress found, among other things, that "aviation noise management is crucial to the continued increase in airport capacity," "community noise concerns have led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system," and "a noise policy must be carried out at the national level." 49 U.S.C. § 47521(1)–(3).

140.    ANCA sets out uniform procedures and systems of review by which airport proprietors may seek to implement noise and access restrictions.

141.    The nature and extent of these procedures and review turn on the extent of the noise produced by the particular aircraft to be regulated by the proposed restrictions.

142.    The FAA classifies aircraft into five "Stages" of noisiness, from Stage 1 (noisiest) to Stage 5 (quietest). See 14 C.F.R. Part 36.

143.    This classification system serves Congress' goal of furthering noise abatement through technical developments (i.e., encouraging more sophisticated and less noisy aircraft) instead of direct access restrictions.

144.    Upon information and belief, most helicopters in current operation in the U.S. and in New York meet the thresholds of Stage 2.

145.    Under ANCA, airport proprietors may impose noise or access restrictions on Stage 2 aircraft "only if the airport operator publishes the proposed restriction and prepares and makes available for public comment at least 180 days before the effective date of the proposed restriction 1) an analysis of the anticipated or actual costs and benefits of the existing or

proposed restriction; 2) a description of alternative restrictions; 3) a description of the alternative measures considered that do not involve aircraft restrictions; and 4) a comparison of the costs and benefits of the alternative measures to the costs and benefits of the proposed restriction." 49 U.S.C. § 47524(b)(1); 14 C.F.R. § 161.205(a). The process is both expensive to implement and time consuming.

146.    As part of this analysis, the airport proprietor must prepare a study, using federally prescribed methods, of noise levels at the airport and surrounding areas and of the exposure of individuals to noise created by airport operations.

147.    The airport operator also must (1) "use the noise measurement systems and identify the airport noise study area as specified in §§ 161.9 and 161.11," (2) "use currently accepted economic methodology," and (3) "provide separate detail on the costs and benefits of the proposed restriction." 14 C.F.R. § 161.205(b).

148.    The regulations also require that an airport operator "publish a notice of the proposed restriction in an areawide newspaper or newspapers that either singly or together has general circulation throughout the airport noise study area" and "post a notice in the airport in a prominent location accessible to airport users and the public." 14 C.F.R. § 161.203(b).

149.    The airport operator must "directly notify in writing" the following parties:

(1)    "[a]ircraft operators providing scheduled passenger or cargo service at the airport; operators of aircraft based at the airport; potential new entrants that are known to be interested in serving the airport; and aircraft operators known to be routinely providing nonscheduled service that may be affected by the proposed restriction";
(2)    the FAA;[4]
(3)    "[e]ach Federal, state, and local agency with land-use control jurisdiction within the airport noise study area";
(4)    "[f]ixed-base operators and other airport tenants whose operations may be affected by the proposed restriction"; and

---

[4] The FAA must be provided with "a full text of the proposed restriction, including any sanctions for noncompliance." 14 C.F.R. § 161.203(d).

(5)    "[c]ommunity groups and business organizations that are known to be interested in the proposed restriction."

14 C.F.R. § 161.203(b).

150.    That notice must include:

(1)    "[t]he name of the airport and associated cities and states";
(2)    "[a] clear, concise description of the proposed restriction, including a statement that it will be a mandatory Stage 2 restriction, and where the complete text of the restriction, and any sanctions for noncompliance, are available for public inspection";
(3)    "[a] brief discussion of the specific need for, and goal of, the restriction";
(4)    "[i]dentification of the operators and the types of aircraft expected to be affected";
(5)    "[t]he proposed effective date of the restriction, the proposed method of implementation (e.g., city ordinance, airport rule, lease), and any proposed enforcement mechanism";
(6)    "[a]n analysis of the proposed restriction, as required by § 161.205 of this subpart, or an announcement of where the analysis is available for public inspection";
(7)    "[a]n invitation to comment on the proposed restriction and analysis, with a minimum 45-day comment period";
(8)    "[i]nformation on how to request copies of the complete text of the proposed restriction, including any sanctions for noncompliance, and the analysis (if not included with the notice)"; and
(9)    "[t]he address for submitting comments to the airport operator, including identification of a contact person at the airport."

