**Exhibit "A"**

1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

--------------------------------x
                                :
EASTERN REGION HELICOPTER       :    25-CV-4682 (NGG)
COUNCIL, ET AL.                 :
                                :
            Plaintiffs,         :    United States Courthouse
                                :    Brooklyn, New York
         -against-              :
                                :    December 15, 2025
CITY OF NEW YORK,               :    2:30 p.m.
                                :
            Defendant.          :
                                :
--------------------------------x

        TRANSCRIPT OF CIVIL CAUSE FOR PREMOTION CONFERENCE
           BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
             SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES

For the Plaintiffs      PILLSBURY WINTHROP SHAW PITTMAN LLP
Eastern Region and            31 West 52nd Street
Vertical Aviation:            New York, New York 10019
                        BY:   JAMES M. CATTERSON, ESQ.
                              DANIELLE STEFANUCCI, ESQ.

For the Plaintiff       HOLWELL SHUSTER & GOLDBERG LLP
Victoria Seskin:              425 Lexington Avenue
                              New York, New York 10017
                        BY:   JAMES MCGUIRE, ESQ.

For the Defendant:      NEW YORK CITY LAW DEPARTMENT
                              100 Church Street
                              New York, New York 10007
                        BY:   OWANEMI ABIYE BRIGGS, ESQ.
                              AIMEE KARA LULICH, ESQ.
                              NATHAN TAYLOR, ESQ.

Court Reporter:         LINDA A. MARINO
                              225 Cadman Plaza East
                              Brooklyn, NY 10021
                              lindacsr@aol.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

                        Linda A. Marino, Official Court Reporter

Proceedings                                    2

THE COURTROOM DEPUTY:  Civil cause for a premotion conference.  Beginning with the Plaintiffs, please state your appearances.

MR. CATTERSON:  James M. Catterson and Danielle Stefanucci, Pillsbury Winthrop Shaw Pittman.

THE COURT:  Good afternoon.

MR. CATTERSON:  Good afternoon, Judge.

MR. MCGUIRE:  James McGuire, Holwell Shuster & Goldberg, for Plaintiff Victoria Seskin.

THE COURT:  Nice to see you both.

And you are Ms.?

MS. STEFANUCCI:  Ms. Stefanucci, your Honor.

THE COURT:  Yes, welcome.

MS. STEFANUCCI:  Good afternoon.

MS. LULICH:  Good afternoon.  Aimee Lulich on behalf of the City, and I'll let my colleagues introduce themselves.

MS. BRIGGS:  Owanemi Briggs on behalf of the City.

MR. TAYLOR:  Nathan Taylor on behalf of the City.

THE COURT:  Please be seated, everybody.

So, what's this case about?

MR. CATTERSON:  The City passed Local Law 64 --

THE COURT:  When was that?

MR. CATTERSON:  It was passed in the summer and it became law when the Mayor did not exercise his veto over it. It ultimately requires closure of the two East Side heliports

Linda A. Marino, Official Court Reporter

Proceedings                                    3

to nonessential air traffic.

Having litigated an ANCA case before on East Hampton Airport, we were engaged by two of the helicopter associations -- the premier ones on the East Coast -- because the City didn't comply with ANCA and Judge McGuire's client did no SEQRA analysis of any type.

And that was the genesis of the case, Judge.

THE COURT:  I see.  And it was originally brought in Central Slip and then?

MR. CATTERSON:  And then it was shifted here on venue grounds by the magistrate judge.

THE COURT:  It's not venue.  It's not venue.

MR. CATTERSON:  Yes, your Honor.

THE COURT:  Wrong reason, but the rules of the court permit it to be either there or here.

MR. CATTERSON:  It wasn't worth fighting over, Judge.  We're just as happy to be here as we were in the Central Islip courthouse, the individual Plaintiff, of course, residing in Garden City, which is why the case was brought there.

THE COURT:  The individual plaintiffs are whose clients?

MR. MCGUIRE:  Mine, your Honor.

There's a single individual plaintiff.

THE COURT:  And what is the -- thank you very much,

Linda A. Marino, Official Court Reporter

Proceedings                                                4

Mr. Catterson.

What is the individual plaintiff's basis for bringing this litigation?

MR. MCGUIRE:  It's on the SEQRA side, your Honor.

Let me begin by saying that my partner, Jayme Jonat, who is handling this case, flew out for depositions on the West Coast.  I'm kind of standing in here.  I was involved with Judge Catterson in the prior East Hampton litigation.

