**Exhibit "B"**

```
            COMMITTEE ON ECONOMIC DEVELOPMENT          1
CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

          Of the

COMMITTEE ON ECONOMIC DEVELOPMENT

------------------------ X

                    April 16, 2024
                    Start:  10:19 a.m.
                    Recess:  2:14 p.m.



HELD AT:          250 BROADWAY – COMMITTEE ROOM, 16TH
                  FLOOR

B E F O R E:      Amanda Farías, Chairperson


COUNCIL MEMBERS:
                  Erik D. Bottcher
                  Jennifer Gutiérrez
                  Rafael Salamanca, Jr.
                  Inna Vernikov

OTHER COUNCIL MEMBERS ATTENDING:
                  Christopher Marte
                  Gale A. Brewer
                  Lincoln Restler
```

COMMITTEE ON ECONOMIC DEVELOPMENT                    2

A P P E A R A N C E S

Jennifer Sun, Executive Vice President of
Planning for the New York City Economic
Development Corporation

Mikelle Adgate, Senior Vice President of
Government and Community Relations Department for
the New York City Economic Development
Corporation

Anton Fredrikson, Director of Aviation for the
New York City Economic Development Corporation

Carleen McLaughlin, Director of Legislative
Affairs for the New York City Department of
Environmental Protection

Mark Page, Executive Director of the Bureau of
Environmental Compliance for the New York City
Department of Environmental Protection

Daniel Wiley, Representative of Congresswoman
Nydia Velázquez

Lacey Tauber, Representative of Borough President
Levine and Borough President Reynoso

Sam Goldstein, Downtown Heliport

Lydon Sleeper, East Policy Lead with Joby
Aviation

Stacy Sheard, Eastern Region Helicopter Council

COMMITTEE ON ECONOMIC DEVELOPMENT          3


A P P E A R A N C E S (CONTINUED)

Brittany Davies, Northeast Regional Director for the National Business Aviation Association

Josh Rousseau, Northeast U.S. Regional Representative for Vertical Aviation International

William Thomas, board member of Stop the Chop New York/New Jersey

Andrew Rosenthal, Stop the Chop New York/New Jersey

Melissa Elstein, board member of Stop the Chop New York/New Jersey and board member of West 80s Neighborhood Association

Lara Birnback, Executive Director of the Brooklyn Heights Association and advisory board member of Stop the Chop New York/New Jersey

Kenneth Lay, Brooklyn resident and a board member of Stop the Chop New York/New Jersey

Roger Manning, co-founder of the Metro Area Governors Island Coalition

Stephen Tannenbaum, Prospect Park South Association

Janet Handal, President of the Waterside Tenants Association in Manhattan

COMMITTEE ON ECONOMIC DEVELOPMENT                4


A P P E A R A N C E S (CONTINUED)

Michael Hannaman, legal extern at the Natural Resources Defense Council and a law student at NYU School of Law

Merritt Birnbaum, President and Chief Executive Officer of Riverside Park Conservancy

Roland Lewis, consultant to Stop the Chop

Ken Coughlin, Manhattan Community Board 7 and board member of Stop the Chop New York/New Jersey

Warrie Price, Founder and President of the Battery Conservancy

Alex Matthiessen, Stop the Chop

Mark Young, South Midwood Residents Association

Susanne Lee, Hudson Classical Theatre Company

Norrice Raymaker, St. Anthony Neighborhood Houses

Kate Madigan, The Public Theater

Diane Park, Waterside Plaza

Dorothy Lyon

Brenda Quattrini

Ana Maria Jomolca

Christine Collister

COMMITTEE ON ECONOMIC DEVELOPMENT                5

A P P E A R A N C E S (CONTINUED)

Jason Ehrich

Moonira Keghida

John Ost

David Fitzgerald, Fitzgerald family in Marine Park, Brooklyn

Philip Turner

John Wilkens

Christopher Widgren

Sydney Garcia Widgren

Judy Mann, volunteer tour guide on Governor's Island

Stan O'Connor, licensed tour guide

Peter Maloney, South Midwood Residents Association

Arlene Bronzaft, Professor Emeritus of the City University of New York and member of the board of GrowNYC

Debra Lapadula

Dorinne Tye

Mark Diller

COMMITTEE ON ECONOMIC DEVELOPMENT                    6


A P P E A R A N C E S  (CONTINUED)

Michael McCready

Sam Pesin, President of the Friends of Liberty
State Park

COMMITTEE ON ECONOMIC DEVELOPMENT                    7

SERGEANT-AT-ARMS: Check, check. This is a mic check on the Committee on Economic Development, located on the 16th Floor, recorded on April 16, 2024, by Patrick Kurzyna, check.

SERGEANT-AT-ARMS: Quiet, please. Thank you.

Good morning and welcome to the New York City hybrid hearing of the Committee on Economic Development.

Please silence all electronic devices.

If you have any questions, please raise your hand, and one of us, the Sergeant-at-Arms, will kindly assist you.

At no time, please, do not approach the dais.

Thank you very much for your kind cooperation.

Chair, we are ready to begin.

CHAIRPERSON FARÍAS: [GAVEL] Good morning, folks. I really quickly wanted to start off today reading a quote from my Committee's predecessor, former Council Member Paul Vallone, from post my last helicopter hearing that reads, "love watching you and your hearings. So very proud. Keep kicking butt," he

COMMITTEE ON ECONOMIC EVIDENCE                        8

used a different word, but butt, "love, Paul," which I thought was great because here we are again bringing it back to a topic that was really important to him during this hearing while Chairing this Committee.

Good morning and welcome to today's hearing on the New York City Council's Committee on Economic Development. I am Majority Leader Amanda Farías, and I have the privilege of Chairing this Committee. I want to thank my Colleagues on the Committee for being here today as well as the representatives from EDC, DEP, advocates, and members of the public who have joined us. I'd like to note that we've been joined by Council Members Bottcher and Marte.

Today's hearing will examine the important issue of helicopter noise and safety in New York City. Over the past five years, 3-1-1 has seen a staggering 2,329 percent increase in helicopter noise complaints. Exposure to the excessive noise produced by helicopter flights has been associated with serious health effects like high blood pressure, cognitive impairment, and diminished reading comprehension in children. It is simply unacceptable

COMMITTEE ON ECONOMIC EVIDENCE                               9

for our communities to suffer these consequences for the brief enjoyment of wealthy tourists who want to ride in helicopters, especially considering that the City receives relatively little revenue from these flights.

In addition to the noise issue, we have unfortunately seen several tragic helicopter accidents over the years that have raised major safety concerns. These include the deadly 2018 crash in the East River that killed five passengers and a 2019 crash on the roof of a Manhattan building that killed the pilot. In 2016, the City and the helicopter tourism industry reached an agreement to cut the number of sightseeing flights leaving from the downtown Manhattan Heliport in half, resulting in about 30,000 fewer flights per year. While this was an important step forward, the surge in noise complaints shows that it simply wasn't enough. More needs to be done to protect the health and safety of New Yorkers. That's why we are considering a series of package of legislations today to address this problem from multiple angles.

First, we have Intro. 26, which I sponsor, that would restrict nonessential helicopter

COMMITTEE ON ECONOMIC EVIDENCE                                    10

operations at City-owned heliports to electric-powered aircraft only. Electric helicopter technology has come a long way in recent years with successful demonstrations showing they are much quieter than traditional combustion engine helicopters. This bill has received strong support from key advocates who agree it would make a real difference in cutting helicopter noise and pollution. By leveraging the City's control over its heliports, we can accelerate the transition to cleaner and quieter helicopter technology.

We have also Intro. 70 sponsored by Council Member Restler, which would go a step further and prohibit all non-essential helicopters from operating at City-owned heliports.

Next, Intro. 27, which I also sponsored, would require DEP to install sound meters to monitor helicopter noise in impacted areas and provide monthly public reports. This data is crucial for effectively regulating the industry.

Finally, we have three resolutions before the Committee. Resolution 85, sponsored by Council Member Gennaro, calls on the State to establish a noise tax on non-essential helicopter flights,

COMMITTEE ON ECONOMIC EVIDENCE                              11

Resolution 226, sponsored by Council Member Brewer, calls on the State to ban non-essential use of the West 30th Street Heliport, and Resolution 233, also sponsored by Council Member Brewer, calls on the FAA to ban all non-essential helicopter flights over New York City. While the FAA has jurisdiction over flight paths and much of the airspace, the City can and must use the tools at its disposal to protect our residents. I look forward to hearing from the NYC EDC and DEP about their efforts and plans to address helicopter noise and safety. I also want to hear feedback from advocates and the public on this package of bills.

Before we begin, I'd like to remind folks present today to please maintain decorum throughout the hearing.

If you are here to testify, you will have three minutes to speak when your name is called. Please keep responses concise, you don't have to use all of that time, so that everyone has a chance to be heard. If you are unable to finish, please submit your complete written testimony to testimony@council.nyc.gov.

COMMITTEE ON ECONOMIC EVIDENCE                               12

Just another quick note, if you agree with something in this room, the public is to remain silent. Please use the support gesture that I just displayed.

Finally, I'd like to thank the Economic Development Team here at the Council, Senior Counsel Alex Paulenoff, Senior Policy Analyst William Hongach, and Finance Analyst Glenn Martelloni for all their hard work preparing for this hearing. I will now turn it over to our Committee Counsel to administer the oath.

I'd like to call up Mikelle Adgate from EDC, Jennifer Sun from New York City Economic Development Corporation, Anton Fredrickson from NYC EDC, Carleen McLaughlin from DEP, and Mark Page from DEP as well.

Before swearing in, I'm going to allow Council Member Restler a moment to give an opening statement regarding his bill.

COUNCIL MEMBER RESTLER: Thank you so much, Madam Majority Leader and Chair. I really want to just thank you for your leadership on this issue for holding this hearing today. When I first introduced a bill about helicopters early in our

COMMITTEE ON ECONOMIC EVIDENCE                                13

first term, you were our first co-prime sponsor and have been just a relentless champion, and we're really fortunate to have you in this role and leading in this really powerful way. I will tell you, walking around the streets of the 33rd Council District just on the other side of the bridge in Brooklyn, I hear from neighbors more about how angry and frustrated they are about helicopter noise than almost any other issue, and people are just at their wits end. It's like when they go out to Brooklyn Bridge Park, they can't have a conversation with the person walking next to them because the helicopter noise is too loud. They don't want to be on the roof. They don't want to be in their backyard. They don't want to even be sitting on their stoop because the intensity of the helicopter noise, and it's City-owned helipads, and we've introduced Intro. 70 because we want to end non-essential helicopter travel. We don't want tourist flights hanging out over our neighborhoods, just spewing fossil fuels into our community for minutes on end. We don't want the wealthiest of the wealthy getting on helicopter rides to JFK or the Hamptons instead of taking public transit or cars like the rest of us. It doesn't make any sense why

COMMITTEE ON ECONOMIC EVIDENCE                              14

our taxpayer dollars are supporting these helipads for a modest industry, creating a modest number of jobs at huge negative impacts from a noise pollution and air pollution standpoint, and I really do hope that we're going to hear some positive things from EDC today. I hope maybe even some warmth to Intro. 70 and other pieces of legislation that my Colleagues have introduced because the status quo is totally unacceptable, and we have to do better in reining in this industry that is causing havoc and harm in our neighborhoods each and every day. Thank you very much.

CHAIRPERSON FARÍAS: Thank you, Council Member.

COMMITTEE COUNSEL PAULENOFF: Alex Paulenoff, Senior Counsel. Will all members of the Administration who are testifying today please raise your right hand.

Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth in your testimony today, and to respond honestly to Council Member questions?

ADMINISTRATION PANEL: (INAUDIBLE)

COMMITTEE ON ECONOMIC EVIDENCE                        15

COMMITTEE COUNSEL PAULENOFF: Thank you. You may begin when ready.

EXECUTIVE VICE PRESIDENT SUN: Good morning, Chair Farías and Members of the Economic Development Committee. My name is Jennifer Sun, and I serve as the Executive Vice President of Planning for the New York City Economic Development Corporation. I'm joined by my colleagues, Mikelle Adgate, Senior Vice President in our Government and Community Relations Department and Anton Fredrickson, Director of Aviation as well as Carleen McLaughlin and Mark Page from the New York City Department of Environmental Protection. We appreciate the opportunity to testify about our work to reimagine our heliports with a focus on sustainability and innovation.

As you know, EDC is charged with creating a vibrant, inclusive, and globally competitive economy for all New Yorkers, which includes, but is not limited to, promoting economic development and stewardship of the City's waterfront assets. As one part of EDC's waterfront management on behalf of the City, we are responsible for the management of both City-owned heliports, the East 34th Street Heliport

COMMITTEE ON ECONOMIC EVIDENCE                    16

and the Downtown Manhattan Heliport, which we call DMH. At both heliports, EDC acts as a contract administrator for the concession agreements between the City and the heliport operators. Aligned with our commitment to combat climate change and reduce transportation emissions, we are actively pursuing initiatives to advance cleaner aviation technology and optimize sustainable freight distribution. For our aviation sector, this entails building the infrastructure to support electric alternatives to traditional helicopters while, for freight distribution, it involves transitioning goods from trucks to the City's waterways and sustainable micro-freight. There is significant potential at our waterfront assets, particularly the heliports to creatively address sustainability challenges, enhance efficiency and promote economic growth.

This past November, we announced our vision for a first-of-its-kind hub for sustainable transportation and deliveries at DMH. In connection with this announcement, we piloted demonstration flights of multiple electric vehicle takeoff and landing, eVTOL, aircraft in an urban environment, a world first. As we look to the future of sustainable

COMMITTEE ON ECONOMIC EVIDENCE                                    17

transportation and infrastructure, we are readying our heliports for eVTOL aircraft, which have the benefit of being an efficient, sustainable, and quieter alternative to traditional helicopters. Under this plan, DMH will aim to become the first heliport in the world with the infrastructure to support electric flight while also incorporating last mile maritime freight distribution and delivering major quality-of-life improvements for New Yorkers. The innovation being introduced at DMH is emblematic of how EDC and the City are activating infrastructure assets to support our current and future transportation needs. Both DMH and the East 34th Street heliports are already critical NYC facilities used by a wide range of entities and for a broad array of purposes, including hospitals for organ transplants, news outlets for reporting, the New York City Police and Fire Departments responding to emergency calls and other critical City operations as well as chartered, private, and tour flights. As the largest U.S. city and the U.S. capital for international business, our City-operated heliports are essential to maintaining corporate competitiveness, ensuring life-sustaining and

COMMITTEE ON ECONOMIC EVIDENCE                          18

emergency operations, and maintaining our tourism sector. The heliports are also significant drivers of economic activity, providing a total economic impact of 78 million in the city and employing approximately 175 workers. As we envision the future role of our heliports in supporting the City's goals, it remains crucial to uphold their essential economic and logistical functions. Both heliports within EDC's purview, the East 34th Street heliport and DMH, are public use heliports, a Federal Aviation Administration designation that means a heliport is available for use by the general public without a requirement for prior approval of the owner or operator. Public use facilities operate as the refueling stations for helicopters traversing throughout the northeast and tristate area. As public use facilities, we cannot turn a helicopter away, including a helicopter that takes off outside New York City and wants to land at one of our heliports, even if there is no prior approval. As you know, primary responsibility for the regulation of U.S. aviation and air transportation, including the establishment of a national aviation noise policy, and ultimate oversight of local airport noise and

COMMITTEE ON ECONOMIC EVIDENCE                                    19

access restrictions, is vested in the FAA. As a result, the City and EDC have limited ability to regulate traffic, access, and noise in New York City airspace. Where the City does have the ability to influence the industry is through our concession agreements with our operators where we can incentivize the industry to adopt cleaner and quieter technologies and promote diverse uses at the heliport. At both heliports, EDC acts as a contract administrator for the concession agreements between the City and the heliport operators. Day-to-day management of heliport operations is handled by Atlantic Aviation at East 34th Street and Saker Aviation Services at the DMH. The concession agreement set forth the terms and conditions under which each facility operates, including the hours of operation, maximum annual flight volumes, insurance levels, and reporting requirements, including air quality monitoring and route compliance.

The East 34th Street Heliport serves a broad range of uses and is a base of operations for emergency services, essential organ transport to nearby hospitals, chartered and private flights, City operations, and media. The Downtown Manhattan

COMMITTEE ON ECONOMIC EVIDENCE                    20

Heliport, by design, is the only heliport that permits tour flights. It also serves chartered and private flights, NYP and other emergency services. DMH is also the only heliport in New York City that can accommodate presidential flights by Marine One and its supporting aircraft.

While the heliports offer important services for city hospitals, businesses, and emergency personnel, we recognize that community members have quality-of-life concerns regarding helicopter noise, and we are committed to leveraging our position in this space to address these concerns. We have and continue to work collaboratively with the FAA and industry to address noise challenges. As part of this collaboration, we have negotiated flight caps and established over water tour routes with the FAA that fly at even higher altitudes than typically possible in a highly complex airspace like New York City to mitigate noise. We have also worked in partnership with the Council and key stakeholders to improve transparency and address community concerns. We take our asset management responsibility very seriously, and we are committed to working with the Council to address noise impacts from helicopter

COMMITTEE ON ECONOMIC EVIDENCE                    21

operations and data reporting on helicopter flights. To this end, EDC monitors public complaints related to all helicopter flights over New York City, not just flights to and from the two EDC-managed heliports. Under our process, after a member of the public lodges a complaint through the City's 3-1-1 portal, this data is transmitted to EDC and the DMH operator for review. The 3-1-1 data undergoes two rounds of analysis. First, by our DMH operator and then by an independent third-party consultant with expertise in analyzing flight paths. Once both rounds of analysis are complete, EDC compiles monthly reports that are transmitted to the City Council, elected officials, and relevant community boards. We are committed to responding individually to each complaint received and welcome the opportunity to work with Council on how best to present the data in our monthly reports. More recently, we have furthered our commitment to addressing quality-of-life concerns beyond just noise complaints through requirements and recommendations laid out in our ongoing procurement for a new DMH operating contract.

The updated Request for Proposals, or RFP, we released in November 2023 explicitly seeks

COMMITTEE ON ECONOMIC EVIDENCE                              22

proposals for an operator to advance a transition to eVTOL aircraft and operations, diversify revenue streams, and reduce helicopter tour operating hours. Moreover, a key requirement of the RFP is to create and operate a micro-distribution center as part of the City's marine highway network that decreases the City's reliance on trucks. More specifically, the RFP requires upgrades to the DMH heliport to make it ready for eVTOL aircraft as soon as they are authorized for use by the FAA and incentivize eVTOL use when feasible, reduction of tour hours by 30 percent with the new tour hours changing to 10 a.m. to 5 p.m. as well as cutting Saturday operational hours, the construction and operation of a micro-distribution facility, an operating plan and schedule for DMH to facilitate inbound freight deliveries by water, this will integrate DMH into the City's wider marine highway network, which will help push deliveries onto the waterways and reduce diesel truck trips, getting polluting and traffic causing trucks off the roads and greening the city, improve data collection and reporting on all flight activity in addition to 3-1-1 complaints, plans to further reduce takeoffs and landings of non-eVTOL tour and corporate

COMMITTEE ON ECONOMIC EVIDENCE                                    23

and/or personal chartered flights, introduction of greenhouse gas emissions reporting, M/WBE participation goal of 30 percent for site development and construction work, and standing up a workforce training program that improves access to available career pathways in aviation, maritime, transportation, logistics, and other relevant sectors.

We are currently evaluating the DMH RFP submissions and hope to select an operator for the Downtown Manhattan Heliport by this fall. We are very excited for the changes to come to DMH. By incorporating significant steps to improve operations at the heliport, lessen activities related to noise complaints, and continue to improve low- and zero-emission, energy efficient transportation beyond helicopters, we hope to support sustainable aviation and transportation operations citywide.

We are currently reviewing all the bills that are being heard today with our colleagues at the Law Department and look forward to continuing to work with the Council, including updating you on the DMH RFP and continuing to refine and improve our helicopter data reporting. Thank you for the

COMMITTEE ON ECONOMIC EVIDENCE                          24

opportunity to speak with you today, and we are happy

to answer any questions you may have. Thank you.

CHAIRPERSON FARÍAS: Thank you so much for

your testimony. I'd like to acknowledge that we've

been joined by Council Member Vernikov.

I appreciate the thorough testimony on

giving us a full update. I less appreciate not having

responses for each of the bills that are listed. Can

we get a timeline of when we're going to hear from

the Admin or from the agencies on your Law

Department's decision on the bills?

EXECUTIVE VICE PRESIDENT SUN: Yeah, thank

you for the question, Council Member. We know that

the Law Department is reviewing each of the bills

together and, as part of their regular check-ins with

Council Legal, that these bills are being discussed

as part of that.

CHAIRPERSON FARÍAS: Okay, so when should

I expect, I mean usually you folks come with

testimony with some sort of response surrounding

support, not support.

EXECUTIVE VICE PRESIDENT SUN: I

definitely understand the question. Based on our

conversations with the Law Department, given the

COMMITTEE ON ECONOMIC EVIDENCE                              25

complexity of the aviation sector and the

jurisdictional boundaries between the FAA and other

federal regulators and actors and the fact that the

City's authority may be subject to different

limitations, the Law Department has been using this

time to review more thoroughly and so, while I can't

speak on their behalf in terms of a timeline, I do

know that it is something that they are working on.

CHAIRPERSON FARÍAS: Okay. I'm going to

take it as you all are wholeheartedly supportive of

every Intro. and Reso. then.

Okay. I'm going to jump right into some

of the Committee questions here. Can you provide an

update on the City's efforts to address helicopter

noise concerns since the 2016 agreement that reduced

tourist flights? Any successes and challenges?

EXECUTIVE VICE PRESIDENT SUN: Thanks for

the question, Council Member. As I highlighted in my

testimony, we have renewed our focus on areas within

the concession agreement where we might have an

ability to further address quality-of-life complaints

and so, in this most recent procurement of the DMH in

seeking a new operator, we did require that the

respondents submit a plan from their perspective of

COMMITTEE ON ECONOMIC EVIDENCE                          26

how they can work with EDC and the City Council in further incentivizing helicopter operators to operate in a way that has less emissions and less noise. For example, in addition to the 50 percent reduction of annual flights at DMH from 60,000 flights to 30,000 flights, we have required in this new procurement a further reduction of operating hours by 30 percent, and we're looking forward to a private response to how they might further incentivize and diversify the uses of the heliport so that there is an ongoing reduction of helicopter tour flights from DMH over time.

CHAIRPERSON FARÍAS: And anything within the RFP or what we're expecting to see from their plans regarding transparency on their tail numbers or anything like that, that goes through. I'm sure you folks see the complaints from constituency or some of the websites that are utilized to track who's actually not following the rules per se and going over residential properties so are there any specifications listed there on what you expect to see from their plans?

EXECUTIVE VICE PRESIDENT SUN: I'll ask Anton to answer the question more directly about the

COMMITTEE ON ECONOMIC EVIDENCE                              27

data that we're seeing around all helicopter flights in New York City. What I'll share at a very high level is that by looking at data for an approximately one year period from, let's say, spring of 2023 to the current period, what we're finding is that overall about 4 percent of the complaints are coming from the City-owned heliports, meaning that 96 percent of the complaints are attributed to flights originating from other heliports outside of those that are City-operated, but I'll ask Anton to elaborate.

CHAIRPERSON FARÍAS: Sure.

DIRECTOR FREDRIKSON: Thank you and, of that, 1 percent of all flights are tours from the heliport to back up Jennifer's claim.

