**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- x

EASTERN REGION HELICOPTER COUNCIL,
VERTICAL AVIATION INTERNATIONAL, and
VICTORIA SESKIN,

Plaintiffs,

- against -

THE CITY OF NEW YORK,

Defendant.

**REPLY DECLARATION OF**
**ALAA MOUSSAWI**

25-CV-4682 (NGG)

-------------------------------------------------------------------------- x

ALAA MOUSSAWI, declares under penalties of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1. I am the Chief Data Scientist, Legislative Division, for the New York City Council, and I submit this Declaration in support of Defendant City of New York's Motion to Dismiss the Complaint. As Chief Data Scientist for the New York City Council, I lead interdisciplinary teams of data scientists, and software engineers, designing production-grade information infrastructure powering legislative strategy and modern governance. My work includes statistical modeling, retrieval-augmented generation (RAG) systems, NLP architectures, workflow automation, and AI-enabled decision support tools deployed across New York City government. I hold a PhD in Physics focused on spreading processes in complex networks.

2. I understand that the Plaintiffs challenge New York City Local Law 64 of 2025 ("Local Law 64"), which prohibits certain non-essential helicopter operations that exceed certain federally-established noise thresholds from two City-owned Manhattan heliports following certain procedural prerequisites.

1

3.      I have reviewed the Plaintiffs' affidavit of Jeffrey Smith, and its attachment, a "Diversion Study" purporting to assess how traffic from the Covered Heliports could be redistributed among the other heliports in the NYC area as a result of Local Law 64.

4.      I understand that the Plaintiffs' standing depends on whether they have a nonspeculative basis to believe that Local Law 64 will increase the number of helicopter flights over Garden City, NY on Long Island, the home of individual plaintiff Victoria Seskin.

5.      I have reviewed the Plaintiffs' Declarations, briefing papers, and expert materials, and for the reasons further set out below, have determined that they do not contain any nonspeculative basis to believe that Garden City overflights would increase under Local Law 64, not only because they suffer from methodological and factual flaws, but also because they do not even purport to analyze that key question.

6.      Though I understand that it is the Plaintiffs' burden to establish standing, I have nevertheless supervised the City Council Data Team in conducting a review of actual flight track data for the year 2025 to independently assess whether there is any nonspeculative basis to believe that any displacement of flights resulting from Local Law 64 would increase Garden City overflights. The New York City Council Data Team ("Data Team") acquired bulk flight track data for helicopter flights appearing in the New York City region for all of 2025 from a commercial vendor, FlightRadar24. It then mapped and analyzed the routes taken by flights originating or arriving at different heliports in order to project how any diversion of flights between heliports would likely alter the volume of Garden City overflights.

7.      As further discussed below, even accepting all of Plaintiffs' assumptions about the redistribution of helicopter flights among alternative heliports, historical flight data suggests that such diversions are unlikely to increase helicopter flights over Garden City.

2

**I.    The Plaintiffs' Opposition Changes the Allegations in the Complaint**

8.    I understand that the Complaint based the claim of increased Garden City overflights on the allegation that Garden City lies "directly under the flight path of helicopter approach to JFK and LaGuardia Airports." Compl ¶ 37. The Complaint discussed only a single "flight approach" and did not distinguish between flight approaches for different types of flights, or origins/destinations of flights servicing JFK and La Guardia Airports. The clear import of the Complaint was thus that, in effect, *all* flights to JFK and La Guardia airports would approach by way of Garden City, thus threatening Garden City with added noise and air pollution.

9.    My previous Declaration was written to answer the allegation as formulated in the Complaint. In order to do so, the Data Team assessed bulk radar information recording actual historical flight paths. It explained that the largest single category of flights from the East 34th Street heliport—connections to JFK Airport—uniformly did *not* cross Garden City. Moussawi Declaration, sworn to February 27, 2026 ("First Moussawi Decl.") ¶ 21.  Furthermore, the highest volume category of flights from either covered heliport, sightseeing tours from Downtown Manhattan, would be extremely unlikely to pass over Garden City even if rerouted to JFK / LGA airports. Sightseeing tour activity is focused overwhelmingly on Manhattan, and "Garden City does not lie between either JFK or LGA and Manhattan, but approximately ten miles east of either airport—the opposite direction from Manhattan." First Moussawi Decl. ¶ 19.