14 C.F.R. § 161.203(c).

151.    The airport operator also must "establish a public docket or similar method for receiving and considering comments" and "make comments available for inspection by interested parties upon request." 14 C.F.R. § 161.207.

152.    The public comment requirement is designed to give those who might be adversely affected an opportunity to participate in the decision-making process.

153.    The FAA is also required to publish an announcement of the proposed restriction in the Federal Register. 14 C.F.R. § 161.203(e).

154.    Restrictions on Stage 3 aircraft are even more stringent.

155.    Those restrictions may only be implemented if "agreed to by the airport proprietor and all aircraft operators or [] submitted to and approved by the Secretary of Transportation after an airport or aircraft operator's request for approval as provided by the program established under this section."  49 U.S.C. § 47524(c)(1).

156.    The Secretary of Transportation must evaluate specific factors in assessing proposed Stage 3 restrictions.

157.    The Secretary of Transportation must "find[] on the basis of substantial evidence that:

(A) the restriction is reasonable, nonarbitrary, and nondiscriminatory;
(B) the restriction does not create an unreasonable burden on interstate or foreign commerce;
(C) the restriction is not inconsistent with maintaining the safe and efficient use of the navigable airspace;
(D) the restriction does not conflict with a law or regulation of the United States;
(E) an adequate opportunity has been provided for public comment on the restriction; and
(F) the restriction does not create an unreasonable burden on the national aviation system.

49 U.S.C. § 47524(c)(2)(A)–(F).

158.    Res. No. 26-A purports to restrict all non-essential helicopters above certain noise thresholds defined by the FAA.

159.    Res. No. 26-A is therefore a noise and access restriction that falls within the auspices of ANCA.

160.    Res. No. 26-A, on its face, requires as a precondition to imposing restrictions that the FBOs "follow the procedure outlined in subsection (b) of section 47524 of title 49 of the United States code."

161.    As set forth above, this procedure concerns restrictions on Stage 2 aircraft.  14 C.F.R. Part 161, Subpart C.

162.    It is inherently arbitrary for the City to mandate the imposition of a restriction before the City has complied with ANCA.

163.    It is likewise arbitrary for the City to purport to direct the FBOs to perform the requisite study "[p]rior to implementing" the City's preordained restriction, without any provision for the City's consideration of the results of the study or any alternative and less restrictive measures.

164.    ANCA mandates a robust process that explicitly requires comprehensive consideration of both the costs and benefits of the proposed restriction and less restrictive options prior to the imposition of any restrictions.

165.    An outright ban on most helicopter traffic based on *ad hoc* community concerns about noise cannot be the least restrictive option, where the data indicates that helicopters using the publicly owned heliports only constitute a small fraction of the purported evil the City is seeking to remedy.

166.    ANCA further requires a specific form of notice to be given to affected parties, including the FAA, and that there be an opportunity for the general public to comment on the proposed restriction.

167.    Moreover, upon information and belief, the "essential" flights carved out by the legislation all suffer from the same noise issues as the "non-essential" flights.

168.    Non-essential flights also include those conducted on behalf of a "newsgathering organization" and "film, television or commercial photography production activities conducted for a commercial purpose."

169. Res. No. 26-A is also arbitrary by virtue of its failure to assess the consequences of the law to the City generally and locations to which helicopter traffic will be diverted, including the already congested JFK and LaGuardia Airports, particularly.

170. If the Downtown Manhattan and the East 34th Street Heliports are closed to "non-essential" traffic, the traffic will necessarily divert to other heliports, including the West 30th Street Heliport, as well as JFK and LaGuardia Airports.

171. Paying lip service to a federal statute while mandating a particular outcome is nothing more than an end-run around ANCA.

172. The suggestion that the restrictions cannot be implemented "until 180 days after the publishing and public comment period . . . ha[s] commenced" make plain that the City has no intention of completing a proper study under ANCA, which can take years. Further, that the restrictions are effective after the purported study is concluded presupposes that the restrictions are consistent with the results of any study.

173. Additionally, Res. No. 26-A puts the onus of complying with ANCA and its implementing regulations on what the City labels the "airport operator."