So, I'm not really terribly conversant, but I do know that our client, my firm's client, lives, as Judge Catterson said, we contend, in an area that will be effected by the inevitable diversion of helicopters; and, therefore, there's an agreed person --

THE COURT:  We'll get to the diversion of helicopters.

Do you know what the diversion will constitute, Mr. Catterson?

MR. CATTERSON:  Yes, Judge.

As it stands now, with the East Side heliports open, traffic coming from the east, whether it's from East Hampton, Boston, Rhode Island, anywhere from the east, follows the south shore route, the Sierra route, and then curves north to the East Side heliports past Nassau County.

The diversion, we contend, as set out in the complaint, once the East Side heliports are closed, there's

Linda A. Marino, Official Court Reporter

Proceedings                                             5

only one other heliport in Manhattan, and that's the west side heliport, which has only four slots.  It can't handle any more traffic than it already has.

The divergent helicopters will have to go either to JFK or LaGuardia.

Oddly, the flight path on a diversion to JFK or LaGuardia goes up the Meadowbrook -- it doesn't go out down towards the Rockaways anymore, it goes up the Meadowbrook, hangs a left, goes straight over Garden City, and then diverts north and south either to LaGuardia or JFK.

I know you have a passing familiarity with aviation-related matters.

THE COURT:  That's true.

Okay.  Well, there are a couple of issues here.  Why don't we talk about the -- let's talk about venue.  There's an application to move this case out of the Eastern District.

Is that right?

MS. LULICH:  No, your Honor.  I think there's no dispute that we think venue in Eastern District is proper based on the Court having personal jurisdiction over the city, in Brooklyn.

THE COURT:  Okay.

MS. LULICH:  Our concern was under the rules of business of the EDNY, Central Islip would be an inconvenient location for all of the Defendants, so the City and the City

Linda A. Marino, Official Court Reporter

Proceedings                                                    6

agencies involved.

THE COURT:  You wanted it in Brooklyn.

MS. LULICH:  Correct.

THE COURT:  So, there's no venue issue here.

MS. LULICH:  No.

THE COURT:  We're past that.

MS. LULICH:  Correct.

THE COURT:  I didn't understand.  I thought there was desire to move it this to the Southern District of New York.

MS. LULICH:  No, I believe Judge Dunst had raised what would be proper, but I don't think anyone disputed it being in EDNY.

THE COURT:  I'm happy not to have an issue.  We have plenty of issues around here.

But you want make a motion.

MS. LULICH:  We do.

So, if I can just briefly, I'd like to correct a little bit of a misstatement.

This law does not close the heliports to nonessential helicopter traffic.  This law, which has several sort of phases in time but would go into effect after December of 2029, would prohibit the use of helicopters that are essentially not Stage 3 noise capacity or quieter.

THE COURT:  I see.

Linda A. Marino, Official Court Reporter

MS. LULICH:  So, it does not prohibit any -- it doesn't do anything for Stage 3, helicopters that the FAA has deemed to have Stage 3 noise capacity.  And if a helicopter is otherwise Stage 2 but meets the noise criteria of the Stage 3 helicopter, it also would not be prohibited at all.

THE COURT:  So, this isn't a question of the use of a helicopter for, let's say, sightseeing, it's a question of whether the engines meet Stage 3 standards.

MS. LULICH:  Correct, although there is no noise restriction on nonessential flights.  So, it does -- the purpose of the flight does have bearing in that a covered helicopter is not permitted to make nonessential flights out of those two.

THE COURT:  "Covered helicopter" means a helicopter that does not meet the Stage 3 standards; is that it?

MS. LULICH:  Yeah, so, the law defines it as the calculated noise level is higher than the FAA's Stage 3 noise limits.  So, "higher" meaning essentially louder.  So, what is covered are those that are Stage 3 or quieter.

THE COURT:  I see, I see.

So, before we go any further, let me put on the record that I was the chief counsel of the FAA in Washington, D.C., for five years during the Clinton Administration.  That was over 25 years ago.

And I just put that on the record so you know it.  I

Proceedings                                        8

have a familiarity with aviation issues, but I have not had

any involvement with any of these issues in the last 25 years,

as far as I can remember, even though as I grow older my

memory may get a little hazier.  But I think that's basically

correct.

So, go ahead.

MS. LULICH:  So, that was the clarification I wished

to make.  So, essentially what we're talking about is a

certain subset of helicopters that after, assuming all of the

other steps of the law go forward according to plan, would be

prohibited from using the two heliports on City-owned property

after December of 2029.

Prior to that, every year from 2026 on to 2029 the

Economic Development Corporation must submit a report to City

Council and the Mayor reporting the percentage of nonessential

flights coming out of those two heliports and the stages of

the aircraft doing that.