Separately, I wanted to address on the flight activity side. This is a new requirement that we're putting into our RFP so before we've looked at complaints, but that's a subset of all flight activity happening so as part of the new RFP, the operator will be expected to develop a tool that'll analyze all flight activity over New York City so we have a more complete picture of all the activity and can make more informed decisions from that.

COMMITTEE ON ECONOMIC EVIDENCE                              28

CHAIRPERSON FARÍAS: And is that going to be a public tool or is that going to be internal between the operator itself and EDC?

DIRECTOR FREDRIKSON: Yes, that information is using publicly available information through ADS-B data, and we can work with our operator to see if we can make it more publicly accessible or more easily digestible that data that's available already publicly.

CHAIRPERSON FARÍAS: And have you seen any efforts made that have brought in specific changes that have been particularly effective in reducing noise or answering for some of the data that we've already aggregated over the years with complaints (INAUDIBLE) the operators?

DIRECTOR FREDRIKSON: Yeah, we have a consultant today at the Downtown Manhattan Heliport that looks at all complaints, and already we're rolling out and developing new tools to improve the tracking so looking potentially even geofencing areas of the city to get a complete picture of all activity and not just looking at complaints as they come through and categorizing those individual complaints.

COMMITTEE ON ECONOMIC EVIDENCE                          29

CHAIRPERSON FARÍAS: And are there going to be any penalties or anything associated with them necessarily? Let's say they come up with a plan, we have this transparent public tool that everyone can see, which we already have different data sets and tools that people can see that folks are in violation, what then does the EDC have as a penalty or a repercussion tool to then say this operator is being a bad actor and not living up to the agreement.

DIRECTOR FREDRIKSON: Yes, so we do have a system in place today where there are penalties if there is a repeated offense from that particular operator. Now, we have to keep in into account that there are occasionally reasons for a flight to veer off course for weather or safety-related things so we take that into account as well, and we will be always looking to strengthen that in the new operating agreement as well.

CHAIRPERSON FARÍAS: How many penalties have you folks issued over the last year?

DIRECTOR FREDRIKSON: We can get that information from you.

CHAIRPERSON FARÍAS: I would love that information.

COMMITTEE ON ECONOMIC EVIDENCE                    30

I just want to note too, I think generally the public always understands when, let's say bad weather, folks have to veer off. I think the problem that we've seen, I mean over a decade, even though I've only been here year three, is that that information is not transparent and it's not actually publicly made for use and I don't think anyone would ever want anyone to put themselves in a dangerous condition just because they're in a helicopter but, if folks understand that connection, which I hope is what you're aiming to gear towards more public transparency of why people might be off course if there is a reason to help validate people's lived experiences of the issues that they're seeing every day.

How does the Administration balance the economic interest of the helicopter industry with the health and quality-of-life concerns raised by impacted communities?

EXECUTIVE VICE PRESIDENT SUN: Thanks for the question, Council Member. I think demonstrated by our approach through the new procurement of balancing the revenue that we're collecting from the operator who manages the heliport day-to-day with the quality-

COMMITTEE ON ECONOMIC EVIDENCE                          31

of-life concerns is really in the reduction of operating hours so, in addition to the reduction by 50 percent in 2016, we're going further again in this new procurement of reducing those operators by 30 percent. In addition to that, we're requiring a private investment and charging infrastructure to really reduce barriers for supporting the industry and adopting eVTOL technology as soon as it becomes available and is certified by the FAA.

CHAIRPERSON FARÍAS: And what steps does the City take to ensure that community voices are heard and considered in decisions related to helicopter regulation?

EXECUTIVE VICE PRESIDENT SUN: So the 3-1-1 complaints is certainly a primary source for understanding where residents in New York City are experiencing that noise in their neighborhoods, and we do frequent engagement through community boards and elected officials, and certainly that's a channel in which we're hearing about quality-of-life concerns as well.

SENIOR VICE PRESIDENT ADGATE: I would just add to that, Council Member, I think the items that we identified in the RFP, in terms of changes

COMMITTEE ON ECONOMIC EVIDENCE                          32

that we're making for this new procurement, I would say are almost a direct result of the conversations that we've had with you, other Committee Members, community boards, not just reducing the tour hours by 30 percent, but looking at improving data collection, improving transparency, how those records so we do take all of the feedback that we've gotten very seriously and have baked that into the RFP.

CHAIRPERSON FARÍAS: Yeah. I see that in some of these bullets so that's appreciated.

Are there any examples of compromises beyond the 2016 agreement that have been reached through a collaboration with the industry and community stakeholders?

EXECUTIVE VICE PRESIDENT SUN: I can't share our negotiations with the respondents to the RFP, but I look forward to being able to share that as soon as we can once we're further along in our process.

CHAIRPERSON FARÍAS: And how does the City navigate the balance between the federal and local authority when it comes to managing helicopter traffic?

COMMITTEE ON ECONOMIC EVIDENCE                                33

EXECUTIVE VICE PRESIDENT SUN: We achieve that balance through a strong partnership and an ongoing conversation with the FAA and with the helicopter industry, recognizing that, I think, where EDC can have influence in policy is really through those partnerships and through negotiated agreements to try to achieve the right balance between maintaining an economically viable heliport but also being responsive to community concerns.

CHAIRPERSON FARÍAS: And can you discuss the City's working relationship with the Federal Aviation Administration?

EXECUTIVE VICE PRESIDENT SUN: Yeah, I'll share at a very high level and then Anton can elaborate that we have, again, very active ongoing conversations with the FAA to understand the latest in terms of regulations at the federal level with respect to noise and safety and also continuing to talk about where together we can be responsive to the Council and community concerns in going further than what we've done already.

DIRECTOR FREDRIKSON: Thank you, Council Member. In addition to our constant engagement with the Federal Aviation Administration, we're also proud

COMMITTEE ON ECONOMIC EVIDENCE                                34

to participate in a series of symposia that the FAA

has convened with the helicopter industry. This is a

regional challenge, I think we I can all appreciate,

so it's going to take collaboration with stakeholders

outside of New York City as well, and we're proud to

be part of those discussions.

                    CHAIRPERSON FARÍAS: Thank you and, in the

Administration's view, what's the most effective and

appropriate combination of local, state, federal

actions to address the impacts of helicopter traffic

on New York City communities?

                    EXECUTIVE VICE PRESIDENT SUN: Thanks for

the question, Council Member. I think you just

touched upon it. It is about a partnership at all

levels of government both within New York City but

also engaging elected officials and constituents in

New Jersey as well, and then I think that's where the

federal elected officials as well as FAA has an

important role is recognizing that a lot of this

helicopter tour traffic doesn't only originate in New

York City but also in New Jersey and elsewhere, and

therefore the opportunity for addressing these

concerns more comprehensively really resides in a

regional and national approach.

COMMITTEE ON ECONOMIC EVIDENCE                          35

CHAIRPERSON FARÍAS: Okay. I'd just like to talk a little bit about 3-1-1 complaints. Can we get how many 3-1-1 complaints about helicopters EDC received last year, 2023, 2022, 2021?

EXECUTIVE VICE PRESIDENT SUN: Yes. Let's see. Do you?

DIRECTOR FREDRIKSON: Yes. We received approximately 50,000 noise complaints last year.

CHAIRPERSON FARÍAS: And do we have 2022? I can pull it up.

DIRECTOR FREDRIKSON: I think it was about 25 off the top of my head.

CHAIRPERSON FARÍAS: Oof. Okay. After this, like offline, can we get maybe the last three to four years of just top line totals so we can see how that's increased, if we went nearly double in a year. It's something for us to consider and look at.

Do we know how many 3-1-1 complaints came from DMH or 34th Street were found to be justified?

DIRECTOR FREDRIKSON: We had less than 1 percent were tour flights originating from the Downtown Manhattan Heliport.

CHAIRPERSON FARÍAS: But I mean justified in that, the percentage were actually in violation to

COMMITTEE ON ECONOMIC EVIDENCE                                36

their 3-1-1 complaint versus dismissed for lack of

jurisdiction or anything else. Do we know that

percentage?

          DIRECTOR FREDRIKSON: We can get back to

you with that exact number.

          CHAIRPERSON FARÍAS: Who's actually

responsible for investigating the 3-1-1 complaints

about New York City based helicopters?

          DIRECTOR FREDRIKSON: Yes. Thank you for

the question. Three layers, Economic Development

Corporation first receives the 3-1-1 data, we parse

through it then we pass that on to our private

heliport operator at the Downtown Manhattan Heliport,

who's responsible for all 3-1-1 complaints. They do a

thorough investigation of every individual complaint

and then categorizes that based on what type of

aircraft it was, even if there isn't enough

information, they will go in and triangulate which

flight that was to the best of their ability, and

then we have a third layer through an independent

third-party consultant that will then double check to

make sure each of those complaints was categorized

accurately then that's reported back to OTI and

COMMITTEE ON ECONOMIC EVIDENCE                                37

updated to close the loop back with the original complainant.

CHAIRPERSON FARÍAS: And the third-party consultant, is that through EDC's contract, like a separate contract through EDC or is that through the operator's contract?

DIRECTOR FREDRIKSON: Yes, it's a third-party consultant through EDC.

CHAIRPERSON FARÍAS: Okay. I'd like to talk a little bit more about that only because I do understand that, I guess I want to better understand what at our point at EDC, clearly we don't have, or maybe you can explain, we need the third-party consultants to verify because of technology systems, capacity, like I would say we want as much of an independent or municipal control over validating complaints and violations, and obviously we have the expectation that all of our operators are being honest and justly evaluating their own complaints that come through, but it's kind of like I'm not going to tell on myself kind of thing, right, so we want to make sure the third party, I'm trying to better understand why you have a consultant and is it

COMMITTEE ON ECONOMIC EVIDENCE                    38

because we don't necessarily have that capacity or the technology necessary to validate and verify?

DIRECTOR FREDRIKSON: Not yet, so that's what we're hoping to achieve with this operating agreement to have and develop that tool so that we can be more informed. That's why we've started with the consultant for that third-party check and, as much as we appreciate the efforts of our operator, sometimes complaints slip through and we want to be able to catch every single one and make sure it's categorized correctly.

CHAIRPERSON FARÍAS: Yeah, totally. That's what I was trying to get at so that's where the tool is coming in this new operation. Got it

All right, and then do we know why there are 30,000 helicopter tourist flights from DMH not showing up with their tail numbers on the flight tracking app that's utilized?

DIRECTOR FREDRIKSON: I'm not aware of flight tail numbers being hidden from the tour operators. If there are instances of that, we will have a look into it.

COMMITTEE ON ECONOMIC EVIDENCE                          39

CHAIRPERSON FARÍAS: There are a ton of instances. I'll start sending you my tweets every morning that I get from the folks.

DIRECTOR FREDRIKSON: Even if the tail number isn't there, I'll say we can still identify which operator it is based on the type of aircraft, where it is at that position, we can still identify so it's not like these complaints are not being accounted for?

CHAIRPERSON FARÍAS: Yeah, I think that is the case. I think a lot of folks feel like their 3-1-1 complaint is actually not being accounted for because there's an inability for them to properly report if the tail numbers are not being identified or being able to be shown. We don't necessarily have, we as the public, me speaking on behalf of the public, don't necessarily have the tools that you might have to do the tracking down of who that operator is and whether or not they're in violation in the moment that it is happening.

DIRECTOR FREDRIKSON: I wish we had different tools or more improved tools. I'm working with Flightradar24 on my iPhone like anyone else.

COMMITTEE ON ECONOMIC EVIDENCE                          40

CHAIRPERSON FARÍAS: And then just quickly on the response rate to constituent 3-1-1 complaints, right? There are a lot of folks that issue complaints into 3-1-1 system, and they rarely get any response back that I think maybe feels validated or not, and I think in the direct connection ends up getting super frustrated and then eventually give up on making a lot of those complaints so I think a lot of folks in the public feel the numbers are skewed because there are a ton of people that are just begrudgingly tolerating what's happening around them. Is EDC fully aware of that and that it's occurring and is that being taken into consideration while developing this new tool?

DIRECTOR FREDRIKSON: Absolutely, and I'll say, even If the respondent hasn't heard back on the complaint, that complaint is still being counted for and is part of the 50,000-plus that we have reported on. I've personally filed my own 3-1-1 complaints, still waiting to hear back on the one from last week, so we recognize that there is a backlog and we're trying to work through that. I will also point out that a large uptick of these complaints are coming from the same users so 90 percent are coming from the

COMMITTEE ON ECONOMIC EVIDENCE                              41

top 20 complainants. Now all complaints are valid, but it is often generated by the same user, many times a day, sometimes with all their neighbors addresses as well, and we take all of those seriously. I just want to point out as well that they're often repeated from the same users.

CHAIRPERSON FARÍAS: Yeah, I totally hear that and that's understandable to look at that data and see that it could be skewed in a way coming from certain individual users but, all that to say is, a lot of people just tolerate it and give up, like apathy in local government is real and it's something that I think all of us are fighting both as elected officials and as City agencies to build more faith and trust with the systems and operations that we have in place for constituents.

DIRECTOR FREDRIKSON: Absolutely.

CHAIRPERSON FARÍAS: I'd like to talk a little bit about the Heliport RFP. The RFP EDC issued for the operation of the Downtown Manhattan Heliport asked bidders to submit proposals to address quality-of-life concerns arising from helicopter operations. What concerns does EDC have regarding quality-of-life issues?

COMMITTEE ON ECONOMIC EVIDENCE                              42

SENIOR VICE PRESIDENT ADGATE: Yeah, I think, Council Member, as we mentioned earlier, we really tried to be responsive to the feedback that we heard from yourself and your Colleagues and our communities, and so some of the things that you see here, the introduction of greenhouse gas reporting that hadn't been done before. Some of it also to our economic development goals so the M/WBE participation rate and standing up a workforce training program. Obviously, this connection to micro-distribution and thinking about our City assets more holistically, as Jennifer said from a sustainable transportation perspective, is a part of the feedback that we have heard as well, and so we really tried to be thoughtful and strategic and thinking about the DMH in particular, since that is the open one, but our assets more generally, so that we're taking that feedback into consideration.

CHAIRPERSON FARÍAS: Okay. Thank you. Why didn't the RFP mandate that only the eVTOLs be allowed for tourist flights as soon as they are approved for use by the FAA instead of us maybe setting a goalpost?

COMMITTEE ON ECONOMIC EVIDENCE                        43

SENIOR VICE PRESIDENT ADGATE: Yeah, I'll hand it over to Anton to talk a little bit about the permitting and jurisdictional process.

DIRECTOR FREDRIKSON: Yes, thank you for the question. It would be wonderful to see all tours switch to eVTOL from day one. We recognize that won't happen overnight, but that it will be a transition, and we'd like to see a whole industry approach to transitioning to that quieter and cleaner type of technology. We've also required incentive plans from each of the respondents for the RFP to demonstrate to us how they are transactionally incentivizing the accelerated rollout of electric vertical takeoff and landing aircraft, and that is part of the evaluation criteria of the RFP so it's something we take very seriously and are doing everything we can to drive that as quickly as possible.

CHAIRPERSON FARÍAS: Okay, and when will the EDC make a selection for the operator at DMH again?

DIRECTOR FREDRIKSON: Yeah, so we're in active procurement right now so it'll be by this fall.

COMMITTEE ON ECONOMIC EVIDENCE                                    44

CHAIRPERSON FARÍAS: Fall. Okay, I just wanted to, before I get into some, actually I'll pause after a couple questions on your testimony and let my Colleagues ask questions if they have any.

In your testimony, you stated the heliports are also significant drivers of economic activity providing a total economic impact of 78 million in the City. I want to get a better idea of this breakdown of economic impact. I'm assuming this is also including like the inclusion of tourism, inclusion of film and TV. I know that is a huge impact that gets put into this 78 million. I remember very clearly because I was left totally shocked in my oversight hearing last year that we have 1.2 to 2 million in revenue generated from the operators itself so I want to get the difference between the 2 million and the 78 million economic impact and if we have a better breakdown of that.

EXECUTIVE VICE PRESIDENT SUN: Sure. Council Member, the 2 million in annual revenue comes to EDC, supports our programs and our ability to deliver on EDC's mission programmatically. Whereas the 78 million dollars in estimated economic impact, that comes from our Economic and Research Group. The

COMMITTEE ON ECONOMIC EVIDENCE                          45

breakdown at a high level is 50 million dollars of

direct economic impact resulting from the heliport

operators making purchases like fuel, for example, or

other supplies to support their operations, and then

20 million of indirect economic impact from spending

of their employees, for example, as workers in the

economy.

CHAIRPERSON FARÍAS: Got it. Thank you,

and I see where that is here in terms of spending and

operations, but do we know how that gets broken down

into like City local investments and if people see

that, like I think initially what I've been trying to

do with looking at some of these issues is like where

are the measures that we take in whether it's from

revenue generation or from our City budget and say

how do we rectify and make investments locally

whether it's for the noise complaints or for the

environmental justice impacts that we see. Do we know

if there's any direct way that that estimation of

revenue gets put into communities locally?

EXECUTIVE VICE PRESIDENT SUN: I think

conceptually the spending that results from the

heliport activity would be realized through City tax

levy funds through tax revenue that then goes through

COMMITTEE ON ECONOMIC EVIDENCE                                46

the general fund and then is probably dispersed by OMB at a citywide level, rather than being locally targeted.

CHAIRPERSON FARÍAS: Okay, so we need to see more local remediation efforts in our City budget specifically for this if it goes back into the general fund.

Another part of your testimony I just highlighted and wanted to see if we had a number for these cases, you stated public use facilities operate as the refueling stations for helicopters traversing throughout the Northeast and tristate areas. How many folks are actually having to stop for emergency or utilize, do we know how many stops a day do we have for refueling?

EXECUTIVE VICE PRESIDENT SUN: I think we'll have to look through our data to see if we can get to that level of granularity.

CHAIRPERSON FARÍAS: Thank you. Okay. Do we have any, Lincoln just left, do you have questions? Okay, I'll pass it over to Council Member Bottcher for questions.

COUNCIL MEMBER BOTTCHER: Thank you, Chair. Thank you.

COMMITTEE ON ECONOMIC EVIDENCE                                47

Help us understand, what's your realistic estimate, most optimistic, most pessimistic with respect to the approval of electric air taxis, electric helicopters. What can we really expect one year, two year, three years, four years, five years?

DIRECTOR FREDRIKSON: Yes, thank you for the question. We share in that we want to see the rollout of this technology and this really quiet technology as soon as possible. From a technological standpoint, we've seen that these aircraft can fly. I think a number of people here in this room were present at our demonstration flight in November at the Downtown Manhattan Heliport, and we heard, or rather we didn't hear, just how effective these aircraft were in addressing quality-of-life issues so we're very encouraged by that. Now in terms of certification, that's up to the FAA. The companies that we are engaged with in the industry and in our conversations with the FAA, we're anticipating 2025 for that certification. Now, could it be '26 potentially for the commercial rollout? We recognize that it may not happen exactly in '25 so that's what we're aiming for, the '25, '26, and we're really hoping and having conversations everywhere we can to

COMMITTEE ON ECONOMIC EVIDENCE                              48

make sure we stick to that. We also have some competitive dynamics when we look internationally so I'll point out that in Paris for the Olympics, the European equivalent of the FAA may be approving as soon as this summer so we will have our eyes there to see if that gets done and then it always adds a bit of competitive dynamics. The Chinese have also started with certification actually late last year. We don't know exactly the standards they've been using so I don't think that's the right comparison, but it's encouraging to see that this is happening, not just here in the U.S. but around the world and put some pressure on our regulators as well.

                COUNCIL MEMBER BOTTCHER: So let's say in January of next year, the FAA announces that we, the FAA, have approved electric air taxis as a safe flying technology in the United States. What then happens here in New York City in the EDC heliports for you to allow that technology, when would that be happening in New York City?

                DIRECTOR FREDRIKSON: Right away.

                COUNCIL MEMBER BOTTCHER: So they approve it in January of next year, and we think that we

COMMITTEE ON ECONOMIC EVIDENCE                                    49

could see electric air taxis in the air late January of next year?

DIRECTOR FREDRIKSON: We don't know about the January date first of all. I will say that the nice thing about being in New York and, particularly because of these noise issues, this is the top market for most of these companies. I personally worked at one of these companies prior and the reason I'm in this role is because New York kept on coming up at the top of this list for the rollout of this technology, and we see in the interest that a leading European eVTOL company, a leading American move their aircraft to our heliport to demonstrate that this is a top priority for them so we're encouraged that these companies that have these aircraft and hopefully the customers of these aircraft as well, depending on the business model, will put New York first on that list. We'd like to beat Paris.

COUNCIL MEMBER BOTTCHER: And the charging infrastructure, do we have currently in place at the EDC heliports, do you have the charging infrastructure in place that these companies would require?

COMMITTEE ON ECONOMIC EVIDENCE                    50

DIRECTOR FREDRIKSON: Thank you for the question. We recognize it's a bit of a chicken and egg problem, and that's why we've made a policy decision to put the infrastructure in right away so what we've done through our procurement is we've made it, not a nice to have, but a requirement for that operator to make the necessary infrastructure upgrades to support electric aircraft within 12 months of FAA certification and definitely within that five-year term. So let's play it out, in the very unfortunate event that the FAA doesn't certify within five years, that operator will have already invested that money in that infrastructure that may not even be used, and that's something that we are requiring of our operator.

COUNCIL MEMBER BOTTCHER: On the west side, I represent the Manhattan Cruise Ship Terminal, and we're working to provide shore power for the cruise ships. That is going to be a multi-year process because what we're waiting on is to hear from Con Edison on whether or not a new electrical substation will be needed to accommodate the charging infrastructure. Do you know if at the heliports, if Con Edison has made a determination about the need

COMMITTEE ON ECONOMIC EVIDENCE                                    51

for a new electrical substation, or does the current

power, would that accommodate the charging

infrastructure that you need?

DIRECTOR FREDRIKSON: That's a very good

point. Internally, we've done an analysis of the

existing substation capacity and are confident that

there is adequate capacity for a number of charging

stations at the heliport. We also are in

conversations with Con Ed across our portfolio to

make those necessary upgrades and to make sure that

the capacity is there. Thirdly, I will say that

working with the operator, we will go hand in hand

with Con Ed to make sure that that capacity is in

place. On timing, I will say as well, you mentioned

that it may take some time to build this out for

something like Manhattan Cruise, within the 12-month

time clock that we've set through our procurement is

for that infrastructure to be in place and

operational so for the operator of the Downtown

Manhattan Heliport, they need to make those

investments right away and start planning for that

right away. They're not waiting until certification

because they know this is an expectation that has to

be in place as soon as a certification hits.

COMMITTEE ON ECONOMIC EVIDENCE                          52

COUNCIL MEMBER BOTTCHER: Thank you.

CHAIRPERSON FARÍAS: I now like to recognize Council Member Vernikov for her questions.

COUNCIL MEMBER VERNIKOV: Thank you, Chair.

Just a couple questions. I believe you stated earlier there were about 50,000 noise complaints from 3-1-1 calls. Is that correct?

DIRECTOR FREDRIKSON: Yes.

COUNCIL MEMBER VERNIKOV: Can you just specify how many of those are from essential service flights like medical and emergency if you know?

DIRECTOR FREDRIKSON: Yeah, we can get back to you on the exact numbers. I do know from looking at the aircraft owners of these individual complaints that the top two is a newsgathering operator and the NYPD. Those are the essential ones.

COUNCIL MEMBER VERNIKOV: But you don't know how many right now?

DIRECTOR FREDRIKSON: I have it somewhere here.