10.    In their opposition to the City's Motion to Dismiss, I understand that the Plaintiffs have retreated from their primary claim in the Complaint. Now, Plaintiffs admit, "Ms. Seskin does not claim that 'airport shuttles' or 'Manhattan sightseeing tours' would pass over her home," and Plaintiffs "do not suggest that 'flights to and from JFK necessarily fly over Garden City[].'" Instead, the Plaintiffs, for the first time, particularize their claim of injury to noise from "[h]elicopter flights coming from the east end of Long Island, or outside the state, [which]

3

approach JFK and LGA from the east." Plaintiffs' Mem. of Law at 23. Thus, rather than claiming specifically that flight approaches to JFK and La Guardia airports will increase noise in Garden City, as in the Complaint, the Plaintiffs now assert that Local Law 64 will cause helicopter traffic to be redistributed among FAA-approved routes when traversing Long Island more generally, and that this redistribution will increase Garden City overflights.

11.    At any rate, this focus on diversions of specifically westbound flights from Long Island to JFK/LGA is a far cry from the blanket allegations in the Complaint that Garden City lies "directly under the flight path of helicopter approach to JFK and LaGuardia Airports," and the strong implication that any flight diversions would thus traverse Garden City.

   a.  *Plaintiffs' Allegations Differ among their Papers*

12.    Even for this reformulated argument, different documents in the Plaintiffs' opposition papers describe the set of flights allegedly causing injury somewhat differently. The Plaintiffs' Memorandum of Law asserts that "[i]n approaching JFK and LGA from the east, *many of those helicopter flights [from the east end of Long Island, or outside the state]. . . will be directed by the FAA to use what is known as the 'Track' route." Plaintiffs' March 27, 2026 Joint Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Pls.' Mem."). The Memorandum also asserts that "some portion of those flights [to and from JFK]—*those coming from points east*—do [necessarily fly over Garden City]." (emphasis added)

13.    However, while these statements cite the Declaration of Jeffrey Smith, the Smith Declaration is more circumspect, claiming only that "in approaching JFK and LGA from the east, many of those helicopter flights, . . . will be directed by the FAA to follow *commonly used routes, including* what is known as the 'Track' route." (emphasis added). Of the available routes identified on the FAA Helicopter Route Chart for New York City, only the Track Route actually

passes near Garden City. FAA Route Chart, NYC, Feb. 27, 2026 Declaration of Aimee Lulich, Ex. H.

14.    As seen on the FAA Route Chart, and in Figure 1 at right showing actual 2025 flight tracks, the other major east-west corridors, the North Shore Route, connecting to LGA via either the Throgs Route or Harlem River Route, travel primarily over the Long Island Sound. The South Shore Route travels over water off the coast of the south Long Island barrier islands. The Smith Declaration makes no attempt to quantify how flights are distributed between the three main east/west routes under existing



*Figure 1:* All 2025 Helicopter Flight Tracks from the three main Manhattan heliports crossing the Longitude of Levittown on Long Island. Source: NYC Council Data Team analysis of FlightRadar24 data.

conditions, or to analyze whether and how that distribution would likely change under Local Law 64. Instead, it discusses impacts in general terms: that "helicopter traffic approaching JFK and LGA from the east *may* traverse airspace near" "*communities such as* Garden City, New York." Smith Decl. ¶¶ 16–17 (emphasis added).

## II.    Plaintiffs' "Diversion Study" Omits Any Discussion of Flight Routes, and Contains Methodological and Factual Errors Undermining its Credibility

15.    The Plaintiffs' primary empirical evidence is a "diversion study" purporting to analyze how flight volumes at other NYC area heliports could be affected assuming that all nonessential flights servicing the Covered Heliports are diverted. However, the Diversion Study omits any discussion of helicopter flight *routes*—the only determinant of whether Garden City would experience an increase in overflights. Instead, it focuses exclusively on *heliports* and how their flight volume could change if flights from the Covered Heliports are diverted.

16.     While the Plaintiffs' other papers attempt to fill in the missing connection by alleging that flights from eastern Long Island to JFK and LGA airports may use the Track route, they do not attempt to compare any resulting utilization of the Track route with its use under existing conditions. As seen in Figure 1 above, traffic servicing the three Manhattan heliports in 2025 already included substantial traffic on the Track route, as well as the other east/west corridors. The question, then, of whether that traffic would increase, decrease, or remain the same under Local Law 64 requires much more than the simple statement that some westbound flights from Long Island to LGA/JFK may use the Track route. It requires a comparison of any such utilization with existing conditions. Plaintiffs' assumptions that traffic will increase based on diversions appear to be based entirely on speculation.