174. The requirements for a Stage 2 study in 14 C.F.R. Part 161, Subpart B, are tasks for the "airport operator." See also 48 Fed. Reg. 48661 (Sept. 25, 1991) (promulgating and further elaborating upon the requirements of 14 C.F.R. Part 161).

175. However, unlike Res. No. 26-A, 14 C.F.R. § 161.5 defines an "airport operator" as the "airport proprietor."

176. Thus, the City itself, as the owner of the Downtown Manhattan and the East 34th Street Heliports, is required to undertake the study and otherwise ensure compliance with ANCA and its implementing regulations. There is no provision in federal law or regulation to delegate

that compliance to an FBO, nor could an FBO fulfill all of the mandated obligations, which presume governmental powers.  For example, an FBO is plainly unable to comply with 14 C.F.R. § 161.207, which requires a public docket, and the retention of the comments received as long as the restriction is in effect.

177.    The City has given no indication that it intends to comply with ANCA.

178.    Instead, Res. No. 26-A seeks to avoid the City's obligations under ANCA by delegating to the FBOs which operate the heliports.

179.    The City cannot both claim the proprietor exception to impose the restrictions, as it has previously, and then disclaim responsibility set out under ANCA for an airport proprietor. It is the City's responsibility to undertake the study as required by ANCA.

180.    Upon information and belief, only a handful of Stage 2 studies have ever been undertaken, as the studies take significant time and come at great cost.

181.    While the FAA is not empowered to specifically approve Stage 2 restrictions, it has the authority to identify and take action based on deficiencies in a Stage 2 study, including by withholding approval for federal funding and discretionary grants.  See City of Naples Airport Auth. v. Federal Aviation Admin., 409 F.3d 431, 434–35 (D.C. Cir. 2005).

182.    Thus, neither ANCA nor the FAA sanction perfunctory Stage 2 studies.

183.    Res. No. 26-A makes no provision as to who would bear the cost of a Stage 2 study, thus implicitly shifting the cost to the FBOs by directing them to conduct the analysis.

184.    The legislation purports to exclude from the definition of a covered helicopter "any helicopter with calculated noise levels . . . that are not higher than the stage 3 noise limits."

27

185.    To the extent the legislation is intended to or has the effect of prohibiting Stage 3 aircraft, the process for imposing restrictions on Stage 3 aircraft is even more burdensome than that for Stage 2 aircraft.

186.    To regulate Stage 3 aircraft, ANCA requires either (1) agreement by the airport proprietor *and all aircraft operators* or (2) approval by the FAA subject to conditions stricter than for Stage 2.

187.    Upon information and belief, since the enactment of ANCA, the FAA has never approved a noise and access restriction on Stage 3 aircraft.

188.    Accordingly, Plaintiffs respectfully request a declaratory judgment that Res. No. 26-A is preempted by ANCA.

## SECOND CLAIM FOR RELIEF
### (*For Declaratory Judgment that Res. No. 26-A is Preempted by the FAA's Authority to Regulate Safety*)

189.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

190.    In 1958, Congress passed the Federal Aviation Act "for the purpose of centralizing in a single authority— indeed, in one administrator— the power to frame rules for the safe and efficient use of the nation's airspace."  Air Line Pilots Ass'n, Intern. v. Quesada, 276 F.2d 892, 894 (2d Cir. 1960).

191.    Under the Act, the FAA was given exclusive authority to regulate, *inter alia*, noise and safety.

192.    The FAA has promulgated the Federal Aviation Regulations, codified in Title 14 of the Code of Federal Regulations, which prescribe certain standards of care for the aviation industry.

193.   The "interdependence" of "safety and efficiency," on one hand, and "protection of persons on the ground," on the other, "requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled." City of Burbank v. Lockheed Air Term. Inc., 411 U.S. 624, 638–39 (1973).

194.   The Second Circuit has made clear that the Federal Aviation Act "impliedly preempts the entire field of air safety." Tweed-New Haven Airport Auth. v. Tong, 930 F.3d 65, 74 (2d Cir. 2019) (internal quotations and citations omitted).