THE COURT:  I see.

MS. LULICH:  There's also a requirement built into

the law that prior to this law going into effect, the heliport

operators must follow the procedures set forth in ANCA for

regulating both Stage 2 and Stage 3 noise capacity, although,

again, Stage 3 is not prohibited under this law.  So, that is

built into the law and must happen before the law can go into

effect.

Linda A. Marino, Official Court Reporter

Proceedings                                           9

THE COURT:  So, you're not taking issue with the regulations that require operators to meet the noise abatement standards of ANCA; is that right?

MR. CATTERSON:  Just so we are clear, Judge, at present there are no Stage 3 helicopters.  All helicopters that operate in United States, other than the electric helicopter that was introduced to much fanfare which is not commercially available, all helicopters under 14 CFR 36 are either Stage 1 or Stage 2.

THE COURT:  But there will have to be some adjustments along the way or has there been no development of a Stage 3-compliant motor for helicopters?

MR. CATTERSON:  There is no -- other than a series of test flights, which Blade is a large helicopter carrier, gave much fanfare to, there are no commercially available Stage 3 helicopters in the country.  All helicopters, at least under the CFR and the FAA regs, are Stage 1 or Stage 2.

THE COURT:  Okay.  I hear you.

MR. CATTERSON:  But because they're Stage 1 or Stage 2 aircraft, they have to comply with ANCA.  And there's plenty of Second Circuit case law that says not only do they have to comply with ANCA in the city limits, they can't delegate to the FPO their responsibilities under ANCA.  Having litigated these cases, there are two Second Circuit cases directly on point.  And because we're at a motion to dismiss stage, I

Proceedings                                    10

don't have to go into the facts, but the whole premise that this only applies to a small subset of helicopters is not true.

THE COURT:  Well, we're going to get to that in the briefing, I think.

So, yours is a motion to dismiss the complaint in its entirety, I take it.

MS. LULICH:  Yes, correct, your Honor.

THE COURT:  Well, I know there's some case law because you've mentioned it in your letters.

And, so, have you discussed a motion schedule?

MR. CATTERSON:  No, Judge, not yet.

THE COURT:  Well, fortunately, you've gotten here before this law goes into effect.  So, you've got what, three years to go?

This is one of those unusual circumstances where the parties have arrived at the courthouse steps long before the crisis becomes an actuality.

MR. CATTERSON:  Yes, Judge.

THE COURT:  So, how much time would you like for your motion to dismiss?

MS. LULICH:  We would like to start after the holidays, and, so, if we could have, like, January 30?

THE COURT:  Believe me, I'm going to give you all the time you need for this, but I would like to have

Proceedings                                    11

everything in in the next three months, basically?

MS. LULICH:  I don't have my calendar with me, but I would say maybe the first Friday of February, I think, for our moving papers.

Does that work?

THE COURT:  That would be February 6, 2026.

And Plaintiffs?

MR. CATTERSON:  30 days, Judge, would be good.

THE COURT:  Let's make it March 6, 2026.

MR. CATTERSON:  Thank you, Judge.

THE COURT:  And reply, if any, March 20 --

MS. LULICH:  Perfect.

THE COURT:  -- 2026.  I'm not going to set any time for oral argument, but I think it's likely that we will have oral argument.  Otherwise, after reviewing the papers, if I decide it's not necessary, I will simply resolve the case on the papers without any further discussion here in court.  But it's an interesting case and we'll get to it, hopefully, in the first half of 2026.

Well, it's hard to say what the next step would be. If I grant the motion to dismiss, I assume there will be an appeal.  If I deny the motion to dismiss, there will be discovery and we'll move forward to the extent that there are still open claims after motion practice.

MR. CATTERSON:  Yes, Judge.

Linda A. Marino, Official Court Reporter

Proceedings                                    12

THE COURT:  Well, this is very interesting.  I thank you very much.

And you're all in the Corporation Counsel's office?

MS. LULICH:  Yes.

THE COURT:  Who is the corporation counsel now?

MS. LULICH:  It is Miriam Goode-Trufant.

THE COURT:  Oh, she's still the Corporation Counsel?

MS. LULICH:  Until January at least.

THE COURT:  At present, I understand.  It's nice to see you all.

It's always nice to see you gentlemen who I never see but whose names have come up from time to time over the years.

MR. CATTERSON:  We did bring the brain trust with us.

THE COURT:  Yes, I noticed that.  That's a wise decision.

We don't have to put this on the record.

(Discussion off the record; matter concluded.)

Linda A. Marino, Official Court Reporter