COUNCIL MEMBER VERNIKOV: Okay. Okay, yes, that's good.

COMMITTEE ON ECONOMIC EVIDENCE                          53

Do you happen to know what would be the economic loss to specifically the tourism industry if we ban non-essential helicopter flights?

EXECUTIVE VICE PRESIDENT SUN: No, Council Member, we haven't looked at that specific analysis, but that's something that we can work with our team to see if we can respond to that.

COUNCIL MEMBER VERNIKOV: So that would be you guys, you guys would be the ones to make that assessment?

EXECUTIVE VICE PRESIDENT SUN: We would speak with our Economic and Research team to see if they have the ability to make that kind of estimate and analysis of economic loss.

COUNCIL MEMBER VERNIKOV: Okay, great. Thank you. That would be great, and then just one more question. If you know, do you think that the City Council is the appropriate venue to deal with these issues?

SENIOR VICE PRESIDENT ADGATE: Thank you for the question, Council Member. I think it sort of ties back to the Chair's comment about the legislation currently before the Committee. The Law Department has been working closely reviewing this

COMMITTEE ON ECONOMIC EVIDENCE                                    54

legislation to really understand the jurisdictional

boundaries because aviation is such a complex

structure and so we obviously value the relationship

that we have with the Council in terms of addressing

quality-of-life issues, but for the actual legal

analysis of all of the different bills that are

before you today, we'd have to defer to the Law

Department.

COUNCIL MEMBER VERNIKOV: Thank you very

much.

CHAIRPERSON FARÍAS: Thank you. As Chair

of the Committee on Economic Development that

oversees the EDC where all these heliports are

municipally our property, I'd like to say it is under

our jurisdiction to have oversight of this.

I'd now like to recognize Council Member

Brewer who also has questions.

COUNCIL MEMBER BREWER: Thank you very

much. I've been working on this issue for about 25

years, and so I hope we get somewhere. It is a huge

challenge for New Yorkers to hear this noise. My

question around the Downtown Heliport is, maybe you

talked about this, I was teaching at Hunter today so

I'm late, I'm sorry. You have an RFP out, you have

COMMITTEE ON ECONOMIC EVIDENCE                                    55

three or four people who are responding. One of them is more of a marine-type response. Is that something that you could take seriously? I know you can't talk about it, it's an RFP, you got to wait to see what happens, but I'm just saying could you consider being more out of the box thinking about that heliport so it's not including those who are just using it to go out to East Hampton or for tourism. Is that something that is even in your thinking?

EXECUTIVE VICE PRESIDENT SUN: Yeah. for the question, Council Member. You are correct. We can't speak specifically about responses that we have received but, as you saw in the RFP that we put out, we very much clarified and specified that we are looking to integrate DMH into our broader marine highway network, and so that was language that was in the RFP itself. We talked a little bit about our goals from a sustainable transportation perspective and, as you saw at the event that we did last fall, we had sort of demonstration project because we do think it's critical that we think of all of these assets from a variety of perspectives.

COUNCIL MEMBER BREWER: Okay. Maybe I know too much, which is often a problem, but one of the

COMMITTEE ON ECONOMIC EVIDENCE                    56

RFP responses is for marine more than aviation, and the other two, I happen to know what they're saying, is much more aviation. I'm just saying, please, EDC, think outside the box when you respond to this thing.

Number two, the 34th Street Heliport. That could be ended tomorrow if the City and the State decide, they have to do it together, that you don't want that heliport there. I will speak for the Hudson River Park Trust. They would lose 1.7 million dollars. They're fine to do that. Fine. No problem. So what are you doing to work with the State to either move it out into the river, I know it's controversial with DEC, I know all of those issues, but it's crazy to have, you obviously need maybe police and you need press and you need emergency, I got it, but you have a lot more going out of that so what are you doing to think about changing and reducing the traffic if not eliminating it from 34th Street? All you have to do is say City and State, we're changing.

SENIOR VICE PRESIDENT ADGATE: Yeah, so Council Member, I really appreciate the question. As you mentioned, we do not operate the heliport. The Hudson River Park Trust…

COMMITTEE ON ECONOMIC EVIDENCE                              57

COUNCIL MEMBER BREWER: Listen, I want to be clear. If you say to the State, if Hochul and Adams say we don't want it, they're done.

SENIOR VICE PRESIDENT ADGATE: I would say we have regular conversations with the Hudson River Park Trust and happy to continue talking with you and them about the future of that site but, just from a jurisdictional perspective, that is not a heliport that we operate.

COUNCIL MEMBER BREWER: Okay, but I'm letting you know, with all due respect, that's a little bit of a BS answer because the Hudson River Park Trust will give it up tomorrow if you and the State tell them to.

SENIOR VICE PRESIDENT ADGATE: I understand, Council Member. Thank you.

COUNCIL MEMBER BREWER: Okay, so are you talking to the State about it also? The hell with the folks at the Trust are willing to say goodbye. Are you talking to the State?

SENIOR VICE PRESIDENT ADGATE: I would have to defer to Anton. I don't believe that we have had a specific conversation with the State about that.

COMMITTEE ON ECONOMIC EVIDENCE                          58

COUNCIL MEMBER BREWER: Could you have one please? Could you promise to do that?

SENIOR VICE PRESIDENT ADGATE: Yes, and we can report back to you.

COUNCIL MEMBER BREWER: Thank you, and then, finally, New Jersey. I went to New Jersey. I flew in a plane. I went right over Central Park and Brooklyn Bridge Park and Governors Island and the doors off and so on and so forth. What are you doing with the feds to advocate for the bill because it ain't going to happen by itself without the federal government. New Jersey makes lots of money, I've been out there, I tried to stop it, local Council Member tried to stop it. It's not happening if the feds don't help us. What are you doing to help us with the federal government, FAA.

DIRECTOR FREDRIKSON: Thank you, Council Member. We're part of a working group with the FAA and representatives of the helicopter industry including from the New Jersey side and officials from New Jersey DOT, EDA and are initiating those discussions to how do we look at this more holistically and across the region. We don't have the same leverage as we do over heliport operators in New

COMMITTEE ON ECONOMIC EVIDENCE                          59

Jersey. As you know, the helicopter tours that leave from Manhattan all follow over white water routes. We'd like to see similar.

COUNCIL MEMBER BREWER: I negotiated that. I'm aware of it.

DIRECTOR FREDRIKSON: Yes. Thank you for that, and so we'd like to see as close in adherence to those routes as possible, working in collaboration with New Jersey stakeholders, recognizing that our powers are limited here. We can influence and…

COUNCIL MEMBER BREWER: I know my time is up. I have two resolutions that say support the federal, Nadler and other acts that say shut it down. Is that something that you support, federal legislation to shut down tourism over Manhattan or anyplace else, but particularly over the five boroughs. That's what I'm talking about.

SENIOR VICE PRESIDENT ADGATE: Yeah, thank you, Council Member. I would say in terms of reviewing the resolution, I have the same response about the legislation in that we need to review all of them holistically, and we're working closely with the Law Department on that so I'm not yet ready to comment on our response.

COMMITTEE ON ECONOMIC EVIDENCE                          60

COUNCIL MEMBER BREWER: That's the only way to close New Jersey. There is no other way. Thank you.

CHAIRPERSON FARÍAS: Thank you, Council Member.

I'd like to recognize Council Member Restler.

COUNCIL MEMBER RESTLER: Thank you. I just want to take a second to again, thank you, Chair, for leading this hearing and being such a strong voice on this issue, and I also want to thank my Colleague from the Upper West Side, who has been a strong leader on this issue for a very long time, and we have many elected officials in New York City, like Congressman Nadler, Congressman Velázquez, many others who have been fighting hard to rein in the helicopter industry, but none have fought harder than Gail Brewer, and so just credit to Gail for all the work that she's done for a very long time on this.

Sir, you mentioned international competition and that we're looking at other global cities and how they're looking at electric helicopters, but also I hope how they're reining in the helicopter industry. Are you aware that Paris

COMMITTEE ON ECONOMIC EVIDENCE                        61

does not allow non-essential tourist helicopter flights over their city?

DIRECTOR FREDRIKSON: Yes, I'm aware.

COUNCIL MEMBER RESTLER: Okay, and yet no consideration of a similar policy is in place in New York.

DIRECTOR FREDRIKSON: That's a federal decision so the FAA controls the airspace, so that is not up to us.

COUNCIL MEMBER RESTLER: But we do control our own helipads and what happens at New York City helipads. Is any decision being considered to end non-essential tourism helicopter flights at New York City Economic Development Corporation-owned helipads?

SENIOR VICE PRESIDENT ADGATE: Yeah, thank you for the question, Council Member. In the same vein of how we are reviewing the legislation that you've introduced, that is a conversation that is ongoing with the Law Department so if the question is are you considering it, I would say yes within the context of our review of your legislation.

COUNCIL MEMBER RESTLER: I have to say I don't recall when Chair Farías notified the Economic

COMMITTEE ON ECONOMIC EVIDENCE                                    62

Development Corporation of this hearing. Do you know the date that you were made aware of this hearing?

SENIOR VICE PRESIDENT ADGATE: I think it was about three weeks ago.

COUNCIL MEMBER RESTLER: Three weeks ago, and the bills that are being considered today, almost all of them had been introduced months, if not years ago. Is that correct?

SENIOR VICE PRESIDENT ADGATE: That's correct. Some are 2022 for some of them.

COUNCIL MEMBER RESTLER: And the expectation, you've worked in governmental affairs for a long time, the expectation of agencies is to come prepared to testify on the bills at the hearings at which you attend. Is that correct?

SENIOR VICE PRESIDENT ADGATE: Yes.

COUNCIL MEMBER RESTLER: So to have no comment whatsoever on half a dozen pieces of legislation, is that correct? You can understand how that is frustrating to the Members of the City Council.

COUNCIL MEMBER RESTLER: I absolutely understand the frustration. I would just ask you to keep in mind a couple of different things. One, from

COMMITTEE ON ECONOMIC EVIDENCE                                63

a legislative perspective and a legal perspective, we do rely on the Law Department and their level of expertise, particularly when it comes to the complexity around federal airspace, aviation jurisdiction, and so on, and so it is not a legal review that lies within EDC only. We do work with our colleagues at the Law Department who I know also work with Council Legal on review as well and so, while I can't speak on behalf of the Law Department, I can say that they are earnestly reviewing the legislation from that lens.

COUNCIL MEMBER RESTLER: If they were earnestly reviewing the legislation, then we would have answers at the hearing today. If this Administration was taking the City Council seriously, we would have answers today. I mean City Hall is sitting here. It's disrespectful. It's disrespectful for your agencies to show up here unprepared to answer our questions and to respond substantively on the legislation that we introduced. We put an enormous amount of effort into these bills and to crafting them thoughtfully, carefully, deliberately with our lawyers, making sure that they are in fact legal and appropriate and, to not get responses, it

COMMITTEE ON ECONOMIC EVIDENCE                              64

really undermines our ability to do our jobs, and it's really disappointing.

CHAMBERS: (APPLAUSE)

COUNCIL MEMBER RESTLER: No, you're not allowed to, you're not, please, do like that instead. I'm sorry.

I'm sorry to get worked up, but it's disappointing and it's frustrating and it really does undermine what we're trying to accomplish in these hearings.

I'll move on to other questions. As you shared in your in response to earlier questioning, we saw the number of complaints double from 2023 to 2024 around helicopter noise in New York City. What did EDC do in response to doubling of complaints, nearly 60,000 complaints, to try to lessen negative impacts in our communities?

SENIOR VICE PRESIDENT ADGATE: Yeah, thank you for the question, Council Member. I think in terms of where our leverages and where we have regulatory authority, we really see that in our concession agreements and the management of the heliports and so, as we described in our testimony and in response to the Council Members' questions,

COMMITTEE ON ECONOMIC EVIDENCE                    65

the things that we have added into our RFP for the

new operator speak directly to what we are doing to

further address these concerns so reduction of tour

hours by 30 percent. That is something that we have

the ability to do within this agreement that is

separate from the FAA jurisdiction over airspace.

COUNCIL MEMBER RESTLER: And to that,

what's the current number of flights that are

permitted under the current agreement?

SENIOR VICE PRESIDENT ADGATE: I'm going

to differ to Anton for the specifics.

DIRECTOR FREDRIKSON: Yeah, we have a

flight cap at the downtown Manhattan heliport of

30,000…

COUNCIL MEMBER RESTLER: 30,000 and then

the new RFP allows for?

DIRECTOR FREDRIKSON: It's the same flight

count.

COUNCIL MEMBER RESTLER: Same, so despite

the 30 percent reduction in hours, we're talking

about the same number of helicopter flights that

communities are going to be burdened by as a result

of the new RFP?

COMMITTEE ON ECONOMIC EVIDENCE                    66

DIRECTOR FREDRIKSON: Not necessarily. We don't want to create a situation where we're concentrating all that they should be reaching that flight cap still within the hours. They should be operating safely within those hours.

COUNCIL MEMBER RESTLER: I hope that everything's operating safely, but I just mean facts, numbers, it's the same number of flights from the old RFP to the new RFP. Is that right?

DIRECTOR FREDRIKSON: That's correct, yes.

COUNCIL MEMBER RESTLER: Okay, so I just, for me, that's really disappointing because we've seen complaints skyrocket, and yet we're not doing anything to actually rein in the number of flights…

DIRECTOR FREDRIKSON: I'd like to point out that 1 percent of all complaints are tours from the Downtown Manhattan Heliport so…

COUNCIL MEMBER RESTLER: To that point, I have to say, I'll give you an example. We recently had two complaints that came in to 3-1-1 then they called our office. We followed up with EDC because the complaints were dismissed as non-tourist flights. We sent in images, we sent in the course of the

COMMITTEE ON ECONOMIC EVIDENCE                              67

flights and, of course, EDC then confirmed, yes,

these were tourist flights so nobody's perfect.

DIRECTOR FREDRIKSON: I know.

COUNCIL MEMBER RESTLER: And everybody

makes mistakes. I only get so many times that

constituents follow up with the 3-1-1 numbers that we

can follow up and say, hey, this is what's real, but

when you say it's 1 percent and I say I've got

anecdotally two complaints from recent weeks from

constituents that were dismissed as non-tourist

flights but were in fact confirmed subsequently by

EDC as tourist flights, I don't really know what to

believe. I can tell you that when I sit in Brooklyn

Bridge Park, in my community, and the helicopters are

idling up above, that's not Blade, that's not

somebody going to JFK or the Hamptons. They want to

see the park. They could see it perfectly well from

the ground, but they choose to watch it from up

above. I know some of those flights are coming from

New Jersey, but a lot of those are tourist flights

that are coming from our helipads and that we

control, and I get that there's state and federal

regulations here, especially federal, but we control

COMMITTEE ON ECONOMIC EVIDENCE                                68

our helipads. Is it not within our power to regulate

what happens at our helipads?

SENIOR VICE PRESIDENT ADGATE: I think,

Council Member, I will refer back to the improvements

on the flight tracking system that we have laid out

for the RFP because I definitely see the point, and

it's our teams that are following up when there is a

discrepancy and so we know that there's improvement

on the data collection that needs to happen and on

the transparency side, and that's the very reason why

we have baked that into that RFP.

COUNCIL MEMBER RESTLER: I have additional

questions but, perhaps if there's time for more, I

can come back later. Thank you.

CHAIRPERSON FARÍAS: Thank you so much.

Just really quickly, in the RFP that's listed that we

have submissions on, is there a listed leasing fee

for the operators? Is there a description of how much

the operators would have to pay to utilize and lease

out of usage from the heliports?

DIRECTOR FREDRIKSON: Yeah, so it's the

concession that we're running through a competitive

procurement so, as one of multiple evaluation

criteria, it is a fee offer, and it's up to the

COMMITTEE ON ECONOMIC EVIDENCE                              69

market to come up with the most competitive fee offer to generate the most revenue to the City but, again, that's just one evaluation criteria that we're balancing along with operational experience and quality-of-life concerns as well.

CHAIRPERSON FARÍAS: Okay, great. I'd like to see our revenue directly generated from at least these agreements that we have to be higher than what we're getting so please keep me in the loop of what that turns out to be with the RFP.

Heliports emit more than 40 times the carbon than passenger cars. Does EDC see a conflict between the City's overall air quality goals that we've set with allowing the heliports to be used for non-essential purposes like air tours?

SENIOR VICE PRESIDENT ADGATE: I think, Council Member, we see the management of all of our assets very holistically, right, so we were in front of you a couple of months ago talking about shore power with the cruise terminals. Jennifer and her team have been working very closely with DOT on marine highway. We work closely with Mayor's Office of Climate and Environmental Justice on, not just environmental justice communities, but air quality

COMMITTEE ON ECONOMIC EVIDENCE                                        70

programming and, of course, our colleagues from DEP are with us today so I wouldn't say that we think of any one of our particular program areas separate and apart from the rest. We try to think about sustainable transportation within the City's overall goals and, as EDC being responsible for things like the Green Economy Action Plan and looking at the future of green jobs and other like really critical elements to not just the green economy but our overall public health and environmental goals, we try to take an integrated approach as we look across the board.

CHAIRPERSON FARÍAS: Okay, thank you.

I'm going to give EDC a little bit of a break and pull in DEP folks. Hi, folks. What's the City's current protocol for responding to and investigating helicopter noise?

DIRECTOR MCLAUGHLIN: Good morning. Thank you for the question. DEP does not receive the 3-1-1 noise complaints for helicopters so we do not respond to those.

CHAIRPERSON FARÍAS: Does DEP currently have the capability to monitor and report on helicopter noise levels in the city?

COMMITTEE ON ECONOMIC EVIDENCE                          71

DIRECTOR MCLAUGHLIN: No, as far as we know, the technology to do so does not really exist, and so we do not have that capability to track and monitor helicopter noise.

CHAIRPERSON FARÍAS: And do you folks have an idea of what resources would be needed to implement the requirements of my bill, Intro. 27?

DIRECTOR MCLAUGHLIN: We don't because, like I said, as far as we know, the technology required by the bill does not exist but, if it were to be developed in the future, it would certainly be very expensive, in the millions, to install, maintain, and then store all the data required by the bill.

CHAIRPERSON FARÍAS: Do you folks monitor any other decibel meters throughout the city?

DIRECTOR MCLAUGHLIN: We have a decibel meter program to respond to muffler noise on a few roadways throughout the city.

CHAIRPERSON FARÍAS: How many roadways do we have decibel meters for?

DIRECTOR MCLAUGHLIN: We currently have 10 of the noise meter cameras for muffler sound.

COMMITTEE ON ECONOMIC EVIDENCE                                        72

CHAIRPERSON FARÍAS: Okay, and are those all based in one borough or throughout the five boroughs?

DIRECTOR MCLAUGHLIN: They're throughout all five boroughs.

EXECUTIVE DIRECTOR PAGE: They're in four boroughs currently.

CHAIRPERSON FARÍAS: In four boroughs, so we have 10 decibel meters amongst four boroughs. Do we know how much that costs us to run?

EXECUTIVE DIRECTOR PAGE: Those meters individually are around 35,000 dollars and then associated staff.

CHAIRPERSON FARÍAS: And how do we regulate that data or analyze that data?

EXECUTIVE DIRECTOR PAGE: The cameras are triggered by a sound level of 85 decibels and, when that sound level is hit, it takes about a 20 second video and that video is stored.

CHAIRPERSON FARÍAS: Okay.

EXECUTIVE DIRECTOR PAGE: All other recordings are not stored. It has a finite amount of data.

COMMITTEE ON ECONOMIC EVIDENCE                              73

CHAIRPERSON FARÍAS: And is there a violation associated?

EXECUTIVE DIRECTOR PAGE: Correct. There's a summons if we're able to determine the source of that noise and identify the license plate number of the vehicle.

CHAIRPERSON FARÍAS: Sure.

EXECUTIVE DIRECTOR PAGE: We issue a summons.

CHAIRPERSON FARÍAS: Do you know off the top of your brain how much the summons is?

EXECUTIVE DIRECTOR PAGE: 800 dollars for the first offense.

CHAIRPERSON FARÍAS: First offense, 800. Okay, and just for the sake of me right now, because math was never my strong suit so that's like 350,000 to at least run this program with just the meters each, not associated with administration and staff or whoever else has to write in the system itself. Okay. I look forward to this…

EXECUTIVE DIRECTOR PAGE: I'll just add in though that the summonses go into the general fund.

CHAIRPERSON FARÍAS: And the summons is going to the general fund.

COMMITTEE ON ECONOMIC EVIDENCE                          74

EXECUTIVE DIRECTOR PAGE: (INAUDIBLE) paid into the general fund.

CHAIRPERSON FARÍAS: Got it. I appreciate that. That gives me a really good idea in the positive response that I should probably receive from the Admin on this plan because we do something similar already, we already issue summonses. Apparently, there's a video technology, which is great, because that could help us with what's above, and it does not seem too costly to me in comparison to a 107-billion-dollar budget.

DIRECTOR MCLAUGHLIN: Sorry, Council Member, if I could just jump in to clarify that the program for the muffler noise is very different than what we think the bill envisions.

CHAIRPERSON FARÍAS: Sure. I wouldn't know because I don't have a response yet.

EXECUTIVE DIRECTOR PAGE: Sure. Well, we can speak about from the operational side of this bill that we do not support it because, first, as I said, we don't think this technology exists, as far as we know it does not exist, and then, then if it were to be developed in the future, of course, it would be extremely costly to install an unknown

COMMITTEE ON ECONOMIC EVIDENCE                          75

amount of meters at a cost that we don't know because it doesn't exist yet to maintain them, to staff a program to monitor them and then, of course, all of the data that's required, which is an extraordinary amount of data and, like Director Page mentioned, we don't store constant data with our muffler program, right? We only store the snippets of when we believe there is a violation. The bill calls for constant data to be kept, I think every five seconds for an unknown amount of time, so that the storage even itself would be extremely expensive and, because DEP does not have enforcement authority over this noise, we wouldn't be able to do anything with this extremely expensive data that we've been gathering, and so we think it's much more valuable to allocate our resources in areas where we can do enforcement and can really make an immediate difference in the quality of life and the health of our neighbors.

CHAIRPERSON FARÍAS: I look forward to getting a full response on the bill and the recommendations on amendments to my bill that would better work for the agency itself and the City of New York.

DIRECTOR MCLAUGHLIN: Absolutely.

COMMITTEE ON ECONOMIC EVIDENCE                          76

CHAIRPERSON FARÍAS: Ultimately, you folks as an agency do oversee noise complaints and, with the mass amounts, from what we see from year to year, double the amounts of noise complaints we are receiving, maybe the City has to think a bit more constructively and innovatingly on what we do with our City-owned property and how we actually take aggregated data from 3-1-1 and associate it appropriately to violations throughout the city to make sure we have good actors in our communities.

Okay, with that, I'll end there because these other questions that I have for you folks, we don't have a response on the bill so it doesn't seem like I can ask them right now, but I will follow up with them so we can have a better thorough response.

I'd like to also acknowledge Council Member Salamanca, and I'd like to call Council Member Brewer for second round questions followed by Restler.

COUNCIL MEMBER BREWER: Very quickly, and maybe you said this, but what is the timing on the RFP that's for the Downtown?

COMMITTEE ON ECONOMIC EVIDENCE                          77

EXECUTIVE VICE PRESIDENT SUN: Our goal, Council Member, is to select an operator by this fall.

COUNCIL MEMBER BREWER: By this fall. I do appreciate coming to the electric helicopter event. What's the timing on an electric helicopter? I assume it's not by the fall.