17.     The Diversion Study does purport to have analyzed flight track data, and, in fact, includes a "heat map" derived from flight track data showing flight volumes in the New York City region writ large, as seen in Figure 2. However, the Plaintiffs have made no effort to use that data to determine how their projected changes in flight volumes at various heliports might translate into changes in Garden City overflights. As further discussed below, an analysis of historical flight track data from 2025 in fact shows that the Plaintiffs' projected redistribution of flights among different heliports would have essentially no impact on Garden City overflights.



*Figure 2*: Plaintiffs' Smith Decl, Ex. A, "Diversion Study" Representation of Flight Track Data, at 2-3

18.     However, in addition to omitting any analysis of the most important question going to the Plaintiffs' standing to bring environmental claims, the Diversion Study

suffers from several glaring methodological and factual deficits that limit its usefulness even in establishing impacts on flight diversions—the question with which it is primarily concerned.

### a. Volume of flights diverted

19. The "Diversion Study" assumes that, because essentially all helicopters are "Covered Aircraft," "the overwhelming majority of commercial passenger flights would no longer be permitted to operate at Manhattan's city-owned heliports." Diversion Study at 3.1. I understand that Plaintiffs take the position that essentially all helicopters on the market are "covered aircraft," because, they allege, Local Law 64 covers all helicopters unless formally FAA certificated as "stage 3" helicopters. Pls.' Mem. at 15. The City's position is that Local Law 64 does not cover helicopters with calculated noise levels that comply with the FAA's stage 3 noise limits, regardless of whether they have been formally certificated by FAA.

20. Local Law 64 requires the Economic Development Corporation to provide for annual reports "detailing the percentage of flights by covered helicopters to or from a heliport that were non-essential flights during the previous calendar year." § 2(a). The report for 2026 demonstrates that, in fact, the vast majority of flights in 2025 were serviced by helicopters that are not "Covered Aircraft" under Local Law 64. *See* EDC Report (2026), April 24, 2026 Declaration of Aimee Lulich, Ex. J. However, because the dispute over the definition of "Covered Aircraft" is beyond the scope of this Declaration, the Data Team has conservatively analyzed the hypothetical displacement of all "non-essential" flights, following the assumptions in the Diversion Study. In so doing, the Data Team does not concede that any displacement is likely.

### b. JRA Omitted

21. The Diversion Study purports to determine how operations volumes are likely to change at other heliports as a result of noise regulations at JRB and 6N5. However, the

Study conspicuously omits any discussion of the highest-volume alternative heliport, the West 30th

Street Heliport ("JRA" or "KJRA") in Hudson River Park. In my prior Declaration, I explained

that the Covered Heliports and West 30th Street were:

"three major heliports in the New York City." First

Moussawi Decl. ¶ 8. And indeed, the Complaint itself

explained that "[i]f the Downtown Manhattan and the

East 34th Street Heliports are closed to "nonessential"

*Figure 3*: Detail, Plaintiffs' Smith Decl., Ex. A, Maps showing "KJRA" in the "Diversion Study"--the only

traffic, the traffic will necessarily divert to other mentions of the major West 30th Street Heliport in the document

heliports, *including the West 30th Street Heliport*, as well as JFK and LaGuardia Airports."

Compl. ¶ 170. Indeed, JRA already services a significantly higher volume of flights to destinations

on Long Island and points east than the Covered Heliports combined. *See infra*, p. 12, Fig. 4.

22.     While the Diversion Study includes KJRA in its map of area heliports, and

plainly shows a high-volume "plume" of flights originating/arriving at KJRA in its flight track

visualization, KJRA is not included in the study's discussion of Heliport alternatives to the

Covered Heliports. *See*, Diversion Study at 3.8. This glaring omission completely undercuts the

reliability of the Study's conclusions and raises questions generally about its methodology.

    *c.   Flight Diversions Not Categorized*

23.     The Diversion Study concerns only *heliport* diversions, not any analysis of

likely *route* diversions. Though the key question at this stage is whether there is a nonspeculative

basis to believe Garden City overflights would increase as a result of Local Law 64, the Diversion

Study never addresses this question. Instead, Plaintiffs treat market segment and destination

heliport as a proxy for likelihood of Garden City overflight, without ever explaining why that

association is justified.