195.   Therefore, "[s]tate laws that conflict with the FAA or sufficiently interfere with federal regulation of air safety are thus preempted." Fawemimo v. Am. Airlines, Inc., 751 F. App'x 16, 19 (2d Cir. 2018) (summary order).

196.   Where "Congress' intent to supersede state law altogether may be inferred because the scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . . the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982) (internal citations and quotations omitted) (cleaned up).

197.   Res. No. 26-A was enacted to "address helicopter noise and safety."

198.   Ms. Farías stated that the legislation's intent is to "moderniz[e] policy to meet the moment — a moment defined by urgent need to reduce emissions, protect public health, and modernize for safety."

199.   She further stated that "[t]his bill uses the power we have, our city contracts and heliport permits, our noise code and jurisdiction to *raise the bar on safety* and sustainability." (emphasis added).

200.     It is thus abundantly clear that Res. No. 26-A is "on the same subject" in an area of dominant federal interest and sufficiently implicates air safety such that it infringes upon the FAA's exclusive authority under the Federal Aviation Act.  Fid. Fed. Sav. & Loan, 458 U.S. at 153.

201.     Accordingly, Plaintiffs respectfully request a declaratory judgment that Res. No. 26-A is preempted by the Federal Aviation Act.

## THIRD CLAIM FOR RELIEF
### (For Declaratory Judgment that Res. No. 26-A is Preempted by 49 U.S.C. § 40103(e))

202.     Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

203.     In 1982, Congress passed the Airport and Airway Improvement Act of 1982 (hereinafter referred to as the "AAIA").  49 U.S.C. § 47101 et seq.

204.     The AAIA authorizes the FAA to grant federal funds to public airports for construction and other improvement projects.

205.     The FAA may only approve such grants after receiving "written assurances" that the airport will comply with various statutory requirements, including that it "will be available for public use on reasonable conditions and without unjust discrimination," and that "a person providing, or intending to provide, aeronautical services to the public will not be given an exclusive right to use the airport."  49 U.S.C. § 47107(a)(1), (a)(4).

206.     Upon receipt of federal funds, the recipient is prohibited from granting an exclusive right for the use of the subject airport for an aeronautical activity under 49 U.S.C. §§ 40103(e) and 47107(a)(4).

207.     49 U.S.C. § 40103, entitled "Sovereignty and use of airspace," provides that "[t]he United States Government has exclusive sovereignty of airspace of the United States."

208.    Under the statute, airports that have accepted federal funding, including, but not limited to, FAA grants, are prohibited from imposing "exclusive rights." 49 U.S.C. § 40103(e).

209.    "An 'exclusive right' is a power, privilege, or other right excluding or debarring another or others from enjoying or exercising a like power, privilege, or right." 41 N. 73 W., Inc. v. U.S. D.O.T., 408 F. App'x 393, 400 (2d Cir. 2010) (internal quotations and citations omitted).

210.    "Such a right is constructively granted when the imposition of unreasonable standards or requirements has the practical effect of imposing a significant burden on an entity's ability to engage in a particular aeronautical activity." Id. (internal citations and quotations omitted).

211.    Both the Downtown Manhattan and the East 34th Street Heliports have received federal funding.

212.    The Downtown Manhattan Heliport accepted $6 million in federal AIP funding in the mid-1980s for the reconstruction of the facility.

213.    Notwithstanding that most of the assurances associated with those AIP grants have expired, 49 U.S.C. § 40103(e) remains in effect at the Downtown Manhattan Heliport.

214.    Additionally, in the aftermath of Hurricane Sandy, both the East 34th Street Heliport and the Downtown Manhattan Heliport accepted FEMA grants for diving inspections.

215.    The Downtown Manhattan Heliport further accepted a FEMA grant for repairs to its facilities.

216.    Thus, 49 U.S.C. § 40103(e) applies to both the Downtown Manhattan and the East 34th Street Heliports.

217.    Here, Res. No. 26-A conflicts with the federal legislative scheme set forth in 49 U.S.C. §§ 40103(e) and 47107(a)(4), as it unjustly discriminates against what the City characterizes as non-essential flights and, conversely, provides exclusive rights to what the City characterizes as essential flights.