DIRECTOR FREDRIKSON: Not by the fall, unfortunately, but we are anticipating FAA certification as soon as 2025.

COUNCIL MEMBER BREWER: 2025 so, the RFP could talk about electric but it wouldn't be able to implement until 2025. Is that what you're saying?

DIRECTOR FREDRIKSON: It talks about electric and we're requiring our operator to start making investments right away in anticipation of FAA certification.

COUNCIL MEMBER BREWER: But electrics wouldn't be operating until 2025 ostensibly.

DIRECTOR FREDRIKSON: As much as we'd like that to be the case…

COUNCIL MEMBER BREWER: Okay.

DIRECTOR FREDRIKSON: The aircraft have to be certified by the FAA first.

COMMITTEE ON ECONOMIC EVIDENCE                                78

COUNCIL MEMBER BREWER: Okay, and is it possible to have, looking at the RFPs again, where it's not implementing any helicopters that are doing what I would consider tourism or non-essential tasks, is that something that is part of that discussion with the RFP?

EXECUTIVE VICE PRESIDENT SUN: So the RFP takes the approach recognizing that EDC has the ability through our concession agreements to try to, through policy moves, further restrict tour flights at DMH, and so that's the requirement then of reducing the tour operating hours by 30 percent. That's an effort to be further responsive to quality-of-life concerns.

COUNCIL MEMBER BREWER: How does that impact that 30,000 flight number?

EXECUTIVE VICE PRESIDENT SUN: It doesn't. I acknowledge that we're not changing the overall annual flight cap. That still remains at 30,000, but still we're trying to, through operations, reduce the number of tour flights and how often they're in the skies.

COUNCIL MEMBER BREWER: Okay, just so I understand, what is the purpose of having these tour

COMMITTEE ON ECONOMIC EVIDENCE                                    79

flights? Is it because you're afraid? I know de Blasio used to tell me, I tried with Bloomberg, he had a helicopter and he was a pilot so I gave up, and then I tried with de Blasio and he told me that if we didn't have them in New York, meaning tourism and non-essential, everybody would go to New Jersey. They're already in New Jersey so we have to work on the federal to get rid of New Jersey, but it does seem to me that we shouldn't be, I don't understand the economic model, particularly if you have a new RFP that is giving you the kind of income you want, why you have to include the tourism and the non-essential? What is the economic input for that?

EXECUTIVE VICE PRESIDENT SUN: So a rationale from an economic perspective is that as excited as we are about eVTOL technology, it is still relatively new, and so it might be perceived as risky if we were to require eVTOL only out of these operations and so, recognizing that there might need to be a transition from conventional helicopters to fully electric helicopters, maintaining some amount of tour flights, for example, allows that transition from a revenue perspective, meaning you maintain some revenue from traditional helicopters to then support

COMMITTEE ON ECONOMIC EVIDENCE                         80

incentives that then encourage the faster adoption of

eVTOLs.

COUNCIL MEMBER BREWER: You're just making New Yorkers crazy with this, and it's not everybody and so I'm just suggesting that you really reconsider the tourism, non-essential, even if there's a period that you have to with fossil fuel still being the main attraction or the main driver, and I'm not even clear with the electric if they're completely quiet. It seemed like they were, but I am not convinced. Please reconsider this. Thank you.

CHAIRPERSON FARÍAS: Thank you, Council Member.

I'd now like to recognize that we've been joined by Council Member Gutiérrez and call on Council Member Restler for his additional questions.

COUNCIL MEMBER RESTLER: Thank you so much, Chair, and I do want to say I think there were some good things in the new RFP. I know that you all are good professionals and you're trying, but the policy of the Administration is to prioritize the needs of the top .001 percent of New Yorkers who use these helicopters over the needs of people in our

COMMITTEE ON ECONOMIC EVIDENCE                          81

neighborhoods and communities, and ultimately that decision is made at City Hall and the Mayor is wrong.

I do want to just dig in on a few specific things. The implication of what you said, even though you haven't responded to any of our bills today, is that a reduction in these flights would be detrimental to the economy and move these flights to New Jersey. Do you think that extremely wealthy people who are taking flights to JFK or the Hamptons would travel from Lower Manhattan to New Jersey to get on helicopters?

SENIOR VICE PRESIDENT ADGATE: I think, Council Member, the point that we tried to make in terms of industry moving to other locations is less about the personal or individual choices of a person or a company and more about what are the opportunities. Let's just say for tour flights in particular, that we do have the ability to control from…

COUNCIL MEMBER RESTLER: Excuse me, but my question was do you think that very wealthy individuals who go to the Hamptons or JFK that represent a significant amount of the helicopter travel that we all are burdened by in our

COMMITTEE ON ECONOMIC EVIDENCE                          82

communities, those people who are just doing it for

time, right, they're too rich and important and fancy

to take cars or public transit like the rest of us.

Do you think they would take the time to go to New

Jersey to get on a helicopter to go to the Hamptons

or JFK?

SENIOR VICE PRESIDENT ADGATE: Council

Member, I really cannot speak to what a hypothetical

person may or may not do.

COUNCIL MEMBER RESTLER: I just mean to

say it would definitely take them more time. They

wouldn't do it. It would eliminate that helicopter

travel. That would be to the benefit of our

communities, and some percentage of the tourists

would choose not to go to New Jersey. Some would,

some wouldn't but, ultimately, it would lead to a

reduction in the total amount of helicopter activity

that we are burdened by in our neighborhoods, and

that would make it a positive thing. We have no idea

what EDC, I mean we know what EDC's policy is on our

bills, we didn't hear it today unfortunately because

we didn't get a response in your testimony, but it

would inevitably help our neighborhoods to eliminate

the non-essential tourism travel so the idea that all

COMMITTEE ON ECONOMIC EVIDENCE                          83

of it is just going to move to New Jersey is not true.

I'd like to also ask about noise. Could you just clarify what studies have taken place to evaluate the noise impacts in places where we see chronic, intense helicopter noise like Brooklyn Bridge Park?

EXECUTIVE VICE PRESIDENT SUN: I would defer back to what our colleagues at DEP said in terms of us not being aware of any specific studies on the ground in a place like Brooklyn Bridge Park that is able to assess and quantify helicopter traffic, looking to my colleagues in case I'm mis-stating that, but…

COUNCIL MEMBER RESTLER: I would strongly encourage you to consider it because we all have seen the research about the long-term health impacts that noise can have on people sleep, on their anxiety levels, on cardiovascular issues. There's a relatively small number of areas in New York City that are experiencing the intense burden of this helicopter activity. I was going to actually read you just one of the testimonies from one of my constituents who's submitting it today. Suffice it to

COMMITTEE ON ECONOMIC EVIDENCE                                    84

say that the massive disturbances to my sleep, sanity, and overall quality of life have pushed me beyond my human limits. This, on top of the blatant disregard for our suffering environment by climate crisis joy-riders, is why I support the legislation being considered today.

I hear this from thousands of my constituents. You're nodding because it's real. This is in my District, it's not every District in New York City, but in my District thousands of people are negatively impacted every day, but we can't say that we've studied and looked at what are the actual impacts of the noise in these communities so I really hope the DEP and EDC will undertake the necessary studies and analysis to see what kind of horrible impact this permitted industry is having, and then I also just wanted to ask you about jobs. Remind me, again, how many jobs are associated with the two helipads in New York City?

CHAMBERS: 125.

COUNCIL MEMBER RESTLER: I know the number. I was asking them for the record.

COMMITTEE ON ECONOMIC EVIDENCE                                85

SENIOR VICE PRESIDENT ADGATE: There is an estimated total of 175 jobs.

CHAIRPERSON FARÍAS: I just want to reiterate, again, the public has to be silent. Thank you.

COUNCIL MEMBER RESTLER: But I appreciate the knowledgeable folks in the audience. You must be in one of the neighborhoods. So 173, 175 jobs. Have you done any analysis that if these helipads were limited to essential activity, how many jobs would potentially be lost?

EXECUTIVE VICE PRESIDENT SUN: We haven't looked at that incremental difference.

COUNCIL MEMBER RESTLER: Okay. I appreciate there is a potential path in downtown to go to electric which would have significant environmental and noise benefits in all communities, but I strongly want to encourage the Mayor and EDC to reconsider the continuation of non-essential helicopter travel until the electric helicopters are permitted, and I know we're not getting any answers on anything today but I really hope that that policy will be seriously considered. Thank you.

COMMITTEE ON ECONOMIC EVIDENCE                          86

CHAIRPERSON FARÍAS: Thank you so much, Council Member.

Just some last bit of finance-related questions. How much revenue, according to EDC records, comes directly to New York City each year based on its agreements with tour operators that use NYC heliports? Is it still the amount from my oversight hearing or has it increased, decreased?

EXECUTIVE VICE PRESIDENT SUN: It's 2 million to the two City-owned heliports total each year. I don't think we have the breakdown of that 2 million, how much of it originates from the tours versus other types of flights.

CHAIRPERSON FARÍAS: Okay, great, and how much does it cost New York City, as estimated by EDC, to maintain the heliports each year?

DIRECTOR FREDRIKSON: The maintenance of the heliports is covered by the operators so they receive the revenues from the various uses, like tours, and in the case of the Downtown Manhattan Heliport, it's over 90 percent to your earlier questions. It's primarily the tours that are then supporting the upkeep of the facility, and then the revenues, there's a revenue share agreement that then

COMMITTEE ON ECONOMIC EVIDENCE                                87

passes those revenues down to the City, and this is what we're hoping to, as you mentioned earlier increase while still diversifying the revenue uses at that heliport.

CHAIRPERSON FARÍAS: Okay, thank you, and can EDC disclose any annual operating capital expenditures related to managing the two heliports to the Committee?

DIRECTOR FREDRIKSON: Again, the maintenance for the facilities are covered by the operator. This is why the structure works, preserves dollars from the City's standpoint for these facilities.

EXECUTIVE VICE PRESIDENT SUN: I'll add, Council Member, we don't have the data today, but we'll look to see if we have that and share that with the Council.

CHAIRPERSON FARÍAS: Okay, great. Thank you, and just my last question, when the 2016 agreement reduced tourist flights by half out of the New York City heliports, did that lower revenue have any material impacts on our budget or on EDC's budget or New York City finances?

COMMITTEE ON ECONOMIC EVIDENCE                          88

EXECUTIVE VICE PRESIDENT SUN: We'd also have to again look at what fiscal impact that might have had on our programs, if any.

CHAIRPERSON FARÍAS: I'd appreciate looking at those numbers so we can get a better idea, especially now with the new RFP you're doing 30 percent less or requesting that at least.

I don't have any other Council Members signed up for questions so this panel is now dismissed.

Okay, as EDC and DEP folks are transitioning out, I would like to call up representatives from Borough President Reynoso's and Levine's office, Lacey Tauber, and a representative from Congresswoman Nydia Velázquez's office, Daniel Wiley, to the panel.

I'll call Lacey and Daniel one more time. It's like Price is Right, come on down.

You folks can begin when you're ready, okay?

DANIEL WILEY: All right. Thank you, Majority Leader and Council Members. I'm from Congresswoman Nydia M. Velázquez's office, and I'll read a brief statement from her.

COMMITTEE ON ECONOMIC EVIDENCE                           89

Over the years, I've come to the inescapable conclusion that unnecessary helicopter traffic is simply a poor fit for New York City, one of the most densely populated metropolitan areas. There have been too many helicopter crashes in New York City. Think of this, right now, no one, not the FAA, not anyone else, is actually regulating helicopter traffic above New York City. There's no minimum altitude, there's no radar tracking of the aircraft. It is essentially the wild, wild west of urban airspace. Not only is this about safety, but it's also about the quality of life for many of us, especially my neighbors living on the waterfront and along commuter routes. Helicopter noise is a persistent problem. The sound echoes. These flights generate an amount of noise that greatly reduces the quality of life for many New Yorkers. This includes those in my District from Queens to Brooklyn. The helicopters crowd the skies to a dangerous level as we've seen in result in multiple tragic accidents over the years. In Congress, we've brought renewed efforts to address this issue for the sake of all who call our great city home. That is why I am an original co-sponsor of HR-7753, Protecting

COMMITTEE ON ECONOMIC EVIDENCE                                90

Communities from Helicopter Noise Act. I support local efforts to restrict non-essential helicopter traffic, and I'm proud to support the bill before the City Council to halt non-essential helicopter flights at the two City-owned heliports and eliminate tens of thousands of unnecessary flights. I support this and other bills to protect our community and restore the quality of life and reduce noise pollution. Enough is enough. My colleagues and I, together, will continue to fight for the day when the safety and quality of life for New Yorkers will not be put at risk for the sake of profit. Thank you.

LACEY TAUBER: Good afternoon, Chair Farías and Members of the Committee. I'm here today on behalf of Brooklyn Borough President Antonio Reynoso and Manhattan Borough President Mark Levine to again express their commitment to ridding our city's skies of non-essential helicopter travel. Helicopters are simply not necessary for either tourism or commuting, and their outsized impacts on noise and air pollution far outweigh any entertainment or convenience they may provide. Even according to the helicopter industry, the noise that they generate flying at 500 or even 1,000 feet over

COMMITTEE ON ECONOMIC EVIDENCE                          91

the city is well within the range considered dangerous by the Hearing Health Foundation. With thousands of non-essential helicopter trips around NYC every week, it's no wonder that noise complaints have risen more than 2,000 percent in the last five years, and we just heard doubled in the last year. The noise is disruptive to residents who live along the flight paths, Manhattan and Brooklyn's waterfronts, North and Central Brooklyn along the JFK routes, and the constant exposure can cause health impacts such as stress and anxiety in addition to quality-of-life issues. We appreciate the changes the City has already implemented on the tourism industry such as reducing the number of tourist flights, restricting flight patterns over the waterways, and exploring new technologies However, the presence of tourist helicopters along our waterfronts is extremely disruptive. Among other issues, the noise negatively impacts the experience for residents and tourists enjoying relaxation in our city's open spaces, especially Riverside Park, Hudson River Park, Battery Park, and Brooklyn Bridge Park where the noise is constant. New Yorkers have invested billions of dollars into supporting and improving these parks,

COMMITTEE ON ECONOMIC EVIDENCE                                    92

only to have their enjoyment of them diminished. Yet noise pollution is not the only issue, so efforts to curb it only address part of the problem. Commuter helicopters use approximately 20 times more fuel per hour than the average car, depending on the model. With thousands of non-essential trips every day, the industry is a major source of air pollution and runs counter to our City's stated goal of reducing greenhouse gas emissions. We're aware that the issue requires a regional solution. The Borough Presidents have joined with their federal colleagues to call on the FAA to ban non-essential helicopter travel from NYC's airspace, and they support Council Member Brewer's resolution. This would address the concerns that this would just push traffic to New Jersey. In the meantime, we must work with the tools at our disposal. Both Borough Presidents support Council Member Restler's Intro., which would ban non-essential helicopters operating at City heliports. Notably, the concession license agreements that allow helicopter operators to use the City's heliports do not require a cause for termination. Yet despite repeated calls for EDC to ban non-essential helicopter flights, they instead renewed their

COMMITTEE ON ECONOMIC EVIDENCE                              93

agreement with the downtown Manhattan operator last year. In conclusion, both Borough Presidents don't believe their constituents should have to suffer from noise or air pollution for another day just so tourists can view the city from above or commuters can pay exorbitant sums to get to the Hamptons faster until such time as the helicopter industry can sufficiently demonstrate that it can operate in a way that does not disrupt residents' quality of life, does not pose a threat to public health, and does not use fossil fuels that result in carbon emissions. Both Borough Presidents support a ban of non-essential flights from our City's heliports. Thank you so much and thank you for the grace with time. They look forward to working with the Council.

CHAIRPERSON FARÍAS: Just remind them I gave them more time.

Thank you. Thank you both. Do we have any questions? Council Member Restler?

COUNCIL MEMBER RESTLER: Just a comment. I don't think Borough President Levine's office has ever sounded as good as they do today, and just a question for Dan, is there anything we can do to support federal advocacy efforts and the

COMMITTEE ON ECONOMIC EVIDENCE                              94

Congresswoman's leadership around regulating helicopters in New York City?

DANIEL WILEY: I think what we've introduced is trying to get the FAA more involved. There's an issue with under 1,500 feet or 1,200 feet, radar doesn't really cover because we have towers. That's why it's not a good fit for New York City. We've been calling on FAA to do more to analyze the problem and be a partner and obviously the largest solution is going to have to come from both states and be a federal solution because, obviously, helicopters can find another route in, but we have to address this locally here, too, so I think what everyone is doing, we've got to keep doing it and keep the pressure up.

CHAIRPERSON FARÍAS: Thank you both, and I would love to continue the conversation around each of the bills and Resos that we have here at the hearing today.

I now open the hearing for public testimony.

I remind members of the public that this is a formal government proceeding and that decorum

COMMITTEE ON ECONOMIC EVIDENCE                                    95

shall be observed at all times. As such, members of the public shall remain silent at all times.

The witness table is reserved for people who wish to testify. No video recording or photography is allowed from the witness table. Further, members of the public may not present audio or video recordings as testimony but may submit transcripts of such recordings to the Sergeant-at-Arms for inclusion in the hearing record.

If you wish to speak at today's hearing and you have not done so already, please fill out an appearance card with the Sergeant-at-Arms and wait to be recognized. When recognized and in the interest of the over 100 people we have signed up today, folks will have two minutes to speak on today's hearing topic, Helicopter Noise and Safety.

If you have a written statement or additional written testimony you wish to submit for the record, please provide a copy of that testimony to the Sergeant-at-Arms. You may also email written testimony to testimony@council.nyc.gov within 72 hours of this hearing. Audio and video recordings will not be accepted.

COMMITTEE ON ECONOMIC EVIDENCE                                96

I will call the first panel, Lydon Sleeper, Sam Goldstein, Brittany Davies, Stacey Sheard, Josh Rousseau.

JOSH ROUSSEAU: Thank you.

CHAIRPERSON FARÍAS: Please state your name for the record.

JOSH ROUSSEAU: Thank you, Chair. I've been volunteered to go first so thank you again. My name is Josh Rousseau. I'm the Northeast U.S. Regional Representative for Vertical Aviation International, VAI.

VAI is the world's leading membership association dedicated to the industry. We represent more than 1,000 companies, over 16,000 industry professionals in more than 65 countries. I think the importance and the critical importance of the heliport system in New York City has been well-documented, so I will, in the interest of time, spare going into any of that. I do think the critical piece here with some of my friends from Stop the Chop in the room is to understand that we understand that sound signatures are a common source of concern associated with helicopters and the facilities they use, which is why one of VAI's top priorities is

COMMITTEE ON ECONOMIC EVIDENCE                                    97

community compatibility, being good neighbors. We are constantly engaged with our members, community groups, and industry partners in an ongoing dialogue intended to forge positive relationships that produce meaningful results for all stakeholders involved. This collaboration continues to create sound mitigation efforts and innovative solutions to fly neighborly. Additionally, our industry is developing innovative technologies such as Advanced Air Mobility, AAM, and eVTOLs, which were referenced earlier, to improve community compatibility and environmental sustainability. VAI wholeheartedly supports the efforts of Mayor Adams and EDC's prioritization of initial steps to realize a new vision for the first-of-its-kind hub for sustainable transportation. However, to be clear, this technology is still in development. It is not yet a reality. The economic impacts of enacting legislation to ban non-essential helicopters are beyond significant as the general aviation industry holds a vital position in shaping both national and state economies. In New York alone, it supports a workforce of over 43,000 individuals and generates significant total economic output. The general aviation industry is vital for

COMMITTEE ON ECONOMIC EVIDENCE                              98

supporting key sectors in the New York City and state economies, including emergency services, law enforcement, utility work, transportation, tourism, and business aviation. I will be very quick. Whether it be City Council bills being discussed in this hearing or legislation currently pending before the New York State Legislature, VAI has serious concerns about the legality of any effort to regulate aviation operations. Specifically, these bills contravene well-established federal law as the FAA holds the sole jurisdiction to regulate all aspects of aviation operations, including noise-related standards and regulations. Uniform federal authority is essential to maintaining safe and efficient transportation in the nation's airspace. Enacting these bills runs counter to just that.

CHAIRPERSON FARÍAS: I'm sorry, you are 30 seconds over.

JOSH ROUSSEAU: Yep.

CHAIRPERSON FARÍAS: And you will have to submit that for public record.

JOSH ROUSSEAU: I've submitted testimony and, with all due respect, Chair, you have given a little bit of latitude to a couple other people.

COMMITTEE ON ECONOMIC EVIDENCE                              99

CHAIRPERSON FARÍAS: Right, and it's still my hearing that I'm Chairing…

JOSH ROUSSEAU: I understand.

CHAIRPERSON FARÍAS: And I'm saying your time is over, and we're going to move to the next person.

JOSH ROUSSEAU: Understood.

CHAIRPERSON FARÍAS: Thank you for submitting it.

JOSH ROUSSEAU: Thank you for your flexibility. Thank you.

CHAIRPERSON FARÍAS: Thank you.

BRITTANY DAVIES: Good morning. My name is Brittany Davies, and I am the Northeast Regional Director for the National Business Aviation Association, NBAA.

NBAA is the leading organization for companies that rely on general aviation aircraft to help make their businesses more efficient, productive, and successful. On behalf of our 11,000 member companies, I greatly appreciate the opportunity to submit testimony to you today. As representatives of the general aviation community, we fully recognize the importance of prioritizing the

COMMITTEE ON ECONOMIC EVIDENCE                          100

safety and well-being of New York City residents. It is important to note that the business aviation industry is investing billions of dollars into technologies that will dramatically reduce noise levels and the carbon footprint of aviation. The industry is fueling research and development needed for sustainable solutions across a broad spectrum of applications. With a commitment to achieving a net zero emissions by 2050 and 40 percent reduction in emissions over the past four decades, our industry is dedicated to environmental stewardship and innovation. While the industry is actively implementing measures to improve safety and community compatibility, we do not believe the City has the legal authority to regulate aviation operations at New York City heliports. As designated under the Federal Airport Noise and Capacity Act, INCA, only the Federal Aviation Administration has authority to regulate aeronautical operations. The recent ruling of the Second Department involving East Hampton, INCA also specifically applies to all publicly owned facilities and prohibits access restrictions absent FAA scrutiny. Accordingly, Proposed Ordinances number 0026-2024 and 0070-2024 should not be adopted.

COMMITTEE ON ECONOMIC EVIDENCE                           101

Likewise, the State also may not impose restrictions on operations either directly or via indirect means such as purported taxation and, accordingly, the Proposed Resolutions numbers 0085-2024 and 0226-2024 should not be adopted. NBAA strongly opposes all legislation to ban non-essential helicopter operations as well as any proposal to limit the use of New York City's heliport system. However, our industry looks forward to continued engagement to identify and implement effective solutions that address concerns while ensuring the highest levels of safety and environmental stewardship. Thank you.