24.     The Diversion Study divides the market into five categories, including:

a. Air Taxi Operations
b. Commuter Operations
c. Charter Operations
d. Business / Corporate Operations
e. Air Tours / Sightseeing Operations

As I explained in my initial Declaration, several of these categories, in particular tour flights (the commanding majority of JRB operations) have little likelihood of overflying Garden City even if displaced to JFK and LGA airports. The Plaintiffs have now admitted as much. At any rate, the Diversion Study concedes that "[JFK/LGA] airports are generally not optimized for high-cycle sightseeing operations, and their surface access characteristics—especially at JFK and Linden— reduce their suitability for short-duration or tourism-focused services." Diversion Study at 4-2.

25.    Other categories, such as Commuter and Charter operations, may overfly Garden City, but only if A) their origin and destination lie on either side of Garden City and B) the pilot and/or air traffic controller select the "Track" route and not one of the alternative routes for east/west transit of Long Island. Commuter operations between, for example, New York City and Pennsylvania would obviously not have any reason to be near Garden City.

26.    While the Diversion Study describes the number of flights that could be displaced to a given heliport from the Covered Heliports, it makes no effort to categorize those flights, and for the business/corporate operations, the proportion with origins/destinations on either side of Garden City. The study simply lists the number of flight operations it projects could be diverted to various other heliports. This nonspecific information contributes very little to determining whether the diversions would be expected to increase Garden City overflights, because no evidence is presented on the relationship that a particular heliport origin/destination alone, independent of other flight characteristics, may have to Garden City overflight.

9

27.     While the Smith Declaration discusses the purported injury as being specific to "helicopter traffic approaching JFK and LGA from the east," the Diversion Study does not even attempt to assess Local Law 64's impact on such traffic. Instead, all traffic serviced by a given heliport is combined for analysis. The Plaintiffs' Memorandum of Law then discusses the supposed impact of Local Law 64 in terms of this aggregate number, though the candidates for Garden City overflight are never broken out from the aggregate. Pls. Mem. at 22.

### III. Flight Track Data Belies Any Likely Impact on Garden City Overflights From Diversions, Even If They Occur

28.     I have supervised the Data Team in performing an original analysis of flight track data to determine the key question ignored by the Plaintiffs' study: whether there is a nonspeculative basis to believe the alleged closure of JRB and 6N5 heliports to non-essential flights[1] would result in an increase in helicopter overflights of Garden City.

29.     In order to do so, it was necessary to first determine how many flights that currently service the Covered Heliports cross Garden City under existing conditions. The Plaintiffs' opposition posits that some flights to JFK and LGA from points east will cross Garden City via the Track route, but none of the Plaintiffs' opposition materials considers the extent to which existing flights serviced by the Covered Heliports may *already* use the Track route, and thus traverse Garden City. This quantity is critical to determining how Local Law 64 may change total flight volume over Garden City.

30.     Using bulk flight track data acquired from FlightRadar24, the Data Team quantified the flight volume at each of the five main heliports relevant to the analysis, JFK, LGA,

---

[1] It is worth repeating here that the Data Team does not assume, except for the sake of argument in this Declaration, that the Plaintiffs are correct that insufficient helicopters that are not Covered Helicopters exist to service the NYC market without displacement.



All Helicopter Flights Servicing Major Manhattan Heliports, JFK, and LGA in 2025, with Garden City ("GC") Crossing Volume / Percentage

Legend

Garden City with one-mile buffer

Flight Track

LGA – GC: 8/151 (5%)

JFK – GC: 133/416 (31%)

JRA (W. 30ᵗʰ St.) – GC: 785/4,211 (19%)

FAA Helicopter Route Chart

6N5 (E. 34ᵗʰ St.) – GC: 332/2,079 (16%)

JRB (Dntn. MN) – GC: 164/585 (28%)

11

JRB, 6N5 and JRA. Because only east/west flights that cross the longitude of Garden City are relevant to determining how such crossings may be affected by Local Law 64, the flight tracks were filtered to exclude all other flights, such as sightseeing tours, shuttles to airports, commuter flights to destinations south or west of New York City, and any flights except those crossing the longitude of roughly Levittown, NY, near Garden City.