218.    Accordingly, Plaintiffs respectfully request a declaratory judgment that Res. No. 26-A is preempted by 49 U.S.C. § 40103(e).

## FOURTH CLAIM FOR RELIEF
### *(For Judgment Pursuant to CPLR § 7803)*

219.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

220.    CPLR § 7803(3) authorizes a petitioner to raise in a special proceeding before Supreme Court "whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed."

221.    Agency action will be overturned as "arbitrary and capricious" where "the record shows that the agency's action was 'arbitrary, unreasonable, irrational or indicative of bad faith.'" Matter of Zutt v. State of New York, 949 N.Y.S.2d 402, 412 (N.Y. App. Div. 2d Dep't 2012) (quoting Matter of Halperin v. City of New Rochelle, 809 N.Y.S.2d 98, 103 (N.Y. App. Div. 2d Dep't 2005)).

222.    In 1975, the New York State Legislature enacted SEQRA.

223.    SEQRA is designed "to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources."  N.Y. ENVTL. CONSERV. LAW (hereinafter referred to as "ECL") § 8-0101.

224.    It requires prior analysis of the impact of a discretionary governmental action that is likely to have a significant adverse impact on the environment.

225.    That analysis must be conducted according to thorough procedures established by the New York State Department of Environmental Conservation and codified at N.Y. Comp. Codes R. & Regs. (hereinafter referred to as "N.Y.C.R.R.") tit. 6, Part 617.

226.    SEQRA requires that all agencies determine whether the actions they undertake, fund, or approve may have a significant adverse impact on the environment.

227.    The legislature intends that "all agencies which regulate activities of individuals, corporations, and public agencies which are found to affect the quality of the environment shall regulate such activities so that due consideration is given to preventing environmental damage." ECL § 8-0103(8); see also 6 N.Y.C.R.R. § 617.1(c).

228.    An environmental review must assess all "reasonably related short-term and long-term impacts, cumulative impacts and other associated environmental impacts."  6 N.Y.C.R.R. § 617.9(b)(5)(iii)(a).

229.    SEQRA regulations define an "agency" as "a State or local agency."  6 N.Y.C.R.R. § 617.2(c).

230.    Under SEQRA, "'[l]ocal agency' means any local agency, board . . . or governing body, including any city, county, and other political subdivision of the state."  ECL § 8-0105(2).

231.    The City Council is an agency within the meaning of SEQRA and is responsible for satisfying the requirements of SEQRA prior to passing legislation.

232.    To have standing to bring a SEQRA claim, a party must demonstrate "cognizable injury they would suffer," which is "different in kind or degree from the public at large." Gardner v. City of Yonkers, 694 N.Y.S.2d 465, 466 (N.Y. App. Div. 2d Dep't 1999).

233.    Plaintiff Victoria Seskin lives in Garden City, New York, directly under the flight path of helicopter approach to JFK and LaGuardia Airports.

234.    If non-essential helicopter flights are banned at the East 34th Street and Downtown Manhattan Heliports, a portion of these flights will be diverted to the heliports at JFK and LaGuardia Airports.

235.    Plaintiff Victoria Seskin is concerned that an increase in air traffic to JFK and LaGuardia Airports will result in significant noise issues.

236.    Plaintiff Victoria Seskin is concerned that a diversion of air traffic to JFK and LaGuardia Airports will exacerbate the noise she already lives with and will lead to unbearable levels of noise that will significantly and detrimentally affect her life.

237.    Plaintiff Victoria Seskin is further concerned about an increase in pollution that will result from an increase in air traffic to JFK and LaGuardia Airports.

238.    SEQRA defines agency "actions" to include "projects or activities" that are "directly undertaken by any agency," "supported in whole or part through contracts, grants, subsidies, loans, or other forms of funding assistance from one or more agencies," or "involving the issuance to a person of a lease, permit, license, certificate or other entitlement for use or permission to act by one or more agencies."  ECL § 8-0105(4).

239.    Under SEQRA, agency actions are to be classified as "Type I", "Type II" or "Unlisted."  See 6 N.Y.C.R.R. §§ 617.4–617.6.