STACY SHEARD: Good morning. My name is Stacy Sheard, and I'm representing the Eastern Region Helicopter Council, an association of local helicopter professionals promoting safety, education, awareness, and advocacy. The ERHC has a community outreach program and is actively working with the FAA to address the concerns of the community and to preserve the last of the New York City heliports for the future. ERHC collaborates with our local, state, and community partners to help alleviate helicopter complaints around New York City and surrounding areas. We use data provided by the FAA to devise

COMMITTEE ON ECONOMIC EVIDENCE                                    102

higher altitudes and flight paths over and around the most heavily populated residential areas. We recognize that there is room for continued improvement and that with a collaborative effort more can be accomplished. The ERHC's initiative to improve instrument flight routes in and out of New York City is a great example of that. I've been working on this for three years so, by partnering with the FAA, I'd like to announce that new instrument flight routes for helicopters are being designed to utilize during inclement weather, and these new routes will take helicopters to higher altitudes. They will weave us within jet traffic. They will reduce sound signatures, and the first of these procedures will come online this summer with more instrument routes being designed for follow on release by the FAA. By improving flight routes and embracing quieter aircraft technology, the ERHC is demonstrating a commitment to collaboration through technology. By recognizing the value of heliports and collaborating for continued operation, we can promote innovation, enhance transportation options, and drive economic prosperity and accessibility for the community at large. Thank you.

COMMITTEE ON ECONOMIC EVIDENCE                              103

LYDON SLEEPER: Hello. I'm Lydon Sleeper from Joby Aviation. Joby is grateful for the opportunity to testify here today and grateful for the City's continuing leadership in paving the way for electric aerial mobility. The City's announcement to add charging infrastructure to support electric vertical takeoff and landing aircraft, eVTOLs, at the iconic Wall Street Heliport as well as East 34th Street heliport ensures that New York City will continue to be a global leader in the future of aviation and pave the way for quiet sustainable mobility. We were honored to bring the Joby aircraft to New York City last November, and we're grateful for all the Members of the Council who were there for that exhibition flight. From day one, the Joby aircraft was designed with acoustics in mind with the number of propellers, blades, blade shape, radius, tip speeds, disk loading, all the aircraft selected to minimize its acoustic footprint and improve the character of the sound produced. The results, the aircraft registered the equivalent of 45 weighted decibels from an altitude of 500 meters at 100 knots airspeed, a sound that Joby believes will be barely perceptible against the ambient noise of cities.

COMMITTEE ON ECONOMIC EVIDENCE                              104

Takeoff and landing profiles were found to be below 65 decibels, a noise comparable to a normal conversation at a distance of about 100 meters from the flight path. Specific to the legislation resolutions being heard today, Joby is grateful for the Council's prioritization of quiet electric aviation. We share the goal of making aerial mobility quiet, sustainable, and accessible for New Yorkers. We support the City's current approach of working with the entire vertical lift industry to invest in infrastructure needed for us to take off and land from the City's heliports. By embracing public-private solutions to ready the City's infrastructure, New York City will lead the world in quiet, electric aerial mobility. Once the infrastructure is installed and we're flying here, we're confident the operators and passengers will choose our quiet, sustainable aircraft, and we'll see more applications for eVTOLs throughout the region. Thank you.

CHAIRPERSON FARÍAS: Thank you, Lydon. Thank you, folks. I just have a couple of questions. How many of you operate out of one of our city heliports currently?

COMMITTEE ON ECONOMIC EVIDENCE                               105

STACY SHEARD: We're not based at any of the heliports in New York City, but we do operate out of the heliports in New York.

CHAIRPERSON FARÍAS: Okay, and are any of you a part of the larger symposium that the EDC mentioned earlier?

STACY SHEARD: Absolutely.

JOSH ROUSSEAU: Yes.

CHAIRPERSON FARÍAS: All of you are.

STACEY SHEARD: Yes.

CHAIRPERSON FARÍAS: Just for clarification, Brittany Davies, you stated you folks are thinking about effective solutions. Have we thought some of those through? Have we implemented any of those, whether it's here or elsewhere?

BRITTANY DAVIES: So we work on a continuous basis across the nation with the Vertical Aviation International Association. Our local constituents, Eastern Regional Helicopter Council, we're in continuous conversations in that regard, but one thing I did mention in my written testimony that was submitted was also an initiative across multiple of our alphabet organizations in the aviation sector that's called Climbing Fast, and it is all about our

COMMITTEE ON ECONOMIC EVIDENCE                          106

sustainability initiatives moving forward as a collaboration across the aviation sector as a whole.

CHAIRPERSON FARÍAS: Great, thank you. Miss Stacy Sheard, if you can just re-clarify for me and I think I missed it, your statement around the jet flight paths or the jet paths.

STACY SHEARD: Yeah, so it's incredibly difficult. What's happened with the recent years is helicopter technology has increased greatly. There is similar technology in the latest helicopters as you would find in the newest Boeing jets that you would commute on so, with that technology, we are very capable of flying in bad weather conditions, inclement weather so, when that does happen, in the past we haven't had access out of New York City because you're surrounded by four major airports so it's just been this this quagmire of routing systems for jets typically so weaving helicopter traffic into that, we were very low priority so we've been working for years with the FAA, with our sister and brother associations to try to build relationships and bring our issues to the forefront. One of those was getting a little bit more prioritized on instrument departures. The FAA heard us and about a year ago, I

COMMITTEE ON ECONOMIC EVIDENCE                              107

was able to meet with FAA and we talked about our needs and how that would assist. Basically, these routes can help us to depart New York over the water and climb us as fast as possible and get us out of New York City and blend us with jet traffic or below or keep us clear of the flow of jet traffic and get us to where we need to go, which is out of the city. Normally it's an instrument departure so when the weather descends on the city, we can depart and we don't have to fly underneath it any longer so that's essentially what it'll do for us, and it'll really help us cut down our sound signatures so we can fly neighborly.

CHAIRPERSON FARÍAS: Thank you for that clarification. I appreciate it. Being that all of you folks are a part of this symposium, I did hear in multiple testimony that it's not our jurisdiction or legality in terms of determining whether or not electrification is in the immediacy or in the direction, we heard from the EDC with their conversations with the FAA and being a part of the symposium that they're trying to get to it in 2025 but within at least the next two years so I'd love to hear feedback and thoughts around some of the

COMMITTEE ON ECONOMIC EVIDENCE                           108

responses you folks gave in terms of whether or not legally, it's our jurisdiction and like the hopes of it coming, knowing that you're all a part of the symposium and knowing that we're all receiving the information on moving towards electrification.

LYDON SLEEPER: I'll just speak to the, to Joby and our certification process. We're working through our process with the FAA. I think the statements made by EDC earlier about timing, working through as early as 2025, and commercial operations beginning quickly after that. That is what we are tracking toward with the FAA so from a timeline perspective, that's correct.

JOSH ROUSSEAU: Madam Chair, I would just add too on the symposium piece, which I think is critically important to highlight, it's not just talk, and I think that's really important to point out. In fact, we had a meeting scheduled previously with FAA and some of our friends in the room from Stop the Chop for today, but your hearing took precedence as it should so I think we have more good news coming, and I think the symposium really should be held up as an example of that collaboration with our community partners, with our industry partners,

COMMITTEE ON ECONOMIC EVIDENCE                                   109

and with government regulators as well. Certainly, as we are able to get this information out, absolutely want to keep the Council apprised of that as well so you can get that information out to your constituents as well so I just wanted to highlight that as well.

CHAIRPERSON FARÍAS: Yeah, I appreciate that. I think that from the oversight hearing to conversations with the EDC to conversations with other elected officials from federal government, FAA, you folks, that is what's brought us to this point and to this package of bills and to see where we can land on ensuring that we are in lockstep with the FAA and positive actors to put a foundational setting or like a goalpost for where this industry needs to move and actually being in consideration with community health and being and safety so I appreciate those responses.

Now, I would like to turn it over to Council Member Brewer who has questions.

COUNCIL MEMBER BREWER: Thank you. We have spent a lot of time on the tourism, not the transport so much, getting them to fly higher, particularly along the Hudson River, but they don't. I don't know that this little thing without doors that I was in

COMMITTEE ON ECONOMIC EVIDENCE                    110

from New Jersey could fly with the jets so I'm just wondering is that what you're envisioning? These tourism things, to be honest with you, are more noise-provoking than perhaps even what we've been talking about today coming out of downtown. They are like constant all summer long so my question is what height can they fly at that would be better or will they do that and can they do that? I'm talking about the things without the doors.

STACY SHEARD: Yes, that is something that is in discussion, routing altitudes, and restructuring routes to take them, when neighbors make complaints and we hear that and we realize that there's an issue over a neighborhood, we have to work with Air Traffic Control, FAA, and the powers that be in order to move routes. The FAA will hear noise complaints, ERHC will hear, we all hear the noise complaints, and that's when we bring it to the meetings and say, hey, we're, we have a hot spot here, we need to relocate this, we need to look at the altitude, we need to see what we can do to make it better for the community.

COUNCIL MEMBER BREWER: If you can do anything about Kearny, New Jersey, flying to New York

COMMITTEE ON ECONOMIC EVIDENCE                          111

City? They come in the hundreds on the weekends right over Central Park, right over Governors Island, right over Brooklyn Bridge Park. You can do something about that?

STACY SHEARD: No, I don't think that's what I was referring to. I was just referring to adjusting routes, routing altitudes and adjusting locations of routes.

COUNCIL MEMBER BREWER: All right, but, in other words you can't do anything about that particular situation in New Jersey?

STACY SHEARD: No ma'am, I don't think that was, stopping flights is not something that we do.

COUNCIL MEMBER BREWER: Okay, thank you.

JOSH ROUSSEAU: Council Member, if I could just add to your question. I think just like we work with our members respectively in our organizations in New York State, we're also working with those members in New Jersey and elsewhere as well so I can tell you that those conversations are ongoing literally on a weekly basis to make sure that our members are being respectful of the communities that they live and serve and fly in, and I think, again, referring to

COMMITTEE ON ECONOMIC EVIDENCE                                    112

good news, it's forthcoming and certainly you guys will absolutely have that information in your pockets. We have the ability to affect our members, right? We all work together, and I think it's critically important to note that we strongly, strongly encourage our members to be at the top of their game as far as best practices and being responsible to the community so those conversations are ongoing. I think to Stacy's point, we can't force, to use that word, folks to do things, but we, certainly within our ability as an organization, an all-inclusive organization in our industry, we do have the ability to strongly encourage and push our members in the right direction. The right direction being from your perspective.

LYDON SLEEPER: If I could also just say you mentioned Kearney, we've got a partnership with the Kearney team where we're actually going to add our charging infrastructure at Kearney so we'll be able to take off and land there as well as Wall Street and East 34th Street so we're excited about the progress we're making in the City, but we're also expanding to heliports like Kearney.

COUNCIL MEMBER BREWER: Doors off or on?

COMMITTEE ON ECONOMIC EVIDENCE                          113

LYDON SLEEPER: We'll have doors on, yeah.

COUNCIL MEMBER BREWER: Tourists want the doors off. That's the problem. I don't agree with it, but I'm telling you that's what's going on because I was in the helicopter.

CHAIRPERSON FARÍAS: Thank you so much. I'd now like to recognize Council Member Restler.

COUNCIL MEMBER RESTLER: Thank you so much, Chair.

Just one question for Mr. Sleeper. I think that the environmental benefits of electronic helicopters are obvious and straightforward. The noise benefits, I just would like some greater clarification on. We've heard from some neighbors that there are still significant noise issues. We've heard from others that they're almost silent. Could you give us some clarity based on the testing that you all have been doing?

LYDON SLEEPER: Yeah, I appreciate that, and we actually have a partnership with NASA where NASA came out to our facilities in California and measured our aircraft from 100 meters away at takeoff, we flew overhead at about 1,500 feet, and they actually released that study, and it was the

COMMITTEE ON ECONOMIC EVIDENCE                                    114

sound that I mentioned before but, in the context of

New York, what we're really excited about when we

were here in November, we took off, we had a chase

helicopter so you could only hear the helicopter, but

the day before we flew, we didn't have the chase, and

we actually had teammates across in Brooklyn Bridge

Park doing measurements of the sound, and it was

imperceptible from Brooklyn Bridge Park, and that was

while we were at hover and transition so the

fundamentally different sound profile of our

aircraft, we really do think will change the way

people in New York experience aerial mobility, both

as passengers but also as people playing in the park

and people over the city listening overhead.

CHAIRPERSON FARÍAS: And just a quick

followup to that, Mr. Sleeper, how did you folks

monitor that?

LYDON SLEEPER: Yeah, we just set up

microphones around because we wanted to make sure

that, it was the first time we'd flown in an urban

setting like New York so we wanted to know exactly

how we would hear what it would sound like so we just

had our folk with microphone. For the study that we

did with NASA, they actually came out and set up a

COMMITTEE ON ECONOMIC EVIDENCE                                115

whole set of arrays on the ground. The anecdote that we like to tell is when they came out, they did a bunch of measurements when we were flying overhead, and they were picking up the grass from the field next to us so we had to mow the grass in order for them to get a more accurate reading of our aircraft because it's so quiet.

CHAIRPERSON FARÍAS: Yeah, I saw within your testimony, and I thank you for being brief because it was many pages that you did have decibel ratings comparatively, and so we are able to use decibel meter or at least like noise meters to regulate some of this and the noise complaint issues that we have. Thank you.

Seeing no other questions, this panel is dismissed.

Thank you, folks.

UNIDENTIFIED: Yes, I'm calling because I (INAUDIBLE).

CHAIRPERSON FARÍAS: Can someone mute our Zoom participant? Thank you.

I'd now like to call up, it's a very important call, Lara Birnback, Melissa Elstein, Andrew Rosenthal, William Thomas, and Kenneth Lay.

COMMITTEE ON ECONOMIC EVIDENCE                                    116

Anyone can begin when you're ready, okay? Just let us know so we can get the Sergeant.

Sergeants, are we ready for time?

Okay, you can begin.

WILLIAM THOMAS: Are we operating with a two-minute time limit just so, we are, okay.

I'm Bill Thomas. I'm a board member of Stop the Chop New York, New Jersey. I have submitted to you my written testimony so I'm not going to cover all of it because you can read it at your leisure. I would like to highlight a few key points and also make some comments about some of the testimony that you've already heard today. Stop the Chop is the leading organization in New York City that's organized really to seek to ban non-essential helicopter flights in the New York City area, and we applaud the City Council for its interest in this same issue.

First, I'd like to just highlight a few of the problems, some of which have been alluded to already in the questioning with non-essential helicopter flights. First of all, they're not safe. Someone earlier said that we don't have any crashes in New York City. There have been 30 of them since

COMMITTEE ON ECONOMIC EVIDENCE                                117

1980 including one hijacking as my friend Andy reminds me. Excessive noise increases the risk of hypertension and heart attacks and other forms of illnesses in all of us, and they're an environmental justice issue. There are communities in New York City that have historically been disproportionately affected by all forms of pollution, and many flights fly over those very same communities. It's for these reasons that we applaud, as I said before, the Council's interest in these issues. I want to touch on a couple kind of objections or issues that you hear in response to efforts to curtail these flights. One is the flights will just move to New Jersey. As Councilman Restler said earlier in his questioning, that's simply not the case. There's just not enough capacity, not enough willingness on the part of tourists who would otherwise be in New York City to schlep over to New Jersey to get these flights, A. B, the other City heliport, particularly the one on the west side, is already at capacity, and therefore could not accept additional flights at this time in any event. Also, tourist flights won't hurt the city economy. Even the helicopter's industry own flawed and outdated analysis seem to acknowledge that most

COMMITTEE ON ECONOMIC EVIDENCE                          118

of this economic activity from tourists would simply shift if we didn't have helicopter tourist flights. They would shift to other forms of tourism as well…

CHAIRPERSON FARÍAS: You're approaching 30 seconds over so I need you to wrap. We do have over a hundred people.

WILLIAM THOMAS: I'm going to turn it over to colleagues who will expand on some of the conversations.

CHAIRPERSON FARÍAS: Thank you so much.

WILLIAM THOMAS: Thank you.

ANDREW ROSENTHAL: My name is Andrew Rosenthal. I have lived on the Upper West Side and happily paid my taxes for over 36 years. I love New York City. I would like to thank Majority Leader and Committee Chair Farías for holding this hearing and being a champion of everyday New Yorkers. Unfortunately, despite promises by the EDC and industry to make things better, they have done nothing since 2016 to make life better for New Yorkers. Today, I would like to focus on 3-1-1 helicopter noise complaints. This picture, and they took it away from me downstairs, but I think we've covered the volume of 3-1-1 complaints and the

COMMITTEE ON ECONOMIC EVIDENCE                                    119

escalation of those. I had a chart here. It tells an important story, but a very incomplete one. What it doesn't show is that the problem is much bigger than the data even shows. When many, maybe most New Yorkers see a helicopter in the sky, they assume it's NYPD or news, and therefore don't think of complaining. If they did, the charts, the numbers, would be much more. It does not accurately reflect the misery in the city because sane people stop using 3-1-1 a few months after they start because there are no results. Unlike a pothole complaint or even other categories of noise complaints where the NYPD shows up, nothing happens when citizens file noise complaints in 3-1-1. Instead, they will get a reply from the EDC saying either this helicopter is not within its jurisdiction or, two, the New York City EDC determined that the helicopter tour operator was operating within the limits of the New York City Helicopter Sightseeing Plan. I have received both of these 100 percent inaccurate responses in the past month, despite submitting screenshots documenting that the tour flights originated at DMH and that the flights passed directly over parkland in violation of the 2016 agreement. How many times would any of you

COMMITTEE ON ECONOMIC EVIDENCE                          120

make a complaint given these negative responses?

Lastly, I'm wrapping up, filing a 3-1-1 complaint has

been made very difficult over the last four years.

There is a gauntlet of questions that 99 percent of

the citizens will be unable to answer, such as where

the flight originated and whether it's a tourist

flight. Multiply the numbers that have been reported

by 10 or 100 and you'll get an idea of the real

severity. Unlike many of the issues facing the City

Council, the helicopter problem we are discussing

today can be solved this year if our elected

representatives choose to do so. Please pass

(INAUDIBLE) 26.

CHAIRPERSON FARÍAS: Thank you so much for

your testimony.

Folks, we will be here to midnight if we

keep going like this.

MELISSA ELSTEIN: Yes, people are very

passionate about this, rightfully so, and we thank

you so much, Majority Leader, for hosting us as well

as all the other Council Members for being here and

your questions.

My name is Melissa Elstein. I'm on the

board of Stop the Chop NY/NJ, as well as the board of

COMMITTEE ON ECONOMIC EVIDENCE                          121

West 80s Neighborhood Association. Both are volunteer-led local grassroots non-profits. We strongly support the passage of the three helicopter bills and three resolutions being heard today. I live on the Upper West Side, like Andy, and there are numerous days per week in our neighborhood it sounds like a war zone due to all the fossil fuel-based tourism commuter helicopters traversing the Hudson River, otherwise known as the new helicopter highway, and I may add that over water doesn't necessarily help because it amplifies the noise so the Hudson River is now a helicopter highway as well as the many cross-town flights negatively impacting our homes as well as Riverside and Central Parks. I also thought initially that they were media, news, emergency services, but became involved with this cause when I realized that it was so unfair that simple joy rides and commutes by helicopter were creating so much misery so basically, this volunteer work, which has consumed my life and we're up until midnight/2 a.m. working on this. We are prepared. How could just a few polluting companies be allowed to wreak havoc on our lives to the point where the constant and disturbing noise has created enormously stressful

COMMITTEE ON ECONOMIC EVIDENCE                                    122

conditions diminished Q of L so this is a story I hear from New Yorkers throughout the city, including from actor, mother, and Brooklynite Amy Schumer, who is filming a movie today and couldn't be here, so I am reading part of her submitted statement. She writes, "Our homes, neighborhoods, and parks are bombarded with the deafening and alarming noise of these choppers, 12 hours a day most days. I urge our elected leaders to end the flights of these non-essential helicopters over New York City and its nine million residents." We agree with Ms. Schumer, and to those who say the non-essential helicopter ban would harm the economy, I heard those same faulty arguments when I was volunteering with my neighborhood association to help ban fracking in New York, single-use plastic shopping bags and straws, smoking in bars and parks. The New York City economy will survive a ban on this niche industry and, by the way, Disney World and Disneyland have such bans. It has become untenable. No other world-class city has this unnecessary problem. It's time we end the Wild West like chopper skies over New York, improve public mass transit, and promote clean and green, quiet transportation modes instead. Thank you so much.

COMMITTEE ON ECONOMIC EVIDENCE                                    123

LARA BIRNBACK: Good morning, or good afternoon at this point. I'll try to be as quick as I can, and I know some of these points have been made already so I'll try to improvise a little here, but I'm not as good at that as some of the others here in the room. My name is Lara Birnback. I'm the Executive Director of the Brooklyn Heights Association as well as an advisory board member of Stop the Chop New York/New Jersey. I want to thank all of you Members of the Council and staff from our Borough President's offices and federal representatives here for your attention and commitment to regulating helicopter noise. Pollution and safety in our city, which is evidenced in part through the bills and resolutions under discussion today. My hope is that we are finally going to have some relief from the detrimental impacts of fossil fuel-based helicopter flights on our communities, environment, and quality of life. We've heard how New Yorkers are disturbed in our beautiful public spaces. It seems incredibly bizarre to me that we would spend taxpayer dollars, investment, time, created non-profits to guard our waterfront parks, the amazing things happening at Governors Island, Central Park, etc., and yet we

COMMITTEE ON ECONOMIC EVIDENCE                              124

allow this relentless noise and pollution to disrupt our experience in those public spaces that are really treasures of our city. Why would we invest the time and money into creating these spaces for people to enjoy and then literally ruin them for the benefit of some joy-riding tourists and some folks who can't get to the Hamptons quickly enough? It just doesn't make any sense. Noise pollution we know is deadly. We've known it for years. Numerous studies confirm this. We've talked about the impact of the pollution and the fossil fuels. We've talked about safety. We've had tragic accidents associated with helicopters. Not to mention the risks of terrorists or other bad actors using our skies against us. We heard already this morning that it's like the Wild West. The FAA does not regulate appropriately the airspace over New York, which is bizarre if you think about that, for a city like New York. I'm going to wrap up here. I just want to emphasize that the trade-offs involving our health, our safety, and our environment, you'd think there'd be substantial economic benefit coming to New York City. There is not so I implore the Council and the Mayor to prioritize the well-being, safety, and environmental sustainability of our city and its

COMMITTEE ON ECONOMIC EVIDENCE                                   125

millions of residents over the privilege of a very few and end these flights as soon as possible. Thank you very much.

KENNETH LAY: Is it ready? Good morning, and thank you for this opportunity. My name is Kenneth Lay. I am testifying as a Brooklyn resident and a board member of Stop the Chop. I previously testified before this Council in November 2022 about the incessant and deafening helicopter flights that constantly fly over huge swaths of Brooklyn, including many environmental justice communities such as Brownsville, East New York, and more. The situation has, if anything, only worsened. Last week, for example, a Blade flight passed over the park where I was watching the solar eclipse with hundreds of my neighbors at the exact moment of peak coverage, rendering it impossible to speak to anyone for nearly 30 seconds. This happens dozens of times per day. You already heard my story and my wholehearted support for these bills so I will instead use my time to let other area residents have their say. Here are a number of quotes we at Stop the Chop have collected from New Yorkers. We have hundreds more I will be submitting as my written testimony.

COMMITTEE ON ECONOMIC EVIDENCE                                    126

Brooklyn. There is perhaps no activity that disturbs more residents for the benefit of so few people than the noise associated with these unnecessary helicopter flights.

Manhattan. The excessive noise on the Upper West Side has become intolerable, yet another reason for long time New Yorkers to leave the city.

Bronx. The helicopters are tormenting Spuyten Duyvil. Please stop them now.

Manhattan. Please let us live in peace in our apartments.

Brooklyn. It is outrageous that fun for a few non-New Yorkers makes life miserable for thousands of voting New Yorkers.

Queens. I work at the Statue of Liberty and the helicopter noise is outrageous. It truly impacts my day and the visitors of the statue negatively.