31.     While the Plaintiffs focus exclusively on NYC-bound flights, Pls. Mem. at 23, we determined that eastbound flights originating at NYC heliports bound for Long Island and other eastern destinations also had a chance of crossing Garden City, though that chance differed to varying extents from westbound crossing percentage, as seen in Figure 4. Thus, the Data Team included all flights either originating from or arriving to NYC heliports or airports where the other endpoint was east of Levittown.

**2025 Helicopter Flights Between NYC and Points East of Levittown
With Garden City Crossing Percentages**

| NYC Heliport | Inbound Flights (to NYC) | | | Outbound Flights (NYC to East) | | | All Flights | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Cross GC | Cross GC % | Total | Cross GC | Cross GC % | Total | Cross GC | Cross GC % |
| West 30th | 2,053 | 391 | 19.0% | 2,158 | 394 | 18.3% | 4,211 | 785 | 18.6% |
| East 34th | 978 | 183 | 18.7% | 1,101 | 149 | 13.5% | 2,079 | 332 | 16.0% |
| Downtown | 283 | 79 | 27.9% | 302 | 85 | 28.1% | 585 | 164 | 28.0% |
| JFK | 232 | 77 | 33.2% | 184 | 56 | 30.4% | 416 | 133 | 32.0% |
| LGA | 72 | 6 | 8.3% | 79 | 2 | 2.5% | 151 | 8 | 5.3% |
| **Total** | **3,618** | **736** | **20.3%** | **3,824** | **686** | **17.9%** | **7,442** | **1,422** | **19.1%** |

*Figure 4:* Flights Spanning Levittown longitude, by Garden City Crossing. Source, Data Team, Flightradar24

32.     Flight tracks were superimposed on a map of the NYC region, with a polygon added representing the boundaries of Garden City with a one-mile buffer.  Each heliport

was assessed for both the total volume and the proportion of flights servicing eastern origins/destinations that intersected with the Garden City polygon. The extent to which flights serviced by a given heliport crossed Garden City varied, as seen in Figure 4, on the previous page, with LGA the least likely to cross Garden City by a significant margin, and JFK the highest.

   a. *Redistribution of Flights*

33.    In order to assess whether a nonspeculative basis exists to believe that Garden City overflights would increase under Local Law 64, the Data Team assessed how Garden City overflights would have differed in 2025 assuming that all flights from Downtown Manhattan and East 34th Street heliports had been redistributed to other heliports. The Data Team assumed, for purposes of this analysis, that any flights displaced to a different heliport would adopt the same likelihood of crossing Garden City as the other flights already serviced by the new heliport. For example, JRB flights, with a 28% incidence of Garden City crossing, would become more likely to cross Garden City if diverted to JFK (32%) but less likely if diverted to LGA (5.3%). Where flights to/from a heliport crossed Garden City at different rates depending on whether they were leaving New York City or arriving there, the Data Team reflected the difference in its analysis. Thus an inbound flight to East 34th Street, if diverted to JFK, was adjusted from a Garden City crossing likelihood of 18.7% to 33.2%, while an outbound flight with the same diversion would be adjusted from 13.5% to 30.4%.

34.    While the methodological flaws in the Plaintiffs' Diversion Study are well documented elsewhere in this Declaration, the Data Team nevertheless accepted, as one scenario, the roughly even split between diversions to JFK and LGA projected by the Diversion Study. While the Diversion Study projected only a small minority of total flight diversions to LGA (10%) and JFK (9%), it also did not attempt to disaggregate flights by category, meaning that this number

would have reflected a percentage of all flights including irrelevant but high-volume categories such as sightseeing tours.

35.    Because the Diversion Study included insufficient information to determine specifically what proportion of flights servicing NYC and endpoints east of Levittown would be diverted to JFK/LGA, the Data Team conservatively assumed that *all* such flights would be diverted to JFK and LGA. Though the Diversion Study acknowledged that LGA was a more attractive facility for serving Manhattan-based helicopter passengers than JFK, largely due to proximity, the Data Team conservatively modeled the two facilities absorbing equal shares of the flights serviced by the Covered Heliports in 2025.