240.    While the procedural requirements applicable to an action vary based on these classifications, the ultimate obligation is for the agency taking the action to determine whether the action may have any significant adverse environmental impact.  6 N.Y.C.R.R. § 617.7(a).

241.    Type I actions are defined through a non-exhaustive list of actions.  A Type I action is one that "carries with it the presumption that it is likely to have a significant adverse impact on the environment."  6 N.Y.C.R.R. § 617.4(a)(1).

242.    Type I actions also include "any Unlisted action . . . occurring wholly or partially within or substantially contiguous to any publicly owned or operated parkland, recreation area or designated open space."  6 N.Y.C.R.R. § 617.4(b)(10).

243.    "Type II" actions are specifically enumerated in 6 N.Y.C.R.R. § 617.5 and are defined as "[a]ctions or classes of actions" that have been "determined not to have a significant impact on the environment."  6 N.Y.C.R.R. § 617.5(a).

244.    Type II actions are defined through a list of minor and routine agency actions as set forth in 6 N.Y.C.R.R. § 617.5.

245.    Any agency action that is not identified as a Type I or Type II action in 6 N.Y.C.R.R. § 617 is an Unlisted Action.  6 N.Y.C.R.R. § 617.2(al).

246.    Under SEQRA, an agency may not decide to approve or disapprove a Type I or Unlisted Action until it has completed the SEQRA process.  See 6 N.Y.C.R.R. § 617.3(a) ("No agency involved in an action may undertake, fund or approve the action until it has complied with the provisions of SEQR[A]."); 6 N.Y.C.R.R. § 617.6(a)(1)(i).

247.    As early as possible in an agency's formulation of an action, it must determine if the action is subject to SEQRA.  6 N.Y.C.R.R. § 617.6(a)(1).

248.    The first mandatory step for a Type I or Unlisted action is the completion of an Environmental Assessment Form (hereinafter referred to as "EAF") to determine the environmental significance of the action.  6 N.Y.C.R.R. § 617.6(a)(2)–(3).

249.    A full EAF must be used for Type I Actions, while for Unlisted Actions the agency may use either a full EAF or a short form EAF.  See id.; 6 N.Y.C.R.R. § 617.20, Appendices A and B.

250.    After completing the EAF, the agency must determine if the contemplated action may have any significant adverse environmental impacts.  6 N.Y.C.R.R. § 617.7(a)–(b).

251.    This determination entails a thorough analysis of the relevant areas of environmental concern.  6 N.Y.C.R.R. § 617.7(b)(3).

252.    The agency's conclusion is then set forth in a positive declaration if a significant adverse environmental impact exists, or a negative declaration if the action does not have such an impact.  See, e.g., 6 N.Y.C.R.R. § 617.12.

253.    SEQRA's definition of "environment" is expansive.  See 6 N.Y.C.R.R. § 617.2(l).

254.    An agency action may be found to have a "significant adverse impact" on the environment if the action might result in, among other things, (1) a substantial adverse change in existing air quality, ground or surface water quality or quantity, traffic or noise levels or solid waste production, (2) encouraging or attracting a large number of people to a place for more than a few days, compared with the number of people who would come to such place absent the action, or (3) impairment of existing community or neighborhood character.  6 N.Y.C.R.R. § 617.7(c).

255.    For Type I actions, both a positive and a negative declaration of significance must be made readily accessible and available to the public upon request.  6 N.Y.C.R.R. § 617.12(b).

256.    Further, notice must be published in the Environmental Notice Bulletin.  6 N.Y.C.R.R. § 617.12(c).

257.    Following positive declarations of significance, an agency is prohibited from taking further action until an Environmental Impact Statement (hereinafter referred to as an "EIS") is completed.  See 6 N.Y.C.R.R. § 617.9(b).

258.    The content of an EIS is subject to detailed regulatory requirements.  6 N.Y.C.R.R. § 617.9(b)(5).

259.    Here, despite receiving letters from the public and conducting multiple public hearings, which, *inter alia*, highlighted numerous concerning environmental effects of the legislation, the City failed to determine whether the action is subject to SEQRA and categorize the action as either Type I, Type II, or Unlisted.

260.    The administrative record contains only two Committee Reports that do little more than regurgitate the history of heliports in New York, recite speculative harms, and offer a cursory description of the proposed legislation.