Manhattan. I report noise problems in the 3-1-1 app and I call my representatives, and nothing seems to happen.

Brooklyn. It's become impossible to sit in Brooklyn Bridge Park or in the Brooklyn Promenade. The helicopter noise is unrelenting.

COMMITTEE ON ECONOMIC EVIDENCE                    127

Queens. This is not bearable anymore.

Manhattan. The helicopter noise along the Hudson is utterly outrageous. It is greatly affecting the pleasure to be found in Riverside Park.

Bronx. The helicopters are so loud and hover over people's private apartments at all hours of the day and night.

Brooklyn. We can't even sit outside and have a conversation sitting next to each other because of these commuter helicopters.

Manhattan. It's high time the politicians began listening to their taxpaying constituents rather than lobbyists. This is a grievous environmental and quality of life issue. Thank you.

CHAIRPERSON FARÍAS: Thank you so much. I don't see any questions for panelists. Council Member Restler.

COUNCIL MEMBER RESTLER: Just for Miss Birnback, BHA gets an impressive amount of incoming from neighbors across Brooklyn Heights about different quality-of-life issues. Could you just give some context on like how does helicopter complaints compare to other issues that you hear from neighbors?

COMMITTEE ON ECONOMIC EVIDENCE                                    128

LARA BIRNBACK: Sure, absolutely. We've been getting complaints about helicopters for years, but even more so in the past I would say three to four years, as evidenced by the 3-1-1 complaints. It's definitely a top, top issue and a top concern of residents in Brooklyn Heights who can hear them, those who are living anywhere close within a few blocks of the waterfront, who are trying to enjoy the promenade as we heard, who are trying to enjoy Brooklyn Bridge Park, who are down in traveling down into Dumbo. I'm hearing it constantly again and again and again.

CHAIRPERSON FARÍAS: Thank you folks so much for your advocacy and your testimony today and the work we've been doing together. I appreciate it. You are now dismissed.

I'd now like to call up Janet Handal, Stephen Tanenbaum, Michael Hannaman, Roger Manning, and Merritt Birnbaum.

ROGER MANNING: Do we start or?

CHAIRPERSON FARÍAS: Yes, we're ready to begin.

ROGER MANNING: Hi, I'm Roger Manning, co-founder of MAGIC, the Metro Area Governors Island

COMMITTEE ON ECONOMIC EVIDENCE                          129

Coalition and, as you may have heard, Governors Island is severely affected by sightseeing helicopters. Governors Island, the city's unique public space in the middle of New York Harbor, is seriously impacted by sightseeing helicopter noise on a daily basis. The constant aerial assault on the island's historic district, national monument, high school, park lands, arts and environmental projects, and wildlife has been described as soul crushing. That's a quote from more than one person. At times, we've counted as many as 18 helicopters in 15 minutes going by and, yes, they do fly over water but Buttermilk Channel is so narrow, it doesn't really help, and then the flights from New Jersey tend to hover over the island for long periods of time. Of course, I'd say the majority of the flights do come from the Wall Street heliport, but a lot of helicopters do come from New Jersey so we're hoping that federal thing that's in the works is successful as well as this awesome City Council stuff that you all are putting forward, and that's it. I'd like to thank Stop the Chop for all their work.

STEPHEN TANNENBAUM: There we go. Steven Tannenbaum. I live and work in Prospect Park South in

COMMITTEE ON ECONOMIC EVIDENCE                              130

Central Brooklyn, and I'm here to bring you news from out there that it's not just a waterfront issue. The JFK round passes through our historic landmark district, the mainly wood-framed houses, so the residents can't even escape the sound by going inside. The other issue in central Brooklyn is that these helicopters are veering off the FAA helicopter route that's Flatbush Avenue, and they're basically making a shortcut to the tip of Manhattan and then to the West 30th Street heliport, and that path takes the helicopters over Prospect Park, over the parade grounds where all the ball fields are, over the Caton School playground, and it's adjacent to the Brooklyn Botanic Garden, and I just think that in a civic place, there's no reason to be ruining these crown jewels of the city. Thank you.

JANET HANDAL: Hello. My name is Janet Handal, and I'm President of the Waterside Tenants Association in Manhattan and represent the 4,000 people living there. I want to take a moment to thank the Majority Leader, Council Member Brewer, and Council Member Restler for your leadership on this really, really important topic. Waterside is located in Manhattan on the East River between 23rd and 28th

COMMITTEE ON ECONOMIC EVIDENCE                    131

Street directly across the FDR from Bellevue. We are built on a triangular platform in the river, which places us out in the middle of the river. At this spot, the East River is a little over half a mile wide. We're here today to speak in support of the package of bills, especially given that we have very near to us the heliport on East 34th Street, which provides almost incessant noise and it has significant impacts on our community. However, the tenants at Waterside think that this package needs to be expanded to include the seaplanes that land on the East River directly in front of us. These seaplanes use the 23rd Street Marina for passenger embarking and disembarking. The marina is managed by EDC. All of the issues cited about the helicopter noise and air pollution apply to the seaplanes, but there's the additional point that I wanted to make about this. The helicopters pretty much go up and down, but the seaplanes have to have a runway to take off and land. In the summertime, we have planes about every three to four minutes so it is absolutely incessant. Friday afternoons, Thursday afternoons, Sunday night, Monday morning. It's dangerous because these planes are, you see them just like that. They're lined up, and I'm

COMMITTEE ON ECONOMIC EVIDENCE                                    132

getting down to next to nothing so, anyway, I just want to tell you that it's very risky to Waterside and also to the other side of the river. When they started flying there, nothing was built there. Waterside wasn't even built there. It's a very different situation now, and it needs to be rectified for public safety and health. Thank you.

MICHAEL HANNAMAN: Hi. My name is Michael Hannaman. I am a legal extern at the Natural Resources Defense Council and a law student at NYU School of Law. NRDC is a not-for-profit legal and scientific organization active in a wide range of environmental health, natural resources protection, and quality-of-life issues across the country, around the world, and here in New York City, where our main offices have been located since the organization was founded in 1970. Excessive noise threatens the health and quality of life of New York City residents. Exposure to heightened transportation noise increases the risk of arterial inflammation and major heart problems, and research has indicated that it does so independently of other environmental, socioeconomic, and behavioral factors. Helicopter noise is especially harmful to human health because it is

COMMITTEE ON ECONOMIC EVIDENCE                              133

intermittent and exceptionally loud. Researchers have found that intermittent noise is associated with higher rates of heart disease, stroke, and death as compared to comparable levels of background noise, and chopper noise is especially piercing. The FAA and NASA have both found that the public perceives helicopter noise to be twice as loud as comparable decibel fixed wing aircraft. The noise from these gratuitous helicopter flights is inescapable in New York City. It bombards residents multiple times per day in their own homes, in their workplaces, and in the city's public parks. Noise is not the only environmental hazard imposed by unnecessary helicopter flights. Tourist helicopters produce approximately 950 pounds of carbon dioxide emissions every hour, which is over 40 times the average hourly emissions of a passenger car containing the same number of people. Some helicopters still burn toxic leaded aviation fuel. The EDC-owned East 34th Street Heliport and Downtown Manhattan Heliport produce, as of 2022, 58,000 helicopter flights annually, and 95 percent of those flights are tourist joy rides. It makes little sense to allow these highly polluting and unnecessary flights to continue at a time when

COMMITTEE ON ECONOMIC EVIDENCE                                    134

the city's also spending billions of dollars on climate change resiliency projects. For these reasons, NRDC supports each of these three bills and three resolutions under consideration today. These would cut polluting helicopter air contaminants, achieve City and State global warming emissions reduction goals, and reduce noise levels across the city, improving the quality of life for hundreds of thousands of New Yorkers. Thank you.

MERRITT BIRNBAUM: Hi, my name is Merritt Birnbaum. I'm the President and CEO of Riverside Park Conservancy. I'm here to voice our emphatic support for all the legislation being considered today. Riverside Park Conservancy works through an agreement with NYC Parks to help the City care for 450 acres of parkland that spread across five parks along six miles of waterfront in Upper Manhattan from West 59th Street to West 181st Street. In other words, we care for the precious public green space that is adjacent to the major highway for helicopters that was mentioned before, i.e., the Hudson River. For decades, non-essential helicopter traffic has traversed this river with impunity, providing tourists, as has been mentioned, dozens of times

COMMITTEE ON ECONOMIC EVIDENCE                          135

today with a 15-minute joyride while saddling our parks with extreme noise pollution, carbon emissions, and environmental degradation. The incessant noise from helicopter traffic disrupts the tranquility of our parks, shattering the peace and serenity that these natural spaces are meant to provide. Families seeking respite from the hustle of city life are instead met with the relentless roar of these menaces overhead, and it's not just an annoyance. It's an attack on our mental well-being and enjoyment of our public spaces. It isn't just noise. As was mentioned about accidents, on a sunny Saturday morning in 2007 when Riverside Park's ball fields are normally filled with hundreds of children, a tourist helicopter had to make an emergency landing on the ball field right on the infield at 77th Street. Thankfully, this happened in July, which was after the main baseball season. Otherwise, it could have been much more catastrophic. Beyond the noise and safety concerns, we cannot overstate the environmental impacts of the constant helicopter traffic. The carbon and pollutant emissions contribute to air and water pollution, further jeopardizing the health of our communities, and so I just wanted to say, knowing that I'm

COMMITTEE ON ECONOMIC EVIDENCE                           136

speaking to the Economic Development Committee here,

Parks, as you know, brings in tens of millions of

dollars of concessions to the city coffers, which

really dwarfs the 2.7 or 2 million that the City

earns from these heliports. Thank you.

CHAIRPERSON FARÍAS: Seeing no questions,
the panel is now dismissed.

I'd now like to call up Roland Lewis,
Alex Matthiessen, Warrie Price, Markie Hancock, and
Ken Coughlin. Trying my best with pronunciations here
today folks. I know how that is with Farías.

ROLAND LEWIS: All right. Good afternoon,
Majority Leader Farías, Council Members. I'm Roland
Lewis, a consultant to Stop the Chop. I'd like to
make two very brief points, one based on my prior
employment and one based on where I live. I ran an
organization called the Waterfront Alliance for 13
years, and you've heard I think and you'll hear more
from my friend Warrie and others, the effect that
helicopter traffic has on the tranquility of our
public spaces. I'd like to talk to you about actually
the economic impact I think Merritt alluded to just a
second ago. One of the statements that you'll have in
in the press release is from Alex Pincus who runs the

COMMITTEE ON ECONOMIC EVIDENCE                          137

Grand Banks Oyster Bar, and he employs 300 people, and he's had customers ask for refunds because of helicopter traffic over his restaurants, 300. That's far more than that employed by the helicopter industry and, if you've been to other great waterfront cities, London or Stockholm and we talked about Paris, Lincoln was talking about that before, these are economic engines. We've invested billions and billions of dollars into our waterfront thankfully with great parks and the ferry transit, all sorts of things happening on the water's edge. We could have so much more economic activity if it weren't for the nuisance of helicopter traffic so we're leaving money and jobs on the table is what I'm trying to say by this industry continuing.

The second point is just basically where I live. I live in Flatbush, a working-class community similar to Parkchester. Nurses, sanitation workers, you name it, the essential workers, the backbone. As mentioned before, I used to think they were police helicopters overhead all the time. They're not. I tell my neighbors, yes, they are going to the Hamptons, yes, they're going to JFK. It is unfair. They go over our neighborhood. They go over East New

COMMITTEE ON ECONOMIC EVIDENCE                    138

York. It is an economic equity issue that you have to address as well so thank you for your time. Please push harder, push fast, get this done, the more at every level of government that we move this ball forward, the sooner we'll be done with this plague, as my colleague said earlier.

KEN COUGHLIN: Hello, my name is Ken Coughlin, and I'm here to speak on behalf of Manhattan Community Board 7 in support of the bills that are before us to reduce or eliminate non-essential helicopters over New York. I'm also a board member of Stop the Chop NY/NJ. Community Board 7 encompasses the Upper West Side of Manhattan from 59th through 110th Streets. On most days, the loud drone of helicopters passing overhead has become the new normal in our neighborhood there. These are tourists and commuter flights traveling up and down the Hudson and crossing the district. Tens of thousands of these flights originate or land at the two City-owned heliports. These tens of thousands of flights have been matched by tens of thousands of complaints to 3-1-1. Between 2022 and 2023, helicopter noise complaints in our district nearly doubled from 11,000 to more than 21,000. In January

COMMITTEE ON ECONOMIC EVIDENCE                          139

2020, Community Board 7 voted unanimously to support our elected officials' efforts to reduce helicopter traffic in the city, including support for a federal bill that would prohibit non-essential flights within New York City airspace. One year later, again by unanimous vote, we called on the City to stop promoting helicopter sightseeing tours on its marketing website, NYC and Company. This promotion subsequently ended thanks to the efforts of Gale Brewer when she was Borough President, and I am submitting those CB7 resolutions here. Manhattan Community Board 7 strongly supports the current Council bills to end non-essential flights at the two City-run heliports as well as other proposals and resolutions to reduce or ban tourist and commuter traffic over our district and city. Thank you.

WARRIE PRICE: Is it on? Thank you. I'm Warrie Price, the Founder and President of the Battery Conservancy. We've been working under the constant deafening noise of helicopters for over 30 years. We've transformed New York's historic Battery. These 25 acres are just a mere 280 meters from the downtown heliport with its perpetual engines that never shut down during their 30,000 annual trips. It

COMMITTEE ON ECONOMIC EVIDENCE                                    140

is constant. Yes, all-day noise from 30,000 choppers with its average of four passengers. We're talking about 120,000 people versus the Battery's annual visitorship of 44 million people who pass by, commute through, come to see the statue, or take classes at the Battery Urban Farm. How dare EDC prioritize a detrimental business over the well-being of millions of children and adults who desperately need and seek nature, beauty, and a livable community. We are a 24/7 work community which began in the early '90s and continues growing with a vigorous rate of residential conversion today. The Battery Conservancy, with its partners at New York City Parks and with funding by the New York City Council, has created a paradise of 240,000 square feet of perennial gardens, the Seaglass Carousel, Acres of Woodland, the Battery Playscape with Showbox Theater, and two urban farms. We value the buzz of our dragonflies and the pollinator bees and the joyful voices of children at play, all compromised by non-essential chopper noise. I submit my testimony with a letter from a neighboring school that no longer will use our Showbox Theater for its Shakespearean plays because of battling constant noise from the heliport. The

COMMITTEE ON ECONOMIC EVIDENCE                        141

most difficult aspect of producing these theatrical things is ambient noise, and they cannot come any longer. I plead for the passage of your Council-initiated bills today. We must ban all of the non-essential flights. To talk to EDC, right now in the Battery, two major climate projects are taking place. The one along the water's edge is run by EDC. It's over 200 million dollars. As you'll see from these two photos, taken in January 13th.

CHAIRPERSON FARÍAS: You are 30 seconds over time. I know you submitted your testimony.

WARRIE PRICE: And then these photos, I will also submit. Climate change is now. This breaching of our waterfront happened in January this year.

CHAIRPERSON FARÍAS: Thank you so much for your testimony. I appreciate it.

ALEX MATTHIESSEN: Ready? Okay. Thank you. Good afternoon, Majority Leader Farías and other honorable Council Members, Gale, my old friend Gale.

First, I wanted to thank you for the work you're doing here. I would urge you though to go for a full ban of non-essential helicopters. The whole eVTOL idea is a pipe dream at this point anyway. It's

COMMITTEE ON ECONOMIC EVIDENCE                                    142

going to be years until those are really in great enough number and reliability to replace petrol helicopters. I'm here for one specific reason, which is to encourage the City to drop its plan to basically give a new five and, let's be realistic, 20-year license to a helicopter port at the Downtown Manhattan Heliport instead of returning Pier Six to its original use as a maritime freight terminal. There's at least one application before the EDC now that is putting forward a marine maritime freight-focused proposal. All the other ones are more helicopters. The City is paid lip service with a 10 percent portion that goes to maritime freight, but it's not real. If we're serious about transitioning to a more climate friendly city, which we should be the leader on, we need to start finding those few piers that are left and devoting them to blue highways to green freight. I've included in my testimony a report prepared by the Center for Post Carbon Logistics, but it makes it very clear there's an overwhelming case for maritime freight over helicopters at Pier Six, better economics, more jobs created, more public benefit gained, and virtual disappearance of noise and pollution. I just want to

COMMITTEE ON ECONOMIC EVIDENCE                        143

say also that this initiative of Blue Highways is the next logical step to follow congestion pricing. With a fully functioning maritime freight pier, you could get more than 1,000 trucks a day off of New York City streets, bridges, tunnels, highways. It'd be a phenomenal change and improvement to our air quality, safety, street safety, etc. I want to say two more quick things, and that is for decades now, the City has promoted blue highways. Very little is done. This is an opportunity for the City Council, for the Adams Administration to finally make good on those many declarations and actually put some boats in the water, electric boats to move our cargo and free up our roads and bridges, and the second thing, just to remind you, it doesn't get mentioned a lot is that this is a public asset publicly owned asset. It's a maritime asset. Why are we devoting it to private profit with so little money to the City with so huge an impact on tens of thousands, hundreds of thousands of New Yorkers for private profit. This is a public asset. It should be devoted to public benefit. It is not today. We have a chance to do it right.

CHAIRPERSON FARÍAS: You are 30 seconds…

Thank you.

COMMITTEE ON ECONOMIC EVIDENCE                          144

ALEX MATTHIESSEN: Thank you.

COUNCIL MEMBER BREWER: I just want to say I tried to say that, not as articulately as you when I was questioning them. Thank you.

ALEX MATTHIESSEN: Okay, good. Thank you.

CHAIRPERSON FARÍAS: Thank you, folks, so much. This panel is dismissed.

I'd like to call Susanne Lee, Kate Maligar, Mulligan, I'm so sorry if I butchered that, Mark Young, Norrice Raymaker, Roger Baron.

You can begin when you're ready.

Yeah, we're keeping a little pile of the folks that aren't coming up just in case.

Please state your name and then read your testimony.

MARK YOUNG: Good morning. My name is Mark Young. I'm representing the South Midwood Residents Association. Anybody who wants to partner with us, our email address is southmidwoodhelicopters@gmail.com. For some of you who don't know, South Midwood is in central Brooklyn just west of Flatbush Avenue near Brooklyn College, and we have the good fortune to be right under one of the two primary routes of helicopters from Manhattan

COMMITTEE ON ECONOMIC EVIDENCE                              145

to JFK Airport along with many other communities in Brooklyn. As you've heard, every day we have repeatedly helicopters flying at 500 feet or sometimes less right over our homes, our businesses, and our public spaces. Something really must be done to address this issue. We join all of our partners here today in support of the bills focusing on the City-owned heliports, but the main reason we're here today It's just to make it clear to the Council Members and others that the proposals that only focus on the City-operated heliports do not have much of an impact on the communities in South Middlewood and most of your constituents in Brooklyn. The fact of the matter is the vast majority of the helicopters that fly over our neighborhoods are from the West 30th Street Heliport that you've heard about before that is owned by the Hudson River Park Trust. If you're a Brooklyn Member of the City Council, you really need to work with your constituents to pressure the Hudson River Park Trust board, who are appointees of the Governor, the Mayor, and the Manhattan Borough President to rethink how they choose to utilize their open space. The irony is not lost on me and us that the Hudson River Trust

COMMITTEE ON ECONOMIC EVIDENCE                              146

mission, what it is, and it's actually sponsoring a heliport that produces so much environmental negative impact on the community. The first step, and I'll wrap up, the first step and the main point we want to make is we want you to join Council Member Brewer in support of the legislation, Resolution 226, that focuses on the State Legislature and to call on them to amend the Hudson River Trust Park Act by banning non-helicopter use at that airport. Thank you.

SUSANNE LEE: Hello, my name is Susanne Lee, and I represent Hudson Classical Theatre Company. We are a non-profit theatre company that has performed in Riverside Park for the past 20 years. We perform on the north patio of the Soldiers and Sailors Monument in Riverside Park on West 89th and Riverside Drive. We produce three full summer productions, each running one month long in June, July, and August. We offer these plays to the public and don't charge tickets. As we are an outdoor theater company, the helicopter traffic that crosses overhead over the monument has been a long-running problem and seems to be getting worse with every passing year. The noise is deafening and we have to stop our show and wait for the helicopters to pass.

COMMITTEE ON ECONOMIC EVIDENCE                                 147

One evening, we decided to count the number of helicopters that flew overhead during one of our shows, and the number was 24 helicopters. This is from one Sunday evening from 6:30 p.m. to 8 p.m. It is extremely difficult to perform with this nonstop helicopter traffic, and it is such a terrible disservice to the roughly 3,000 audience members who come to our shows every summer. They come from all five boroughs, the tri-state area, and we often get national and international tourists, all excited to see an outdoor summer show, only to have the experience marred by the nonstop disturbance of the helicopters. It is also a huge disturbance to the roughly 100 people who work with us every summer from actors, directors, costume designers, artists, and production teams who work so hard on every show, only to suffer through the increasing noise of the helicopters that just disrupt every production. We sincerely hope something can be done about this helicopter traffic before we began our 21st season of producing classical theater in Riverside Park this summer. Thank you for your time.

NORRICE RAYMAKER: Hi. I'm Norrice Raymaker, and I am from Jersey City, New Jersey, and

COMMITTEE ON ECONOMIC EVIDENCE                          148

I have lived there for 30 years, and I want to thank you so much for your legislation, for sponsoring and writing this legislation because you are paving the way for New Jersey. Know that our elected officials and the residents in Hudson County support your legislation. Non-essential helicopters, of course, are ruining our quality of life. We are subjected to tourist, commuter, and charter helicopter traffic that flies over or to New York City, to JFK, to Newark, LaGuardia, and Long Island. We cannot enjoy our parks. Our homes, they vibrate, and the noise is heard inside and outside. It's very disturbing. You cannot have a conversation with people when you're on the street and the helicopters are flying over. They fly over our schools. They fly over our places of worship. They fly over Hoboken. They disrupt learning and services. It also impacts our enjoyment of New York City. Last summer, I was at Lincoln Center and I saw and heard helicopters hovering over Central Park, and New York City is a world class city, but unlike Paris and London which have banned helicopter traffic, helicopter corporations here continue to degrade our beautiful New York City, the New York Harbor, Ellis Island, and Governors Island, Liberty

COMMITTEE ON ECONOMIC EVIDENCE                          149

State Park, the Statue of Liberty, the Brooklyn and Washington Bridges, and other sacred metropolitan landmarks. It's ironic that we have banned plastic bags in New Jersey, but our hands are seemingly tied when it comes to banning non-essential helicopters. We have legislation in committee at the State level that has not made it to the floor. We have been advised that federal legislation will solve the helicopter problem, but that too has not advanced so you have a unique opportunity to dramatically reduce non-essential helicopters, and I'm urging you, please, take the opportunity to regulate non-essential helicopter traffic in the greater New York City area. We are indebted to you. Thank you.