**2025 Helicopter Flights with All Covered Heliport Flights Distributed Evenly Between JFK and LGA Airports**

| NYC Heliport | Inbound Flights (to NYC) | | | Outbound Flights (NYC to East) | | | All Flights | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Cross GC | Cross GC % | Total | Cross GC | Cross GC % | Total | Cross GC | Cross GC % |
| West 30th | 2,053 | 391 | 19.1% | 2,158 | 394 | 18.3% | 4,211 | 785 | 18.6% |
| JFK | 862.5 | 286.3 | 33.2% | 885.5 | 269.5 | 30.4% | 1,748 | 555.8 | 31.8% |
| LGA | 702.5 | 58.5 | 8.3% | 780.5 | 19.8 | 2.5% | 1,483 | 78.3 | 5.3% |
| **Total** | **3,618** | **735.8** | **20.3%** | **3,824** | **683.3** | **17.9%** | **7,442** | **1,419.1** | **19.1%** |

*Figure 5:* Data Team Analysis of 2025 Flight Data, Redistributing flights from the Covered Heliports evenly between JFK and LGA Airports

36.    While Plaintiffs' assumptions about flight diversions to JFK increasing the likelihood of Garden City crossing appeared to have some basis in the observed data, this effect was cancelled out by the extremely low rate of Garden City crossing associated with helicopter flights from LGA. In the end, the total number of Garden City overflights with all JRB and 6N5 flights reassigned evenly between LGA and JFK declined slightly from 1,422 overflights to 1,419.

14

37.     However, the Data Team modeled alternatives, including a scenario recognizing the greater proximity of LGA to Manhattan with a 60% LGA, 40% JFK distribution, under which Garden City overflights decreased from 1,422 flights to 1,349.

**2025 Helicopter Flights with All Covered Heliport Flights
Distributed Between JFK (40%) and LGA (60%) Airports**

| NYC Heliport | Inbound Flights (to NYC) | | | Outbound Flights (NYC to East) | | | All Flights | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Cross GC | Cross GC % | Total | Cross GC | Cross GC % | Total | Cross GC | Cross GC % |
| West 30th | 2,053 | 391 | 19.1% | 2,158 | 394 | 18.3% | 4,211 | 785 | 18.6% |
| JFK | 736.4 | 244.4 | 33.2% | 745.2 | 226.8 | 30.4% | 1,481.6 | 471.2 | 31.8% |
| LGA | 828.6 | 69.1 | 8.3% | 920.8 | 23.3 | 2.5% | 1,749.4 | 92.4 | 5.3% |
| **Total** | **3,618** | **704.5** | **19.5%** | **3,824** | **644.1** | **16.8%** | **7,442** | **1,348.6** | **18.1%** |

*Figure 6*: Data Team Analysis of 2025 Flight Data, Redistributing flights from the Covered Heliports between JFK (40%) and LGA (60%) Airports

38.     Because, as discussed above, the Plaintiffs' Diversion Study failed to discuss *any* diversions to the West 30th Street Heliport (JRA), to which diversions were specifically alleged in the Complaint, the Data Team also modeled a scenario where flights were redistributed equally between JFK, LGA, and JRA. Under that scenario, Garden City overflights were unchanged from the status quo (decreasing by around two flights per year, from 1,422 to 1,420).

**2025 Helicopter Flights with All Covered Heliport Flights
Distributed Equally Between JFK and LGA Airports and JRA Heliport**

| NYC Heliport | Inbound Flights (to NYC) | | | Outbound Flights (NYC to East) | | | All Flights | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Cross GC | Cross GC % | Total | Cross GC | Cross GC % | Total | Cross GC | Cross GC % |
| West 30th | 2,473.3 | 471.1 | 19.1% | 2,625.7 | 479.4 | 18.3% | 5,099 | 950.5 | 18.6% |
| JFK | 652.3 | 216.5 | 33.2% | 651.7 | 198.3 | 30.4% | 1,304 | 414.8 | 31.8% |
| LGA | 492.3 | 41.0 | 8.3% | 546.7 | 13.8 | 2.5% | 1,039 | 54.8 | 5.3% |
| **Total** | **3,618** | **728.6** | **20.1%** | **3,824** | **691.5** | **18.1%** | **7,442** | **1,420.1** | **19.1%** |

*Figure 7:* Data Team Analysis of 2025 Flight Data, Redistributing flights from the Covered Heliports evenly between JFK, LGA, and JRA

15

39.    The Plaintiffs, despite including an extensive empirical document by purported experts who explained that they had examined flight track data, never assessed whether, under their own flight diversion scenarios, Garden City overflights would actually be expected to increase. The Data Team's own analysis of the relevant data shows that there is no nonspeculative basis to suggest that they would.

Dated:    New York, New York
          April 24, 2026

_____
ALAA MOUSSAWI