261.    Nowhere in the reports does the City include a qualitative or quantitative analysis of the legislation's environmental consequences, even though council members touted the purported environmental benefits of the legislation.

262.    Moreover, banning "non-essential" helicopters will not limit their demand but merely displace it.

263.    Tour operators and other non-essential helicopter services will simply move their operations elsewhere.

264.    Those heliports, airports, and their surrounding residents will be forced to contend with the drastic spike in demand from companies looking to use those heliports and airports for their operations, with significant environmental, social, and economic repercussions.

265.    First, passengers will need to commute longer distances to board flights, worsening traffic and increasing idling emissions.

266.    Second, companies will shift their operations to sites that are not under any form of City control, *e.g.*, tourist flights based in Jersey City or Hoboken.

267.    Third, implementing "non-essential" or "noise" restrictions will inadvertently increase the number of helicopters in holding patterns above neighborhoods and sensitive sites in New York City, resulting in air congestion and potential safety considerations.  The legislation will also significantly increase air traffic to other venues such as the West 30th Street Heliport and JFK and LaGuardia Airports.

268.    Fourth, limiting access to City-owned heliports will jeopardize the livelihoods of employees in the helicopter tourism industry, who may be forced to relocate or lose their jobs.

269.    None of these environmental and economic concerns were raised, let alone addressed, by the City before enacting the legislation.

270.    Rather, the City enacted the law upon a record entirely bereft of environmental review, ignoring its obligation to identify and evaluate environmental impacts.  6 N.Y.C.R.R. § 617.3(a).

271.    By failing to follow SEQRA, the City failed to reach the required "balance of social, economic and environmental factors" in its planning and decision-making processes as required under SEQRA.  6 N.Y.C.R.R. § 617.1(d).

272.    Res. No. 26-A is also arbitrary and capricious insofar as it fails to address the noise concerns and safety issues purportedly driving the legislation.

273.    NYCEDC itself has conceded that only 4% of all 3-1-1 helicopter noise complaints are the result of helicopter flights from the Downtown Manhattan or East 34th Street Heliports.

274.    Moreover, only 1% of those complaints are caused by tourism companies.

275.    The legislation will also dismantle a multi-million-dollar industry.

276.    As the Downtown Manhattan Heliport is the only heliport in Manhattan that allows sightseeing flights, the Manhattan aviation tourism industry will be forced to shutter or move its operations, displacing hundreds of workers and undercutting ancillary industries.

277.    Accordingly, Plaintiffs respectfully request that this Court issue an order and judgment vacating, annulling, and invalidating Res. No. 26-A as arbitrary and capricious in violation of CPLR § 7803(3).

**WHEREFORE**, Plaintiffs respectfully request that this Court grant judgment in its favor as follows:

(a) On the first claim for relief, finding that Res. No. 26-A is preempted by ANCA;

(b) On the second claim for relief, finding that Res. No. 26-A is preempted by the Federal Aviation Act;

(c) On the third claim for relief, finding that Res. No. 26-A is preempted by 49 U.S.C. § 40103(e);

(d) On the fourth claim for relief, finding that the City's actions were affected by an error of law as well as arbitrary and capricious for failure to abide by the requirements of SEQRA in violation of CPLR § 7803(3); and

(e) Granting such further and additional relief as the court deems just and proper.

Dated: New York, New York
August 22, 2025

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By:_____

James M. Catterson
Brianna S. Walsh
Stephanie LaGumina
Danielle Stefanucci
31 West 52nd Street
New York, NY 10019-6131
Phone: 212.858.1000
Fax:    212.858.1500
james.catterson@pillsburylaw.com
brianna.walsh@pillsburylaw.com
stephanie.lagumina@pillsburylaw.com
danielle.stefanucci@pillsburylaw.com

*Attorneys for Plaintiffs the Eastern Region
Helicopter Council and Vertical Aviation
International*

**HOLWELL SHUSTER & GOLDBERG LLP**

By:_____

Jayme Jonat
425 Lexington Avenue
New York, NY 1006
Phone: 646,837.8455
jjonat@hsgllp.com

*Attorneys for Plaintiff Victoria Seskin*