KATE MADIGAN: Good afternoon. My name is Kate Madigan from The Public Theater. I just want to note, it's interesting that the previous panels were talking about using instruments to measure sound pollution, but they weren't talking about human ears and that was very interesting to me. The increase in helicopter usage and noise directly impacts the quality of life for many New Yorkers. Every summer, tens of thousands of New Yorkers experience this disruption at the Delacorte Theater during

COMMITTEE ON ECONOMIC EVIDENCE                                    150

performances of Free Shakespeare in the Park. After having waited hours in line for free tickets, thousands of New Yorkers settle into their seats to experience Free Shakespeare in the Park, only to have their experience disrupted by helicopters hovering overhead. Passengers and pilots require ear protections. However, the average citizen isn't prepared to carry around noise-canceling aviation headsets. Additionally, helicopters make more noise when turning compared to flying straight as the change of direction alters the air vortices around the blades. Therefore, any helicopter that circles around the open air Delacorte Theater in Central Park during nightly performances maximizes noise pollution, aka, sound signatures. The Public Theater has actively been working on this issue at every level of government. The organization is currently seeking congressional support for a federal study that would illuminate the impact of helicopter operations over New York City. Thankfully, Congressman Nadler's staff has listened to our quality-of-life concerns. We hope the federal government conducts this study with human ears in order to inform policy makers at the city, state, and

COMMITTEE ON ECONOMIC EVIDENCE                          151

federal level to the challenges facing communities. We welcome the proposals of Introductions 0026, 27, and 70 restricting non-essential helicopter operations over New York City. It is essential to improving the quality of life. Please reach out to our team with any further questions, support with research points. Thank you, Chair Farías, Council Members, Committee Counsel, and Staff for your work on this topic. The Public Theater appreciates your leadership.

CHAIRPERSON FARÍAS: Just in time. Thank you so much.

If you can hold one second, Council Member Brewer has a question.

COUNCIL MEMBER BREWER: I have a question. I know we've been talking to Phil Cohen a lot, your colleague. We've done so many press conferences with New York and New Jersey, and I appreciate it on this topic. Are there any localities, because I know what's going on in the state, but are there any localities in Jersey that have passed any bans, because you have a major number of those doorless that fly pretty constantly because I've been in them so I know.

COMMITTEE ON ECONOMIC EVIDENCE                              152

NORRICE RAYMAKER: Hudson County itself, at the county level, passed resolutions in favor of the New Jersey state legislation. Jersey City also passed a resolution, Hoboken passed a resolution so we do support the reduction of, or the elimination really, of non-essential helicopters. We just are struggling to figure out how to make it effective.

COUNCIL MEMBER BREWER: Thank you very much.

NORRICE RAYMAKER: You're welcome.

CHAIRPERSON FARÍAS: Thank you, folks. This panel is now dismissed.

I'd now like to call up David McConnell, Diane Park, Dorothy Lyon, Brenda Quattrini, and James Harrington.

Whenever you're ready to begin.

DIANE PARK: Hello, I'm Diane Park from Waterside Plaza. Any action or legislation to restrict or eliminate helicopters must also include the extremely dangerous seaplanes that are taking off from and landing in the East River and docking at the Skyport Marina on East 25th Street in Manhattan, also City-owned. My husband and I personally witnessed a seaplane heading straight towards our window before

COMMITTEE ON ECONOMIC EVIDENCE                          153

it veered off. Seaplanes are not regulated or monitored by air traffic control. Pilots visually land and take off in the river at their own discretion, making seaplanes extremely dangerous. Skyport Marina, where the seaplane stock first opened in 1939, the riverfront and the river have changed significantly since 1939. Waterside Plaza wasn't built nor was the nearby United Nations school nor the British International School. There were no high rises along the river in Brooklyn and Queens in 1939 as there are today, nor were there the full fleet of ferries and party boats and barges and everything else going up and down the river. With all of this activity and the residential buildup along both sides of the river, seaplanes are taking off and landing on a small strip of water between two bridges in a congested residential community. It is no longer safe or appropriate for these planes to be taking off and landing in the river at this location. These planes are an accident waiting to happen. What are even the rules for these seaplanes? Can they take off and land within 50 feet of residential buildings? Can they take off and land right next to schools? Are multiple planes permitted to circle in the river while they're

COMMITTEE ON ECONOMIC EVIDENCE                                154

waiting to dock at the marina? How many planes are

permitted to take off and land on any given day? Can

they take off during storms, after dark. Can they fly

dangerously close to the con Edison power point or

fly dangerously close to the Williamsburg and

Queensborough Bridges? I have witnessed all of these

violations myself along with my neighbors. Something

needs to be done about these seaplanes. Thank you. I

just want to bring to your attention I attached

several photos.

CHAIRPERSON FARÍAS: I was going through

them.

DIANE PARK: Okay, good. That show these

planes in action. It's unbelievable.

CHAIRPERSON FARÍAS: Thank you for your

testimony and for the stockpile of photos that you

submitted.

DOROTHY LYON: Okay. Hi, my name is

Dorothy Lyon, and I live in Brooklyn Heights across

the East River from the Downtown Manhattan Heliport.

Over the last two years, the number of helicopters

landing and taking off from the heliport has

increased dramatically. The noise from the

helicopters can often be heard in my living room to

COMMITTEE ON ECONOMIC EVIDENCE                          155

the extent that I cannot accomplish anything productive. There is no place in my apartment to escape the noise. The loud sound of reverberating helicopter blades is especially bad in Brooklyn Bridge Park. I've watched from the park as helicopters have landed and taken off from the heliport every four to five minutes in the afternoon. The helicopter traffic starts to increase around 2 p.m. and will last until about 7 p.m. Weekends are even worse as the helicopters begin their flights earlier in the day. The only time they don't fly is when it is rainy and or windy out. It doesn't matter whether the choppers are flying over the park or the river. The sound is still really loud. It is hard to enjoy being in the park with this overwhelming racket, and I would say these seem to be mainly commuter flights because I'm watching them, and they are heading off towards JFK or over South Brooklyn or heading down to Newark so, to me, I'm not sure they're tourist flights. To me, they seem to be more commuter flights, and it's just overwhelming. I would just say that I fully support the bills and resolutions before the City Council, but I would actually say the number of commuter helicopters to

COMMITTEE ON ECONOMIC EVIDENCE                              156

area airports needs to be sharply reduced, and I

actually would like to see the DMH used only for

emergency purposes. Thank you.

BRENDA QUATTRINI: Hello, my name is

Brenda Quattrini. Non-essential helicopters have been

flying right above the area where I live in Astoria,

Queens on a daily basis from early morning to late at

night for several years now. These outdated,

polluting, incredibly loud objects feel entitled to

interrupt any common human action like having a

conversation in the apartment or focus on studying

and working just to transport few privileged people

to and from the Hamptons so the measured decibel

levels on a helicopter flying over my apartment

ranges between 78 to 86, which are considered

dangerous for the human year, and I have observed how

even birds and other terrestrial animals display a

disoriented behavior while these obnoxious objects

fly over them, and to add the amount of pollution

spread above our heads and right into our lungs is

unacceptable, especially when the air quality is

already affected by a long list of other pollutants

like traffic, factory fumes, and the thousands of

daily flights approaching JFK and LaGuardia. Some of

COMMITTEE ON ECONOMIC EVIDENCE                                   157

the comments from the noise complaints RightAvenues'

app stated, for example, why has the city allowed

these helicopters to take over our airspace? It's

dangerous, bad for the environment, and detrimental

to human mental and physical health. Please make it

stop circling the East River near downtown Brooklyn

on and off all day, still going at 9:15 p.m. 400 ft.

Sounds like an invasion. It's so loud. 11:30 p.m.

Tourist rides. Can we get no peace. Incredibly loud.

It's going to wake our child. This doesn't happen

over other metropolises, not even Disney World. I'm

in a constant state of alert here. Unfortunately, New

York City is letting its citizen's mental and

physical health deteriorate day after day by allowing

these non-essential flights to harass them on a daily

basis. I don't want to be forced to move out of the

city like many others have done already. The City of

New York needs to take a stand and protect its

residents' health. That's why we agree to pay taxes

to both New York State and New York City. Thank you.

UNIDENTIFIED: Hi. Thank you for inviting

me and listening to my concerns regarding helicopter

noise and its constant aggravation. I took the

liberty of sending a 10-second video audio clip of my

COMMITTEE ON ECONOMIC EVIDENCE                                    158

visit recently to the Brooklyn Botanic Japanese Garden to you, which was marred by the intrusion of, what else, helicopters. I hope you had a chance to peruse it. I'm not a priest, far from it, but simply put, God does not dwell in turbulence, and there is nothing more turbulent than helicopters. The ability for us as caring people to practice human compassion is compromised in an environment where the spirit is stilled by a constant barrage of worldly intrusion. The arrogance of helicopters is an especially galling example of man's indifference to his fellow man. It breeds contempt on both sides, by those who selfishly ignore their fellow citizens right to a calm, peaceful, daily existence, and the hateful scorn felt by us, subjected to helicopters' daily torture. This is New York City, and noise is a byproduct of living in it, but there are limits to what is acceptable and necessary. The impatient driver stuck in a traffic jam who keeps his hand on the horn to no avail is frustrated, but this is an everyday part of living in New York City. It must be tolerated. Helicopters, on the other hand, are of a different magnitude altogether. They are equivalent to an invasive species out to destroy our very existence, serving no

COMMITTEE ON ECONOMIC EVIDENCE                                    159

discernible purpose other than gratifying the whims of a few. Where's the time go? I have to tell you I can remember a time when the Lower Manhattan Heliport was only used by like the President or the Pope, maybe Frank Sinatra, I don't know. I remember Mayor Bloomberg, a licensed helicopter pilot, can I repeat that, Mayor Bloomberg, a licensed helicopter pilot, opened up the floodgates. It all came from him, and you have a chance to rectify that mistake. It's in your capability to do that, and I certainly hope you do that. Thank you for your time.

CHAIRPERSON FARÍAS: Thank you for your testimony. Thank you all.

I'd like to call up Mark Berman, Ana Rodriguez, Monica Elias, Christine Collister, and Theo Morton.

You can begin when you're ready.

UNIDENTIFIED: Is it on? Can you hear me? Okay. This is a screenshot of a helicopter flying over my apartment in Park Slope at approximately 50 feet above my building. According to the FAA's reports, and I'm shocked to hear the DEP say they don't know how to measure sounds. It's quite extraordinary because Alexander Bell measured

COMMITTEE ON ECONOMIC EVIDENCE                          160

decibels over 100 years ago, and the FAA in a report called Aircraft Source Noise Measurement Studies puts the Bell 407 that was flying over my apartment at 110 decibels at 200 feet. At 50 feet, it's over 120, the sound of a jet engine. Now, I want to speak to a couple of things that the EDC testified about, and one of the things I want to say that I'm shocked that is not a part of this, I've owned my own business in New York for about 37 years. I have an apartment in Park Slope, Brooklyn. I have an office in Lower Manhattan. I can't focus, I can't concentrate. There is apparently no evaluation of the loss to New York City the massive economic loss to the hundreds of thousands of people like me that are losing productivity, people who are having to lose days from sickness from these deafening sounds. I think it's enormous. I've paid lots of UBT tax over the years. I've paid lots of state and city tax. The other thing I did want to speak to is this mythological thing of the electronic helicopters. When they did that, and there were some reports of the people who were present at NASA when these were done and these tests were done, and what they revealed was that these helicopters flying at 300 feet produce a sound of the

COMMITTEE ON ECONOMIC EVIDENCE                           161

equivalent of someone standing on a street sidewalk next to a highway with cars going by 50 miles an hour. There's plans to, from United, others to turn this into, I'm sorry, I will just wrap it up and turn this into a taxi lane across Brooklyn and Lower Manhattan, which is going to make huge swaths of the city unlivable. I heard the gentleman from the helicopter industry talk about 1,500 feet. These things are not flying at 1,500 feet. They're flying at 200 to 500 feet over our apartments, which is creating sounds. If it's electronic, it's also going to be unlivable. And I just want to quickly say I testified here two years ago. Nothing has happened. The State Legislature by large majorities passed to shut down the heliport. Governor Hochul vetoed that for the false reason that that's the FAA, and it's not true at all. The State had absolute control to shut that down, and it's unfortunate because this is impacting toddlers and children, infants, seniors, the disabled, people throughout New York City. It's got to stop, and I appreciate your efforts to do so.

CHAIRPERSON FARÍAS: Thank you so much.

ANA MARIA JOMOLCA: Thank you. Hi, my name is Ana Maria Jomolca, and I live in downtown

COMMITTEE ON ECONOMIC EVIDENCE                                    162

Brooklyn. I'm an actress, and the only reason I say that is because in this new landscape where everything's being brought home, we have to tape now from home, auditions and, needless to say, I have gone from not in the route of the flight path to in the route and there are helicopters coming. I have to tape and when you hit that spot where you actually nailed an audition and a freaking helicopter comes by and ruins it for you, that's a lot of work but, aside from that, I wanted to bring up something that, aside from the noise pollution is the sky, the skyline pollution. I have actually muted myself and just looked at all the helicopters. At one point, I was down in the Brooklyn Bridge Park, which used to be my respite and my solace and my pause because we as a city are in relationship with everybody, especially in such a tight, congested area. What happens when we are piled up, everyone here has been imagining in a relationship, things get heated, you're in each other's faces, pause, space, a breath, a moment away, the parks, the botanic gardens, that's what that is for the city. It helps us come back to a more clear, a more sane way to deal with the situation but, unfortunately, sanity is not thought of as profit or

COMMITTEE ON ECONOMIC EVIDENCE                                    163

tax deductible but it is crucial, and I feel like that is not being, when did that stop becoming a value, especially in a city? Our sanity is everything, especially right now with what's going on in the world. We need these places to go and recalibrate and come back and deal with something in a sane manner, and that's been taken away by these helicopters so thank you.

CHRISTINE COLLISTER: My name is Christine Collister. I work and live in Gramercy along with my husband and our 8-year-old daughter. Over the last four years, helicopter noise across Manhattan has increased at an alarming rate. Prior to 2021, I felt surprised every time one passed overhead and assumed there was a criminal or news story nearby. A rare occurrence, I heard far less than one per day. So far this month, I've heard at least 10 per day, or 150 in total for the month. Last week, my daughter and I visited Central Park for a picnic lunch. In the short time we sat in the grass, two different helicopters slowly passed overhead 30 minutes apart. Yesterday, I took a ride on the Hudson River bike path, during which I heard at least two. As I sit here writing this, I hear one through my open window. As early as

COMMITTEE ON ECONOMIC EVIDENCE                            164

7 a.m., helicopters crisscross over our apartment. Each time, my shoulders tense up, my blood pressure goes up, I scramble to play music to drown out the sound, the rest of the day is an uphill battle to combat stress. My family should not have to suffer through this so someone else can gawk down on the city like an exhibition or charter a helicopter for a visit to their vacation home. There are many emergency or unavoidable noises that New Yorkers endure including ambulance, police and fire sirens, jackhammering, and the never-ending sound of building construction. On top of that, a symphony of car horns, and yet we're also experiencing non-essential and recreational helicopters overhead. Today, I asked my 8-year-old daughter if she thought the onslaught of helicopters was normal. She said, of course it's not normal, Mom, they're so loud. Yet, here I am, forced to argue against what is obvious to an 8-year-old and an obvious breach to every New Yorker's quality of life. Pulled directly from NYC.gov on a page simply entitled Noise, Noise in the community, even at levels that are too low to cause hearing loss, can affect mental and physical health. Long term exposure to this type of noise can lead to

COMMITTEE ON ECONOMIC EVIDENCE                                    165

stress, higher blood pressure, muscle tension, fatigue, and sleep problems. Those side effects are demonstrable and in the long-term lead to further health consequences including an increased risk of heart attack and stroke. I urge everyone who has a say in this matter to think about the health of families like mine who live directly in the crosshairs of persistent, rackety, non-essential helicopter flights and put a stop to them. Thank you.

CHAIRPERSON FARÍAS: I appreciate all of you for your testimony.

I'd now like to call up Michael Popper, David Fitzgerald, John Young, and Jason Ehrich.

No? Okay, I'll give it one more round. Michael Popper, David Fitzgerald, John Young, Jason Ehrich and, if not, Moonira Keghida. You can come up. Charles Komanoff, John Ost, James Boyd.

Yes, you can begin when you're ready.

JASON EHRICH: Okay, my name is Jason Ehrich, and I'm not affiliated with a particular organization though I appreciate their advocacy that I've seen here as well as the Council's leadership on this issue. I'm simply a resident of downtown Brooklyn who has seen the incredible development of

COMMITTEE ON ECONOMIC EVIDENCE                    166

the Brooklyn waterfront over the last 15 years so it's a mystery to me that the City would allow this triumph of urban planning to be marred with near constant noise pollution. It is also a mystery to me that the EDC and Mayoral Administration is so transparently obstructionist to reform. The DEP representative's assertion that noise monitoring technology does not exist can be disproven with a one-minute Google search, and I can send along other vendors that supply this technology if the Council would like. I guess their attitude can be summed up as New Yorkers can and will put up with it. They do every day, so why shouldn't they put up with this? But the fact of the matter is we shouldn't have to. What is happening is not right, and it's not fair, and New Yorkers will notice where their politicians stand on this issue. Thanks again for the Council's leadership.

MOONIRA KEGHIDA: Good afternoon. My name is Moonira Keghida. I live in Boreham Hill which is about a 10-minute walk from the water's edge, and I am here today just as a resident who's extremely nervous all day because of this sound, but also I wanted to speak on behalf of the people of the

COMMITTEE ON ECONOMIC EVIDENCE                              167

Wyckoff and Gowanus Housing Projects, NYSHA. I live in the shadows of these two projects. I live across the street and let me say that we're a 10-minute walk from the water's edge so you can imagine how quickly a helicopter reaches overhead. They fly very low over the water and, by the time they get to these projects, they are not very high. They fly so extremely low, it's just above people's heads, and I have clocked it. They start at 7:40 every day, the particular company that's flying over our area, 7:40 every day. On a good day, I've clocked it at every 20 minutes. Every 20 minutes, a helicopter is either going to Manhattan or coming from Manhattan, every 20 minutes until about 8 p.m. Last night, the last one came in at 9:40. Now if you restrict the hours of flying, all I anticipate is going to happen, we'll have them coming every 10 minutes. It is so unfair. Let me say something else. Noise, of course, is a huge problem, but also our health. A child in our building was found to have high lead blood content. The pediatrician said it's pretty normal for city kids, but we had a child two doors down die of a brain cancer recently, which I hear is on the uptick also, brain cancer. Probably coming from the lead

COMMITTEE ON ECONOMIC EVIDENCE                                    168

content. This was a 5-year-old child. A million

dollars is spent on gasoline I heard from the

heliports. That million dollars is being dumped on

our heads, and we're getting cancer from it. Okay,

that's all I wanted to say. Thanks.

CHAIRPERSON FARÍAS: You folks might have

to shift a little. There you go.

JOHN OST: Good afternoon. My name is John

Ost, and I see noise rates high on the number of

complaints to the City's 3-1-1 complaint line. I have

served on the Board of Directors of Southbridge

Towers, a 1,600-unit housing cooperative with almost

5,000 residents, located in the South Street Seaport

area. Diagonally across from us is Smith Houses, a

1,900-unit NYCHA housing complex with almost 6,000

residents. As you can imagine, noise is high on our

priority list, especially sirens, whoophorns, and

helicopters. Many of us survived the 9/11 World Trade

Center bombing when helicopters flew overhead

constantly so helicopters present a very stressful

reminder of the past. I avoid going to the seaport

and over on the west side of Manhattan, I also avoid

as the noise is just too disruptive. As I was

preparing for this hearing on April 9th at 9:20 a.m.,

COMMITTEE ON ECONOMIC EVIDENCE                                169

an NYPD helicopter flying over the Brooklyn Bridge near South Street Seaport and, since I live on the 27th floor, I noticed that the helicopter was at eye level, way too low for those walking in the street, and NYPD helicopters burn fuel at the rate of 460 dollars per hour as well as discharge air pollution. NYPD aircraft regularly fly and hover over both of our developments, both Smith and Southbridge. In addition to the very unpleasantness helicopter brings us, we also have the emergency vehicle horns so we're constantly being disturbed in Lower Manhattan. I and my residents in Southbridge Towers greatly appreciate the Council taking these particular legislative moves. Thank you.

DAVID FITZGERALD: Hello, my name is David Fitzgerald, and I represent the Fitzgerald family in Marine Park, Brooklyn. First of all, I'd like to say I actually love helicopters. Personally, I really, really do. I am an aviation enthusiast. I build and fly model planes. I fly drones. I've flown private aircraft. I absolutely love them, but I also know the noise that they make, right, and the helicopter is one of the noisiest flying machines ever invented. Not very efficient and very noisy so I'm just going

COMMITTEE ON ECONOMIC EVIDENCE                          170

to tell you how the machines that I actually love to watch from a distance, as long as it's not too noisy, affect me. Noise has never bothered me that much before, but I'm more than 60 years old and noises seem to bother me a little bit more lately. I don't know why, but especially those helicopter noises so my real complaints and what driving the noise complaints for me and where I live is the altitude. Helicopters are flying over my house. Because I'm an aviation enthusiast, I track ADS-B data, which is the transponder the helicopters use which will display their flight data, where they're going, how high they are, regularly between 120 and 350 feet above my house. I see them take off on Manhattan, climb to 900 feet, and then slowly descend as they cross Brooklyn. Unfortunately, I live about half a block from Flatbush Avenue, and that's the route they use to go from Manhattan to Kennedy Airport. I wanted to call out one or two things that some of the earlier folks said, the helicopter industry representatives. I was hoping I could get to go earlier because I wanted to look them in the face when I said this. The lady mentioned about IFR helicopter flights. For those of you who, if you don't know, is flight in limited or

COMMITTEE ON ECONOMIC EVIDENCE                       171

zero visibility. Right now, that's the only respite

we get is when there are IFR conditions. If they

allow flight in IFR conditions, we'll have double the

helicopter traffic that we currently have here in New

York City. I just want to finish by telling you that

people who, I've personally contacted to deal with

this condition, 3-1-1, multiple times, me and my

neighbors, Hakeem Jeffries, my Congressman, waste of

time. The FAA in Farmingdale. No answer. We'll call

you back. Never called me back. FAA in Washington,

D.C. Wasted my time. Uber Air, Blade Mobility, and

the others responsible for all that commuter

helicopters, and they are the ones directly

responsible for the increase in helicopter traffic.

It's the air mobility apps that are originating in

Downtown Heliport and on the West 13th Street

Heliport. They're the number one driver of the

increase in helicopter traffic.

CHAIRPERSON FARÍAS: Thank you.

DAVID FITZGERALD: Thank you. Oh, thank

you for your work, by the way. I appreciate it, 100

percent.

UNIDENTIFIED: Is it on now? Yeah. Thank

you for your stamina, by the way, and also your

COMMITTEE ON ECONOMIC EVIDENCE                          172

public stamina. I'm sorry to see that some of your panel has left, and I'm sorry to see that the industry shills and the EDC have left because they're unbelievable. I live in Chelsea. I commute every day by bike up to Hell's Kitchen, past the heliport in the park, the egregiously named Very Important Persons heliport from which the Trust makes revenue, which they consider necessary which is really pimping our health and safety, but I don't want to repeat all the complaints that everybody's made because I agree with it completely. I'm alarmed at the endorsement and the enthusiasm about electric helicopters because electric transportation, I'm sorry, is not going to be an answer to climate change. We're two miles out from an environmental trainwreck and electric public transportation, absolutely, but private transportation and especially helicopters, which are used exclusively by wealth, whether they're corporate, business, or private, the problem with electric vehicles is that the production and the materials are carbon intensive, they depend on being charged from fossil fuel plants. More terrifying are the environmental and human rights issues involved with the extremely toxic mining of battery raw

COMMITTEE ON ECONOMIC EVIDENCE                          173

material. Most of us are not aware that cobalt and lithium mining are becoming a neocolonial nightmare for poor populations, re-enacting the pillage of oil extraction and involving child slavery, deadly wage slavery, and devastating pollution. Let's not waste our labor, our health, and our innovation, and our children's lives on the deadly privileges wealth demands. Thank you for your work.

CHAIRPERSON FARÍAS: Thank you folks so much for your testimony. This panel is dismissed.

I'd now like to call up Philip Turner, John Wilkens, Sydney Garcia Widgren, and Christopher Widgren.

You can begin when you're ready.

PHILIP TURNER: Thank you, Council Members. Gale Brewer was my Council Member for a long time. Now Shaun Abreu is, and I'm glad to have them both. I know how long Gale's worked on this issue. Helicopters fly over my Upper West Side neighborhood near Riverside Park day and night. This morning, I got up earlier than usual. It was 6:25. There was already a helicopter flying near me. It just mars our quality of life so much. I ride my bike along the Cherry Walk along the Hudson River. Recently one ride

COMMITTEE ON ECONOMIC EVIDENCE                                    174

I counted six flights in 15 minutes, low-flying. They were terrible.

UNIDENTIFIED ZOOM PANELIST: City University of New York…

CHAIRPERSON FARÍAS: Can you stop the clock for a second?

Go ahead.

PHILIP TURNER: I'm sorry. I don't even know if I need my full two minutes because I've heard so many eloquent people speak this morning. I was disturbed by the minimizing of this problem by the industry officials and the ill-preparedness of the Members of the Administration, which really disappointed me so thank you for everything you're doing. I don't need my full two minutes because we all know the truth.

CHAIRPERSON FARÍAS: A true hero. Thank you so much.

JOHN WILKENS: Hi, (cough) excuse me, sorry, my allergies. I'm John Wilkens, I live with my family in Park Slope, Brooklyn.

CHAIRPERSON FARÍAS: Is the mic on? You see the red light?

JOHN WILKENS: Is it on?

COMMITTEE ON ECONOMIC EVIDENCE                               175

CHAIRPERSON FARÍAS: Click the button. There you go. No?

JOHN WILKENS: There.

CHAIRPERSON FARÍAS: Yeah. Okay.

JOHN WILKENS: Sorry. I'll be brief. I'm John Wilkins. I live in Park Slope, Brooklyn with my family, and I just want to thank the Council for all the hard work you're doing. It wasn't until today that I realized that the EDC actually worked for the helicopter industry. I thought they were working for us. Their 28-million-dollar estimate of the economic benefit of helicopters is frankly bizarre, and I hope to God whoever did that math isn't doing my taxes because I would have made 100 million dollars this year. I live with my boy and my wife in Park Slope, and I'll just relay one anecdote. This Sunday, it was a nice day, all he wanted to do was sit on the stoop and read a book. We grabbed Pete the Cat, his favorite book, sat on the stoop. Before we were able to read one little Pete the Cat story, there were eight helicopters flying over, as others have said, extremely low altitude, deafening not just my family, but hundreds of families in each direction for dozens of miles all the way to the Hamptons where we live on

COMMITTEE ON ECONOMIC EVIDENCE                          176

the main drag between Manhattan and the Hamptons so eight flights in 15 minutes isn't unusual. It was unusual for April. It's commonplace for July afternoons, Friday evenings and Saturday and Sunday evenings are essentially making our neighborhood uninhabitable. The economic benefit of the 28 million fails to include the significant cost of the health damage that the helicopters are doing, the damage to real estate. Now, my neighbors and I, we're all fed up. We're thinking of moving. No one wants to move. We want to raise up our families in what was, a short time ago, a beautiful, fantastic, vibrant neighborhood that is becoming uninhabitable because of the noise so thank you for all you're doing and hopefully we can do something to ban these flights and to turn things back to what they were.

CHRISTOPHER WIDGREN: My name is Christopher Widgren. I live in Park Slope Prospect Heights, about halfway between the Barclays Center and Grand Army Plaza, right on Flatbush Avenue. I thank you guys for hanging out with us so late today. I work as a registered nurse down at NYU Brooklyn Hospital. I was the nurse in charge of the largest COVID unit in Brooklyn down at NYU Brooklyn and

COMMITTEE ON ECONOMIC EVIDENCE                         177

Sunset Park. Everybody came out at Sunset and was banging their pots and pans together and it was very sweet, but now I'm asking for quiet because the situation is just killing me lately. I don't want to be here. I don't want to be hanging out at a City Council meeting all day. I've never sent a dish back at a restaurant or written an angry letter to a business. I'm pretty cool with noise too. Sirens, fine. Police helicopters, traffic helicopters, fine. Horns. We live in New York. This is okay. This is a whole other animal, man. I bought a little decibelometer. It cost 20. Very easy to measure. Don't know why they were saying it wasn't. Every 20 minutes, going up to 100 decibels, 90 decibels inside the apartment. That's like turning on a hairdryer or a blender every 20 minutes starting at 6 in the morning, on Sundays sometimes. I'm just trying to get some sleep. It's completely outrageous, and I don't know what to do. We used to enjoy going on the roof. We can't go on the roof anymore because we can't hear each other. I'm happy now when it's a rainy, cloudy, stormy day because we get a little bit of a break from the helicopters. How sad is that? I don't know what changed it. I've lived there for 10 years. It

COMMITTEE ON ECONOMIC EVIDENCE                                    178

didn't used to be that bad. A couple of years ago it started getting bad, and then just the last six months, a year, and now it's just horrible. I don't know what all has changed, but I hope that we can do something to just help out the people who have our feet on the ground and our ordinary workers and not the wealthy people who are getting out to the Hamptons and JFK.

SYDNEY GARCIA WIDGREN: Hello. My name is Sydney Widgren. I live in the same place just north of Prospect Park, half a block off Flatbush Avenue, and I can attest also to the fact that helicopters are flying very low over our building constantly, almost every day, almost every 20 minutes from 7 a.m. until late into the evening. We live on the first floor. The sound reverberates off of the buildings around us directly into our apartment, and it's deafening indoors and outdoors so thank you for holding this hearing and for this opportunity to talk about my experience which has been unfortunately quite horrible with the commuter helicopters in particular.

CHAIRPERSON FARÍAS:  Thank you all for your testimony, and I'll be sure to relay to DEP

COMMITTEE ON ECONOMIC EVIDENCE                          179

again that they can monitor. Feel free to give any feedback on my bill, Intro. 27, on the decibel meters as well.

I'd now like to call up Judy Mann, Peter Maloney, Stan O'Connor, and Alan Winson, maybe?

Whenever you're ready.

JUDY MANN: Hi, I'm Judy Mann. I'm a volunteer tour guide on Governor's Island, and I have the privilege of working with tourists that come to the island from all parts of the country, all five boroughs, and all over the world. I was going to tell you a lot about the island and how wonderful it is, you know all that, and there's really nothing much to say, except there's just two things. There's a real difference on Sundays on Governor's Island when there aren't tourist helicopters taking off from lower Manhattan. It's radical. I used to work always on Saturdays. I've stopped working on Saturdays. It is intolerable because of the unending, unremitting war zone that we live in, but Sundays are different. You can actually have a conversation with people. You can hear the birds. It will make a difference if you can eliminate the tourist helicopters. I'll just conclude with something that one of the international tourists

COMMITTEE ON ECONOMIC EVIDENCE                         180

said to me which was how can you possibly bear it here? It's just the last thing you want people to think about an island that the city is investing an enormous amount in to make it into just this extraordinarily luscious place so thank you so much for the work and for your endurance and you do a great job. Thank you very much.

STAN O'CONNOR: I'm a tour guide too.

JUDY MANN: Oh… You probably have a license. I'm just an island tour guide.

STAN O'CONNOR: Oh, yeah. Hello, Majority Leader. My name is Stan O'Connor, I'm a licensed tour guide. We, there are almost 10,000 licensed guides, lose money every time four passengers paying 250 dollars each take off for a 30-minute flight. I would be happy to give a half day tour for 250, but those people go up in the air. We guides provide real walking tours in which we take people to museums. Here's my AMNH membership card. Restaurants, bars, stores. Our customers spend money in the city. Tour copter customers spend money on a 30-minute view that creates noise over the heads of millions. When the helicopter operators cry about a coming loss of jobs to 175 workers, please remember that they are

COMMITTEE ON ECONOMIC EVIDENCE                          181

endangering the livelihoods of 10,000 tour guides, and we were here first. Economic Development should support and promote real tours with real guides because we want tourism income to be distributed throughout the city. There's a YouTube video that documents Fort Tryon Park overflights at one every two minutes. The official earlier mentioned that the FAA rules supersede any possible City rules. Copters at the Downtown Heliport are refueled in a manner that's against FAA rules, and apparently nobody checks. Normally, aircraft engines are to be shut off while refueling just as you shut off your car at the gas station. Hot refueling with the engine running is against the rules. The FAA says to avoid hot refueling except when, quote, operationally necessary such as in a medivac situation in which many emergency flights are needed. At Pier 6, they do it all the time. I have photos. Hot refueling saves time, which increases the number of flights. This is a tourist flight assembly line that could turn into a fireball. Thank you.

PETER MALONEY: Thank you for giving this opportunity. We've heard a lot of testimony. I have to agree with even my colleagues right here because

COMMITTEE ON ECONOMIC EVIDENCE                                    182

I'm not going to Governors Island again. the last time I was there…

CHAIRPERSON FARÍAS: Can you just state your name and address?

PETER MALONEY: Oh, I'm sorry. I got yeah. Peter Maloney, I'm a resident of Flatbush. My colleague, Mark Young from South Midwood Residents Association, also spoke. I am here just to follow on a lot of what everybody's been saying, but one thing though, there's been a lot of focus on tourist helicopters. At least for the outer boroughs, the issue is commuter helicopters, and we can track it there. You've heard there's tracking apps, we can track it, and you can see they're Uber and they're Blade helicopters, and they're flying over at the height of the tourist season. They're going to JFK. There could be 30 in a day, and they're flying so low as you've heard before. You make a complaint. You get back a form letter from the FAA. The FAA gives you their guidelines, anyone can look them up. They're violating at least two of the most important guidelines, their height and their being able to veer off in case there's an emergency. They're flying right over Flatbush Avenue. It's the same path, I've

COMMITTEE ON ECONOMIC EVIDENCE                                    183

noticed for years, the police fly. The police need to fly it, and you do that because it's line of sight. You can see Flatbush Avenue all the way down to the Rockaways. They fly because it's easy. Now if they get the technology that allows them to fly without visual line of sight, what's that going to do? I think you really have to consider this is also very much an environmental justice issue. I guarantee you there's an undercount in the number of complaints. I get tired of making the complaints. I have to stop working. I'm working inside, and I can't make a phone call from inside my house. I have to stop the phone call. How many complaints are you going to make in a day? It takes about five or ten minutes and you have to fill out everything on the complaint so it's undercounted, especially in the outer boroughs where a lot of people aren't going to have the means to make complaints, and they need to follow their altitude restrictions, and they're not following them.

            CHAIRPERSON FARÍAS: Absolutely. Thank you for your testimony.

COMMITTEE ON ECONOMIC EVIDENCE                                    184

Just for clarification for you, our bills that are being heard today do cover both, all non-essential, so it's both the commuter and the tourist.

PETER MALONEY: Yeah, and I think that resolution is the only one that's going to help somebody in the outer boroughs because, otherwise, and you have to get at the EDC, that's the hard part.

CHAIRPERSON FARÍAS: Yeah.

PETER MALONEY: It's like how do…

CHAIRPERSON FARÍAS: We're working on it.

PETER MALONEY: There's more money coming in from other sources.

CHAIRPERSON FARÍAS: For sure. Thank you so much again, folks, for your testimony.

Seeing no one else signed up, if you're here to testify in person and have not been called, please go to the Sergeant desk and fill out a form.

We will now move to our online testimony. I'd like to call on Arlene Lillian Bronsart, Bronsapt (phonetic) followed by Debra Lapadula, Dorinne Tye, Mark Diller, Michael McCready, and Sam Pesin.

SERGEANT-AT-ARMS: You may begin.

CHAIRPERSON FARÍAS: Arlene, you can begin when you are ready and unmute yourself.

COMMITTEE ON ECONOMIC EVIDENCE                                185

ARLENE BRONZAFT: Oh, okay. I just lost it. I lost it. I'm so sorry. I clicked it. Oh.

CHAIRPERSON FARÍAS: We can hear you. You can begin.

ARLENE BRONZAFT: Can you hear me? All right. Arlene Bron…

CHAIRPERSON FARÍAS: Oh, we've lost Arlene.

Okay, we're going to move to Debra Lapadula or Capitula? Lapitula?

DEBRA LAPADULA: Hi, good afternoon. My name is Debra Lapadula, and I thank you for all that you do, especially Gale Brewer. I'm calling from Queens. I think there was only one other person from Queens Astoria, but I'm calling from Howard Beach, Lindenwood, which we are the backyard of JFK. It is a true nightmare here of Blade, the non-essential helicopters. We have high rise condos, co-ops in this area. We have a high population of birds also. They start at 7:01 a.m., flying extremely low. It doesn't matter what the weather is like, even the day that the earthquake took place, they were flying before, during the earthquake, and after, and this is a true quality of life for many here, health-wise, but no

COMMITTEE ON ECONOMIC EVIDENCE                                    186

one is also addressing structural damages on buildings and homes. We have homes here in the area that are under local law construction and, with these helicopters flying at the same time, this here could possibly cause a disaster in this neighborhood. I don't understand why for all these years, I have been trying to have ears listen to me since 2016, calling on differing Congress, my City Council Woman from my District has no interest in this whatsoever. She will not participate. She told me this is a business, and we just have to accept it, maybe wear earplugs, and that's unacceptable. It also is affecting veterans who suffer from PTSD. They feel like they're back at war. This is unfair of the torture that we're bearing for selfish people who want to zip across the skies for seven minutes of their flight for 200 dollars, and we have to bear each and every day. You go to house of worship, a funeral, a wedding, just a regular Sunday service.

SERGEANT-AT-ARMS: Your time is expired. Thank you.

DEBRA LAPADULA: So I'm hoping that this can see soon and change their paths.

COMMITTEE ON ECONOMIC EVIDENCE                    187

CHAIRPERSON FARÍAS: Thank you so much for testifying today and waiting patiently virtually.

DEBRA LAPADULA: And one last thing, can I add is maybe a sound can be done. There's numerous 3-1-1 complaints made for 11414. You can look them up, and we need someone to survey this area and have a sound monitor. It is unbearable, unbearable. Thank you. Have a good day.

CHAIRPERSON FARÍAS: Thank you so much. I'd now like to call on Dorinne Tye.

DORINNE TYE: Good morning, good afternoon your time. I am on the other coast, and I live in a small rural farm community. Sorry, my name is Dorinne Tye. I live in a small rural farm community where flight school moved in and became one of the largest helicopter training schools in the Pacific Northwest. Our rural lifestyle, livestock, and health is being crushed by flight schools and helicopter training exceeding 85 decibels up to 16 hours a day. It appears FAA's Part 91 describes two to 500 flight hours required to become a helicopter tour pilot with extra hours required per type. When I see upwards of 20 helicopters over your community at a time, I wonder who suffered those 4,000 to 10,000 hours of

COMMITTEE ON ECONOMIC EVIDENCE                              188

insufferable training over our homes, health, and lives only to come torture your communities indefinitely. Flight school can cost more than a doctorate degree. For the past decade, ALPA, the largest pilot union in the world, continues saying that there is no pilot shortage, including February 5th article titled 2023 Shatters Another Record for U.S. Pilot Production. It would appear the pilot shortage narrative is simply an aviation lobby talking point, making a greedy few unprecedented profit while indenturing students and graduates by equipping them for a flooded pilot market, driving down wages while creating ever more communities, enduring hellish pilot training, touring, and an aviation lobby which continues finding ever more ways to utilize these certificates, like flying by the dozens over New York or national parks or mass distributing biocides, wild horse roundups, wildlife culling, etc. Thank you for acknowledging the aviation noise and pollutions drive down education while driving up violence, hypertension, and heart attacks, true physical and mental suffering and torture. It seems unconscionable and unconstitutional for the FAA to continue delays while sacrificing

COMMITTEE ON ECONOMIC EVIDENCE                              189

wildlife, nature, ecosystems, and human health for glut of non-essential aircraft. Bravo for these bills standing against this. Regarding eVTOL, advanced air mobility, I've been asking how much wildlife and bird removal pulling will have to happen for them to remain safe, and will this change trespassing laws? I don't even receive acknowledgement of the questions. Can the funds generated by helicopter violations move from general fund into a fund designated specifically for combating the aerial problem? Finally, I applaud New York for writing these…

SERGEANT-AT-ARMS: Time is expired. Thank you.

DORINNE TYE: Oh, thank you for acknowledging that the amount of people suffering from sea to shining sea for helicopter and aviation excesses, including helicopter tours, will no longer be tolerated. Thank you.

CHAIRPERSON FARÍAS: Thank you so much.

I'd now like to call Arlene Lillian Bronzaft.

I know we lost you when you were just beginning.

ARLENE LILLIAN BRONZAFT: Thank you.

COMMITTEE ON ECONOMIC EVIDENCE                                190

CHAIRPERSON FARÍAS: We can hear you, yes.

ARLENE LILLIAN BRONZAFT: Okay. Arlene Bronzaft, Professor Emeritus of the City University of New York and member of the board of GrowNYC. I am a researcher writer on the effects of noise on people's mental and physical health. My first two studies, which are considered the landmark studies in the field, were done to explore the impact of elevated train noise on children's learning when their school was adjacent to the train track and, when I compared the reading scores of children adjacent to the train track to the children on the quiet side of the building, they were nearly a year behind in reading, and that is by sixth grade. That is considerable. Fortunately, the Transit Authority chose the site of the school to test out a program on abating noise on the tracks by installing rubber resilient pads, and the Board of Ed put acoustical ceilings in the classroom. I was then asked by a public official to go back to the school and see if this made a difference. Well, it certainly did. When I compared the reading scores of children next to the elevator train track, and it was now quieter, with children on the quiet side of the building, they were

COMMITTEE ON ECONOMIC EVIDENCE                              191

both reading at the same level. The FAA has used these two studies plus studies confirming these results that followed, and they have spent nearly 400 million to quiet schools adjacent to their aircraft. I've also done two studies in New York City on the effects of aircraft noise on people's health and well-being and, should you be interested, I can give you their citations. I heard that at the introduction that you were interested in exploring the impact of noise on people in parks because I also do write about the importance of quiet in people's lives, and I can assist you in that and presently I'm working…

SERGEANT-AT-ARMS: Your time is expired. Thank you.

ARLENE LILLIAN BRONZAFT: I'm working at Columbia on a noise study. Thank you.

CHAIRPERSON FARÍAS: Thank you so much for testifying today, and I would love to read anything you'd send over even though we (INAUDIBLE)

ARLENE LILLIAN BRONZAFT: Okay.

CHAIRPERSON FARÍAS: Right now and found something.

ARLENE LILLIAN BRONZAFT: You like to read? Okay. It's readable. It's readable.

COMMITTEE ON ECONOMIC EVIDENCE                    192

CHAIRPERSON FARÍAS: Great. I look forward to it.

I'd now like to call on Mark Diller.

MARK DILLER: Good afternoon. Thank you for hanging in so long. Quick shout out to Staff Counsel as well as the Chair for hanging in with us. Thank you. I'm a member of one community board and I work at another one, I'm a member of the Civic Engagement Commission, and I'm testifying on behalf of none of those folks. This is just me. You've heard so much about the details and the science and so forth that I won't burden you with a repetition so I'll just share one experience, which was Shakespeare in the Park in Central Park last summer right as Hamlet was giving his soliloquy, which we can all quote, a really dramatic moment of theater surrounded by all kinds of folks who were tourists themselves, were interrupted by a helicopter literally hovering overhead so that I assume one or a small handful of tourists could take a photo. The unnecessary helicopter traffic in effect pits some tourists against others, and this is not the kind of tourism welcome we want for all of our folks on the ground. Someone once described parking as the fertility drug

COMMITTEE ON ECONOMIC EVIDENCE                        193

for car ownership. Well, the use of our EDC heliports is surely the fertility drug of having excess and unnecessary helicopter traffic. I would encourage the adoption of the bills that you have put forward and I thank you for the foresight in drafting and bringing them forward and for this hearing. Thanks so much.

CHAIRPERSON FARÍAS: Thank you so much.

I'd now like to call on Michael McCready.

MICHAEL MCCREADY: Hello. Thank you. Thank you for your patience this afternoon. I'm on a business trip overseas, but I'm calling in because this is such an important issue to us. We live on the Upper West Side, having moved there from downtown, thinking we were moving to a quieter neighborhood. It feels like we live on a rumbling highway, helicopters going by constantly, the windows rumble, the dog hides under the table, she's on anti-anxiety medication now. Someone said that they have to stop business meetings sometimes because of the helicopter noise. That is certainly our case. I'd just like people to try to imagine if we allowed tourists to rent an ambulance or a fire engine to tour neighborhoods. That's kind what it's like with these non-essential flights so I want to thank you for your

COMMITTEE ON ECONOMIC EVIDENCE                                194

time and for listening to us and for your patience.
Thank you.

CHAIRPERSON FARÍAS: Thank you for that.
Please don't give any other industries any other
ideas.

I'd now like to call in Sam Pesin.

SAM PESIN: (INAUDIBLE) Morris Pesin, the
father of Liberty State Park, and I'm the President
of the Friends of Liberty State Park. I express
strong support for the crucial helicopter resolutions
and bills. Liberty Park is 2,000 feet behind Lady
Liberty on the Jersey City waterfront. It's a
beautiful urban park where people engage in a
multitude of unstructured recreation, passive
recreation, and nature enjoyment activities. Liberty
Park is New Jersey's Central Park. It's visited by 5
million people each year. The park is an emotional
health and mental health public resource for people
seeking a peaceful experience in this urban green
area that is so densely populated. These public-be-
damned helicopter tour companies constantly are
violating the National Park Service voluntary
agreement, as limited in scope and unacceptable as
that 2023 agreement was, and they continually fly

COMMITTEE ON ECONOMIC EVIDENCE                                        195

around the Statue and into the so-called avoidance zone. The only real solution is a ban of non-essential helicopters. The Friends were in full support of the powerful testimony of Stop the Chop and all the other amazing speakers today that made the no-brainer case for banning non-essential helicopters so please stand up for people on both sides of the Hudson River. If Lady Liberty was alive, she would urge you to pass these resolutions and bills. Lady Liberty would be covering her ears every day and yelling at the public-be-damned non-essential helicopters as millions of people do every day to shut the hell up and not come back. The public good is clearly more important than helicopter industry profits so thank you for considering taking this crucial action on behalf of urban residents in neighborhoods on both sides of the Hudson and people using Liberty State Park in New York City parks. Thank you very much.

CHAIRPERSON FARÍAS: Thank you so much for your testimony.

Seeing no one else signed up online virtually or in-person, I would just like to say thank you for everyone who joined us both at the

COMMITTEE ON ECONOMIC EVIDENCE                          196

rally earlier today for folks from Stop the Chop New

York/New Jersey and for everyone that patiently

waited here in person and online to talk about this

super-important hearing topic, and we look forward to

the work ahead.

Thank you all so much, and this hearing

is now adjourned.   [GAVEL]

C E R T I F I C A T E

World Wide Dictation certifies that the foregoing transcript is a true and accurate record of the proceedings. We further certify that there is no relation to any of the parties to this action by blood or marriage, and that there is interest in the outcome of this matter.



Date _____ May 13, 2024 _____