# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

EASTERN REGION HELICOPTER COUNCIL, ET AL.,

Plaintiffs,

-against-

THE CITY OF NEW YORK,

Defendant.

- - - - - - - - - - - - - - - X

25-CV-4682 (NGG)

United States Courthouse
Brooklyn, New York

Wednesday, September 16, 2026
2:30 p.m.

TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Plaintiffs: HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue
New York, New York 10017
BY: JAYME JONAT, ESQ.
DENIS D. METIN, ESQ.

PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, New York 10019
BY: JAMES CATTERSON, ESQ.
DANIELLE STEFANUCCI, ESQ.

For the Defendant: NEW YORK CITY LAW DEPARTMENT
100 Church Street
New York, New York 10007
BY: QWANAEMI BRIGGS, ESQ.
AIMEE LULICH, ESQ.
NATHAN TAYLOR, ESQ.

Court Reporter: Linda A. Marino, Official Court Reporter
225 Cadman Plaza East / Brooklyn, NY 11201
lindacsr@aol.com

Proceedings recorded by mechanical stenography, transcript produced by Computer-Assisted Transcription.

THE COURTROOM DEPUTY: Civil cause for oral argument. State your appearances for the record.

MS. JONAT: Jayme Jonat from Holwell Shuster & Goldberg.

MR. CATTERSON: And Jim Catterson, along with my colleague Danielle Stefanucci, from Pillsbury Winthrop Shaw Pittman, on behalf of Eastern Region Helicopter Council and Vertical Aviation International.

THE COURT: Nice to see you.

MR. CATTERSON: Yes, Judge.

MS. JONAT: I'm here with my colleague Denis Metin also.

THE COURT: Welcome.

And who is at the end?

MS. STEFANUCCI: Danielle Stefanucci, your Honor.

THE COURT: Welcome.

MS. BRIGGS: Owanaemi Briggs for New York City Law Department on behalf of Defendant City of New York.

MS. LULICH: Aimee Lulich, also on behalf of City of New York. Good afternoon.

MR. TAYLOR: Nathan Taylor, also on behalf of City of New York.

THE COURT: Three lawyers from the City of New York.

MS. BRIGGS: It's a big city.

THE COURT: I guess it's a big case.

Welcome. Be seated, everybody.

Well, this brings back a portion of my life that ended over 26 years ago, when I was chief counsel at the FAA. I must say that in reading the papers in this case, I didn't even realize that there was a Stage 4 or a Stage 5. There was no Stage 4 ruling, regulation, when I left the FAA in August of 2000. So, I am a neophyte in that sense on the issues that are central in this case.

So, I've read the local law and I'm not -- I don't want to be unkind, but they would be better served in the City Council if they had someone proofread what they do when they do it.

They misspelled a word, they didn't capitalize the City of New York or the Code of the City of New York. I mean, these little things are sloppy. And I think that the City Council has lawyers and they ought to be doing a better job of examining laws that they're about to pass.

So, that doesn't go to the substance of what we're going to do today, but I just wanted to say that as a federal judge, I look at the whole story. And the whole story starts with reading the document that's at issue. And when I start seeing typos and a missing word, where the word that's missing is the word "law" in paragraph three -- this local what?

Is it in the final of the "law" or am I just reading a draft?

It says this local law -- in Paragraph 3: This local law takes effect on January 1, 2026, except that Section 1 of this local law takes effect on December 1, 2029, and Section 2 of this local expires and is deemed repealed on such date.

Anyway, I point that out. And I just think the most wonderful city in the country, in the world, has a legislature which can't proofread its own work. And that's pretty darn unfortunate.

Having said that, welcome.

You'd like to make a motion. Tell us about it.

MS. BRIGGS: Good afternoon, your Honor.

THE COURT: You don't have to stand unless you feel better standing.

MS. BRIGGS: Thank you.

THE COURT: Just talk into the microphone so we get everything down.

And tell me your name again, ma'am.

MS. BRIGGS: I'm Owanaemi Briggs, counsel for Defendant City of New York. I'll be addressing Plaintiffs' first allegation that the Local Law 64 is federally preempted by the...

(Pause in proceedings.)

MS. BRIGGS: I'll be addressing the Plaintiffs' first allegation, that Local Law 64 is federally preempted by

the Airport Noise and Capacity Act; my colleague Ms. Lulich will address the remainder of the preemption claims; followed by Mr. Taylor, who will address Plaintiffs' lack of standing to assert a CERCA claim.

If permitted, the City would also like to request time to rebut Plaintiffs' argument at the conclusion of our portion.

THE COURT: Let me just ask you this: Do you think that since this local law doesn't really take effect until 2029, that after you follow the ANCA protocol as required by federal law, that this case is not ripe for this Court to consider?

MS. BRIGGS: I believe this case is ripe for the Court to consider because the way that this law was drafted was meant to comply with ANCA.

The local law proposes a restriction and then requires the airport operator to comply with those federal regulations under ANCA. And that is the basis of the structure, including the delay in the effective date. I think it all is part of the scheme to comply with the local law.

THE COURT: I'm going to ask the same question of the other side eventually.

MR. METIN: Yes, Judge.

THE COURT: Go for it.

MS. BRIGGS: Local Law 64 is not federally preempted

by the Airport Noise and Capacity Act under either a doctrine of field or conflict preemption for the following reasons.

The law is drafted pursuant to the City's congressionally delegated proprietary authority; it doesn't conflict but complies with ANCA's procedural requirements and its federal objective; nor does it violate ANCA by improperly delegating the City's obligation to a fixed space operator.

Plaintiffs themselves concede their field preemption claims in light of proprietor exceptions. This Circuit has also recognized the proprietor exception and held that it allows municipalities to promulgate reasonable, nonarbitrary, and nondiscriminatory noise regulations at the local level.

ANCA itself also reflects that the federal law doesn't wholly occupy the field of airport noise and noise regulation as it carves out for local authority within the -- it carves out space for local authority within the federal scheme by permitting airport operators, which are referred to as airport proprietors under ANCA, to implement noise restrictions subject to ANCA's procedural requirements.

Local Law 64 is also not conflict preempted because it is possible for a party to comply with the local law as well as the federal law and it does not provide an obstacle for ANCA's federal objective of reviewing, analyzing, and considering a proposed restriction before implementation.

A plain reading of Local Law 64 demonstrates that it

was drafted to comply, not conflict, with ANCA. The law prohibits covered helicopters from conducting nonessential flights to or from heliports on property owned or leased by the City.

Under the local --

THE COURT: Who defines what's essential here?

MS. BRIGGS: The statute defines essential and that the local law is the proprietor, so the City as the proprietor.

THE COURT: You're saying the proprietor can say that certain uses, certain aviation uses, are essential and certain are not essential?

MS. BRIGGS: For the purposes of noise regulations, it does, yes.

THE COURT: Go ahead.

MS. BRIGGS: Under the local law, a covered helicopter does not include any helicopter with noise levels that are not higher than the Stage 3 noise limits set by the Federal Aviation Administration.

THE COURT: So, that would include Stage 3, Stage 4, and Stage 5?

MS. BRIGGS: Effectively, the Stage 3 helicopters, because they are -- I don't believe that there are any Stage 4 or Stage 5 helicopters in the market. So, yes, Stage 3 or helicopters that meet the Stage 3 setting or noise level or

comply with that standard would be covered under the statute and, therefore, are not prohibited under the statute.

THE COURT: So, if a military helicopter was a Stage 2 helicopter, needed to land at this heliport, it would be restricted from landing there?

MS. BRIGGS: I believe as a military helicopter, it would fall under an essential helicopter. And if this occurred following the implementation of the law under the authorities, then it could be -- and it did not constitute a nonessential or essential flight, then, yes, it could be prohibited.

THE COURT: Are there any police helicopters in the City of New York which meet the Stage 3 standards?

MS. BRIGGS: I think per the EDC report, I think most of the helicopters meet the Stage 3 standards available. And I think police reports...

Yes, the statute provides that for police helicopters, armed forces, fire departments, all these emergency services would be considered essential and, so, would not fall under the nonessential stipulation.

THE COURT: I see. So, who's not essential?

MS. BRIGGS: Tours, other private interests that are not necessary for --

THE COURT: Commuters?

MS. BRIGGS: Yes.

THE COURT: Okay. Go ahead.

MS. BRIGGS: Helicopters with the calculated noise levels that comply with the FAA Stage 3 noise limits are not prohibited under this law, which means the louder Stage 2 helicopters with noise levels that exceed the Stage 3 limits are covered under the law and subject to restriction.

THE COURT: Stop there. This legislation is very confusing to me, frankly, but I'm trying to understand what the Legislature's purpose was.

This would not effect a Stage 3 helicopter operated by, let's say, Blade, which is a private commuter helicopter company.

MS. BRIGGS: No, it would not. Stage 3 is the quietest. It would not need to regulate the quietest available level of helicopter.

THE COURT: Without regard to whether it was essential or nonessential?

MS. BRIGGS: Correct.

THE COURT: Okay. If that's what you think it does, then I'm just -- since I didn't understand that particularly, I just want to get a sense of how the City Council understands it. I haven't looked at the legislative history.

Is there a legislative history of this law?

MS. BRIGGS: There are the comments and the discussions and the previous drafts of the law as well as the

discussions that happened with the Council in the different stages of passing this law.

THE COURT: So, there's a record, there's a legislative history, for this law.

MS. BRIGGS: Yes, there is, your Honor.

THE COURT: Which would be covered in discovery, I would imagine, if we got that far.

Go ahead.

MS. BRIGGS: Thank you.

Local Law -- there's further proof that Local Law 64 applies only to Stage 2 aircraft, which can be found in Subdivision C of that local law. And it provides that prior to implementing these restrictions, the airport operator shall follow th procedure outlined in 49 U.S.C. Section 47524(b) and 14 C.F.R. Part 161 subpart C. These are the procedures and the notice and review requirements mandated under ANCA prior to restricting Stage 2 aircraft operations.

So, in effect, what Local Law 64 does is it recognizes that it is proposing a restriction on Stage 2 aircraft operations, which falls under ANCA, and then, accordingly, requires compliance with those corresponding procedural requirements for --

THE COURT: You're going too fast for me.

MS. BRIGGS: The local law --

THE COURT: I'm old. Go slower.

MS. BRIGGS: Okay, your Honor.

The local law recognizes that in proposing a restriction on Stage 2 aircraft operations it falls under ANCA and, accordingly, requires compliance with the corresponding procedural requirements for a Stage 2 restriction under the federal law. This is a clear example of intent to comply with the law, not to conflict with it.

Plaintiffs also argue that Local Law 64 violates ANCA because it was enacted prior to implementing ANCA's procedural requirements. This argument is not supported by the plain language of ANCA. It wrongly conflates the enactment of the local law with the implementation of the challenged noise restriction.

Section 47524B and its corresponding regulations, 14 C.F.R. 161, 203, provide that an airport operator may implement a Stage 2 restriction only if the operator publishes the proposed restriction and prepares and makes available for public comment the analysis requirements that are enumerated in the statutes at least 180 days before the effective date of the proposed restriction.

THE COURT: Would you need a local law to conduct a procedure under ANCA to implement a Stage 2 restriction?

In other words, does it require a statute to do that or can it be done administratively without a statute?

MS. BRIGGS: ANCA doesn't stipulate how this could

be done provided that the requirements are met. So, we believe that a local law is a viable way of doing so.

THE COURT: Okay.

MS. BRIGGS: Contrary to Plaintiffs' arguments and evidence by the plain language, the effective date of the proposed restriction is dispositive here. To comply with ANCA, the specified requirements must be completed at least 180 days before the effective date of proposed restriction. Under the local law, the effective date of this restriction is December 1, 2029.

Therefore, pursuant to ANCA and the local law, before implementing a proposed restriction, the airport operator must meet the procedural requirements and publish and make available for comment the required analysis by June 2029.

As such, this is local law doesn't violate ANCA by prematurely implementing a noise restriction before compliance because the proposed restriction is not In effect, it has not been implemented, and, under the local law, it cannot be implemented without first complying with ANCA.

THE COURT: Now, if you begin the process tomorrow, you would have completed the process in 2027. And 120 days from now is 2027, sort of.

So, would that mean that under this local law you could implement the restrictions two years ahead of the date in this statute administratively?

MS. BRIGGS: Yes, provided that all the requirements of the local law are met, then, yes, it would comply with both the law and ANCA.

THE COURT: So, under this local law --

MS. BRIGGS: My apologies, your Honor.

ANCA would permit it, but the text of the law -- you're right, my colleagues --

THE COURT: Right, the text of the law --

MS. BRIGGS: Specifically requires that this law takes effect on that date.

THE COURT: In 2029.

MS. BRIGGS: Yes, my apologies.

But ANCA would permit that because it would meet the requirements under ANCA of --

THE COURT: So, if all of the requirements of ANCA are met by June 30, 2027, you wouldn't need to follow this law, you could just implement them then if you wished to.

MS. BRIGGS: Under ANCA, yes, and I suppose then that would make this law duplicative.

THE COURT: I'm trying to understand all of this because it has an effect on this procedure, and this statute has -- could have an effect on the Plaintiffs in this case far sooner than 2029, potentially; that if the intent is to act promptly, this law would be redundancy on the ANCA process. And you could implement it and it would have an effect on

companies that fly tours and commuter helicopter operations far in advance of the date set forth in Section 3, which is December of 2029.

We're talking three years from now -- more than three years from now. So, I'm trying to understand what the consequences are moving forward with this and which you would have the right to do without a law. You wouldn't need a statute to conduct this administrative process, this regulatory process, under the federal statutes and regulations that you identify.

MS. BRIGGS: Yes, what you've described would be permissible under ANCA but I would like to stress that City Council has shown no intent of effectuating this law require to its effective date.

THE COURT: All right. Let's move on.

MS. BRIGGS: Plaintiffs also argue that Local Law 64 violates ANCA because it was enacted prior to its procedural requirements. This is unsupported by the plain language because it conflates the enactment date of the local law with the implementation date. As we discussed, the dispositive date is the December 1, 2029 effective date.

Plaintiffs also claim that Local Law 64 mandates the imposition of a restriction before the City has complied and constitutes an end run around ANCA. This is also unsupported by the plain language of the federal statute.

First, because, as already established, Local Law 64 requires compliance with ANCA before any restriction may be implemented.

Secondly, a close reading of Section 45724 and its corresponding regulations, specifically those pertaining to restrictions on Stage 2 aircraft, reflect a federal law which prioritizes the review, analysis, and consideration of the proposed restriction and is silent as to the permissible grounds for implementing or changing a restriction.

Section 47524 is aptly named the Airport Noise and Access Restriction Review Program.

Under the general requirements provided in Section 47524(a), it provides for establishing by regulation a national program for reviewing airport noise and access restrictions and also provides for adequate public notice and opportunity for comment on these restrictions.

Section 47524(b) of ANCA and its corresponding regulations establish an overall system to review, analyze, and publicly comment on proposed Stage 2 restrictions. There's no requirement under ANCA with respect to the Section 2 restrictions as to what conclusion must be reached with respect to these proposed restrictions.

And a quick comparison of the language and for Stage 2 versus Stage 3 aircraft restrictions further illustrate the point.

If you look to Section 47524(c)(2), it provides that the Secretary of Transportation may approve a restriction of Stage 3 aircraft if the Secretary finds that the enumerated standards are met on the basis of substantial evidence. There's no similar standard for restricting Stage 2 aircraft found in the corresponding sections of ANCA.

So, the statute is silent as to what to do with respect to how a conclusion is drawn, but it does explicitly outline the system of review of analyzing and consideration. Therefore, in mandating compliance with the Stage 2 procedural requirements, Local Law 64 aligns, not obstructs, ANCA's federal objective of promoting careful consideration of the costs, the benefits, the alternatives, and the public comments of the proposed restriction.

THE COURT: So, the purpose of waiting until 2029, is there some legislative history -- and I'm getting ahead of myself here, really, but is there some legislative history indicating why the New York City Council has decided to postpone the implementation date of a Stage 2 restriction at these two heliports when the whole idea, I assume, and what the legislation does, is to cut back on noise in the center of New York City?

MS. BRIGGS: While our review of the legislative history did not reflect, or I don't believe reflects, any such testimony to that effect, what I do believe it can evidence is

intent to comply with the requirements of ANCA.

As Plaintiffs listed or mentioned in their complaint, the requirements here, the procedural requirements, take years to accomplish. So, in allocating that amount of time within the statute, it grants the proprietor time to accumulate the requested data.

THE COURT: Thank you.

MS. BRIGGS: Finally, there's no support for Plaintiffs' claim that Local Law 64 impermissibly delegates the City's obligations to fixed-base operators in violation of ANCA. Plaintiffs impute a definition of airport operator that simply is not present in the local law.

At no time does Local Law 64 define airport operator as a fixed-base operator, nor does it direct a fixed-base operator to take any action. In fact, the term fixed base operator is not present anywhere in Local Law 64.

The term airport operator is used elsewhere in the statute but is used in reference to the Port Authority of New York and New Jersey, which is not a fixed-base operator --

THE COURT: Who operates 34th Street?

MS. BRIGGS: That is operated by Downtown Skyport. I believe it is a private operator. It's managed by a fixed-base operator, it is run by the EDC.

THE COURT: You mean the EDC has a presence at that heliport?

MS. BRIGGS: It's the --

THE COURT: Aren't they the owner of the facility on behalf of the City of New York?

But they're not a fixed-base operator.

MS. BRIGGS: No, they're not a fixed-base operator. There's a private entity that serves as the fixed-base operator.

THE COURT: Okay.

MS. BRIGGS: But I guess the usage of the term airport operator within the local law at no point references a fixed-base operator or is used in connection with a fixed-base operator. It's only used in connection with a proprietor.

THE COURT: So, who has the authority to conduct this process for the City?

Does the City conduct the process? Does EDC conduct the process? Does the New York City Transportation Department?

Who is responsible for going through the steps?

MS. BRIGGS: The City at large as the proprietor and the operator of this area would have the authority, and I believe it can delegate certain responsibilities to other City agencies, including the EDC but not necessarily exclusively the EDC.

THE COURT: I see. Thank you.

MS. BRIGGS: Thank you.

THE COURT: And ma'am, what are you going to discuss now?

MS. LULICH: Your Honor, I will handle both the other two preemption arguments which relate to the Federal Aviation Act and then the Airport and Airway Improvement Act.

THE COURT: Be my guest.

MS. LULICH: Your Honor had some questions about the legislative record and the legislative history, and I think that's particularly relevant to the Federal Aviation Act argument. So, I'd like to briefly touch on that right now.

THE COURT: Please.

MS. LULICH: So, the complaint does cite to a couple pieces of the legislative history, all of which is obviously available publicly on LedgerStar. And we have linked to the public site with the entire legislative history and my declaration and our moving papers. And we have also attached part, but not all, of the publicly available documents to our moving papers.

But the portions that are cited in the complaint regarding Plaintiffs' allegations that the -- that Local Law 64 relate to both noise and safety are -- well, they're twofold.

One are the statements during the stated hearing during which this law was passed of one council member. They pull a portion of the quotation of statements that she made

which sort of generally refer to public health and safety. We would just ask that your Honor read the entirety of her statements if those are being considered --

THE COURT: What is the safety issue at these two airports?

MS. LULICH: There is no safety issue.

THE COURT: Has there ever been an accident at these two airports that you know of?

MS. LULICH: No. I mean, there have been accidents within the City --

THE COURT: No, no, that's not what I'm asking.

The President of the United States flies into the Wall Street heliport. I doubt that they would be having him fly into a heliport that is unsafe. And the same could be said the Governor of the State of New York is constantly, forever, flying into the 34th Street airport near the New York City Office of the Governor. And God forbid either of those places is unsafe.

I'm wondering if there's a specific safety issue here rather than a noise abatement issue.

MS. LULICH: There is not. The purpose of this law is noise abatement.

THE COURT: All right. Go ahead.

MS. LULICH: Our contention is that the text of the law, which clearly can be considered by this Court, is clear.

THE COURT: Okay.

MS. LULICH: In which case unless your Honor has other questions about that section, I think that covers it.

THE COURT: Whatever you have to say.

MS. LULICH: I mean, our contention is that on the face of the law and the entire legislative record, it's clear that this is a noise regulation, it has nothing to do with safety, and, for that reason, it does not infringe upon any part of the Federal Aviation Act.

Second, the Airport and Airway Improvement Act does not remove any local authority to regulate anything, let alone noise or certain types of flights, and for that reason, the claim of preemption under the AAIA fails.

What the AAIA does is it authorizes funds to public airports that agree to comply with certain grant assurances. One of those grant assurances is contained in 49 U.S.C. 40103(e) which says that no exclusive rights can be granted at certain facilities who receive these grants.

And the AAIA also provides for enforcement of the grant assurances through the FAA and the Secretary of Transportation.

THE COURT: So, these heliports have received AIP funds?

MS. LULICH: Yes, both have received AIP funds in the past.

THE COURT: Okay.

MS. BRIGGS: But what Plaintiffs are asking this Court to decide is whether Local Law 64 does provide exclusive rights to certain flights rather than going through the process set forth in the AAIA to have the Secretary of Transportation ultimately make that determination. And that request must fail.

First, I think there's no dispute that there's no private right of action in the AAIA. But second and more importantly, Plaintiffs ask this Court to use its equitable powers to decide that Local Law 64 is preempted by the AAIA. But because the AAIA does not show any intent of Congress to take away the ability of any local regulation, the supremacy clause is not an appropriate remedy here.

What the AAIA does is it imposes obligations on airport proprietors. And what Plaintiffs are asking to happen is to have this Court enforce these obligations. But that requires a private right of action.

Here, there is no text of the AAIA that actually limits the local authority to regulate -- anything, but certainly not noise. And any use of the supremacy clause law would simply circumvent the process that Congress has set forth in the statute to enforce these obligations.

And this is clear because the AAIA anticipates federal and local cooperation rather than taking away the

authority of the locality to regulate. It also contains a comprehensive administrative enforcement scheme and it provides for enforcement via the Secretary of Transportation.

And also, the termination of whether something in an exclusive right such that it would violate the AAIA is really a termination that requires the expertise of the agencies and the uniformity of the administrative process that Congress set forth. And I think what's very illustrative of this is both the Armstrong, the Exceptional Child Center case, in which the analysis of the Medicaid Act and the Supreme Court's reasoning for saying that the supremacy clause was not an appropriate way to enforce the obligations of the State under the Medicaid Act is essentially for the same reason: It would be inappropriate for the supremacy clause to be used to enforce the City's obligations under the AAIA.

And additionally, case of Western Airlines, the Port Authority, 817 F. 2d. 222 of the Second Circuit, 1987, has a good comparison in which Statute 49 U.S.C. Section 1349(a) and 2210(a), which is the precursor to the current AAIA, the Court found that these merely impose obligations on airport proprietors in an attempt to enforce the obligation amounts to private right of action where equitable powers would not be permitted.

In contrast to a statute that limits local authority to regulate rates and routes and services of airlines which

does show congressional intent to take away power to regulate that from the locality, the Court did invoke its equitable powers and reviewed the statute.

So, for that reason, the AAIA -- there's no legal authority for the idea that the AAIA takes any local regulation -- the ability for local regulation away. And for that reason, the third preemption claim must also fail.

THE COURT: So, going back to my original question, this statute doesn't seek to regulate the availability of these facilities for any helicopter that meets Stage 3 requirements.

MS. LULICH: Correct.

THE COURT: Are there any helicopters that meet Stage 3 requirements that use these facilities?

MS. LULICH: Yes.

So, there are no helicopters in the country that are certificated in Stage 3, but most, nearly all, of the helicopters that are certificated Stage 2 that operate in the City are not covered under this law because they meet the noise capacity of Stage 3.

So, this law does not require that the helicopter be certificated by FAA as Stage 3. What it requires is it meets the Stage 3 noise requirements. And according to the Economic Development Corporation, which gets the noise levels of helicopters from the FAA, there are virtually no helicopters

operating in the City that are nonessential and that do not meet the Stage 3 noise criteria.

THE COURT: Thank you.

Sir?

MR. TAYLOR: Good afternoon. I'm with the environmental law division, so I'm in this case to talk about the state law claims by Victoria Seskin under New York State's Environmental Quality Review Act.

But I won't be talking much about environmental law today because this claim fails at the threshold. There are no petitioners here who have standing to bring a claim --

THE COURT: That's a wild statement. You mean someone who lives near Kennedy or LaGuardia wouldn't have standing to raise an issue if the airport was going to expand its operations to fly helicopters directly over -- 50 percent more helicopters over his or her home across the street from the airport?

MR. TAYLOR: Well, I won't speak to that hypothetical, but that is certainly not the case that we have here.

THE COURT: How do you know? You haven't had discovery.

MR. TAYLOR: So, on A 12(b)(1) motion, we do have the ability to look to facts outside the pleadings on a motion to dismiss for lack of standing. And there's been quite a bit

of work that's gone into this.

THE COURT: By whom?

MR. TAYLOR: By the City Council's data team and by the Plaintiffs as well. And this is briefed in declarations.

But essentially, there's only one Plaintiff here who even purports to assert an environmental claim. And that is not a person who lives near JFK or LaGuardia, it's Victoria Seskin, who lives in Garden City, which is ten miles east of both of those airports.

THE COURT: She can assert the claim for both Kennedy and LaGuardia. She's sort of the perfect person. Some of the helicopters coming from South Hampton and Greenport are going to fly into Kennedy and they're going to fly into LaGuardia and they're going to be at lower altitude because they're flying into the airports as opposed to two airports on the East River. I can imagine that.

I've had that experience. I was counsel to Queens Borough President back in 1986, and there was no question that people who live on the flight paths are effected. It doesn't require an expert from the City Council to tell me that helicopters at low altitudes effect the quality of life for those neighborhoods and those communities and those people who own homes there.

Your explanation is too broad, is what I'm saying. I live in New York. We all do. And we know that airports and

helicopters make noise. And the perspective of your clients or your Government officials are not necessarily the perspective of a person who lives underneath a flight path. So, bear that in mind.

I'm not saying it's dispositive of this, I'm just saying be reflective, understanding, of this.

MR. TAYLOR: Of course. And your Honor, I'm not here to argue that having helicopters fly over your home does not cause noise that can be an impact to an individual. I'm certainly not here to make that argument and the City isn't here to make that argument.

But what the Plaintiffs have to show here and specifically what Victoria Seskin has to show, because the trade association plaintiffs admit they don't have standing to bring this environmental claim, she has to show that she's proven -- she has to prove by a preponderance of the evidence that she has a nonspeculative basis to believe that the number of flights over Garden City would actually increase under this local law. And that's what we are here to contest.

THE COURT: You're going to contest it without discovery.

MR. TAYLOR: Well, I'm just saying --

THE COURT: You're saying she should prove it. But you would have to provide the proof in discovery, be subject to rebuttal, and could be the subject of a motion for summary

judgment which you could bring at the end of discovery.

That's a fact question. I'm not here on the fact question. I'm here on whether she has the right to assert her claim, not whether she's proven her claim.

MR. TAYLOR: So, the parties are actually in agreement that a fact inquiry is appropriate on 12(b)(1) motion. That's not actually contested.

But let's start here because the foundation of her claim is that -- it starts with the idea that Local Law 64 is going to shut down the two Manhattan heliports to these tour flights and to the commuter flights and that they, therefore, are going to shift their operations to JFK and LaGuardia.

On that point, I want to go back to the last thing my colleague said, which is that under the -- the main dispute between the parties here is on the definition of which helicopters this law actually covers.

There are three categories. There's the pure Stage 2 helicopter that doesn't meet Stage 3 noise requirements -- I want you to imagine a Venn diagram here -- and then you have the certificated Stage 3, and then in the middle what you have is what I call the Stage 3 equivalent helicopters, the ones that are Stage 2 certificated -- which, as an aside, I do not know why it's certificated rather than certified, but I will defer to the bureaucracy on this -- but the Stage 2 certificated that meet Stage 3 requirements.

And what EDC has found is that the two wings of that Venn diagram are essentially empty. All of the New York City market is served by the middle of that Venn diagram, which is the Stage 2 certificated but Stage 3 -- vehicles that meet the Stage 3 thresholds.

So, the very first factual predicate of idea that there's going to be this massive displacement of helicopters from the Manhattan heliports to the airports doesn't make any sense because all of the vehicles that are servicing the market today, which are in that Stage 3 equivalent space, can just continue with business as usual.

What this local law is doing is it's preventing the pure Stage 2, the extra loud helicopters, from coming into the New York City market. But it's not going to be a majorly disruptive regulation to the sustained operations.

What the petitioners do is they go in and they say, well, actually, this law hits everybody that's certificated at Stage 2. It doesn't matter whether they meet Stage 3 thresholds or not, you actually need the Stage 3 certification, you need to be certificated at Stage 3 in order to get out from under this local law.

But when you look at the definition --

THE COURT: Stop for a minute please.

If I look at this legislation, that's not what this legislation says. There's nothing in the legislation that

draws the distinction between Stage 2 certificated helicopters and Stage 2 certificated helicopters that meet Stage 3 standards so as to make clear that it is not going to have an effect on general operations at those heliports unless there is something in the legislative history which makes clear that that is the intent.

MR. TAYLOR: So, I can point your Honor to two things.

First, the definition itself of covered helicopter in the statute. It would have been supremely easy for the City Council to write a definition that said that a covered helicopter is a helicopter that is certificated at Stage 2.

That is not what they did.

The covered helicopter definition means a helicopter but it does not include -- this is the exemption -- it does not include any helicopter with calculated noise levels as indicated in this FAA circular or any successor document that are not higher than the Stage 3 noise limits. And then it cites to where the Stage 3 regulations are.

Now, that is not how you would write a statute that was intended to hit all certificated Stage 2.

And the other thing that I would point your Honor to is that EDC, which is the agency that is going to implement these regulations, is required by the statute is to release an annual report about covered helicopters that are operating out

of New York City-owned heliports.

And the first of those annual reports is at Document 38-1 in the record. And that report found that EDC is not aware of any covered helicopters currently operating out of New York City heliports.

So, it's not -- you know, it's not a fact question that requires discovery. This is a pure statutory interpretation question and it's one that EDC has already come down on the side of saying that middle of the Venn diagram, those Stage 3 equivalents, can continue with business as usual.

THE COURT: So, no one should go out and get a Stage 2 helicopter and start flying it into these heliports because they would be prohibited from doing so under this law.

MR. TAYLOR: Right. But the idea that there's going to be a wholesale displacement of existing traffic out of the heliports is not founded. So, that's the first reason she says that she has last standing, it's that we're going to displace all these helicopters and they're all going to have to move to the airports.

THE COURT: Okay.

MR. TAYLOR: But even if you were to agree with the Plaintiffs on their interpretation of what is a covered heliport -- let's see, what am I going to say about this?

So, Victoria Seskin --

THE COURT: Whoa, whoa, whoa, what are we looking at?

MR. TAYLOR: This is the assertion of standing in the complaint itself.

And she says that she lives directly under the flight path of helicopter approach to JFK and LaGuardia Airport.

THE COURT: Well, she's probably right about that.

MR. TAYLOR: So, this is the FAA helicopter route chart that is publicly available and judicially noticeable.

THE COURT: Did you put it in your papers as an exhibit?

MR. TAYLOR: Yes, it's in there.

I will say that what I've added here is a red box to show the location of Garden City.

THE COURT: If you're giving me something, it needs to be identified for the record with a sticker -- it can be a virtual sticker -- and a copy has to be provided to the Court on paper because that's the way this Court does business. All you need to do is send it on afterwards.

MR. TAYLOR: Sure. It's identified by the PACER filing document; is that sufficient?

At the top of the screen there, it shows that this is filed -- this is a detail from the document filed as Document 31-8. And the paper copy was provided to the clerk

before your Honor arrived.

THE COURT: But it needs to be identified for this actual proceeding that we're doing now. In other words, and in the future, you need to give it an exhibit number. This is Exhibit A or Exhibit 1 for this proceeding so that I can put it in the record that way so I don't have to hunt on PACER for an exhibit, of which there are probably many.

It's just a protocol. That's all I'm asking you to do.

Is that possible?

MR. TAYLOR: Absolutely.

And in fact, I don't need to use these because they are in the record.

THE COURT: If you want me to look at them, fine, but I'm just saying the way to do it is the way to do it.

Why are you arguing with me over it?

Have you never done a proceeding before a judge in this court?

Give it to me here -- don't take it down after you put it up.

What the heck are you doing?

I want to look at it. I know how to look at it.

I'm just saying when we're done, give it to me on paper so I have it in the file so I don't have to go and print it out off PACER and so that it's part the record of this

proceeding.

Do you understand that?

MR. TAYLOR: Absolutely, your Honor.

THE COURT: Well, let's start off by following what I tell you to do and not how you want to do it.

So go ahead, tell me.

MR. TAYLOR: So the flight approaches to JFK and LaGuardia are clearly marked or this route chart. There are multiple approaches and none of them fly over Garden City.

What does fly near Garden City is this transit route over Long Island which is called the track route. It is one of I believe three options, basically, for coming into the five boroughs; The south shore route you can see at the bottom of the screen goes south of Long Island, the north shore route goes north of Long Island. So, if you're coming in from the Hamptons, you would use either the -- you would end up at the track route, you would have the north shore route, or you would have the south shore route.

And that's essentially what the Petitioners put in their papers as well.

THE COURT: Let me ask you, does this show the altitude for those routes?

MR. TAYLOR: It does, your Honor, but I'll be candid: I don't have that part of the document there. The version that's uploaded does have the full map. This is a

detail of the map and it didn't show exactly what those altitudes are.

THE COURT: Okay.

MR. TAYLOR: So, what the Petitioners have not alleged and what they have not shown is anything to say, first of all, how flights are distributed between these routes, and, second, what is the utilization of these routes under the existing conditions.

Now, this is not to say they didn't have this data. Your Honor, they submitted what they called a diversion study. And the diversion study was a lengthy document that purported only to show, assuming that all of the nonessential flights are diverted, which, again, I want to say the most important point, if your Honor takes only one point from this, that is the assumption that is the most faulty, is that all these flights are going to be diverted.

But even if you assume that they are going to be diverted, they purported to show which heliports in the New York City region would absorb how much of the traffic from those downtown heliports. But this professional study that they had done did not even purport analyze the difference in the routes that would be used.

THE COURT: Where's Garden City on this map that you've got?

MR. TAYLOR: Garden City is roughly in the location

of that red box. And again, I will say the red box I added to indicate the location of Garden City.

So, they haven't even alleged that they have shown a likelihood that the usage of the track route would increase.

What they should have done or what the Plaintiffs could have done in order to show this is to use the flight track data that they already had that was referenced in their study to look at what are the existing flights that come in from -- the flights between the Hamptons and other points east and use LaGuardia and JFK and compare that to how often they cross Garden City if they were coming into Downtown Manhattan and East 34th Street.

They didn't do that. And it is their burden, again the Plaintiffs' burden, to show that there is standing, a nonspeculative basis to believe that the number of flights over Garden City are going to increase. So, I would say they did not meet their burden even just based on their affirmative case.

But as I said, the City Council data team, once their motion opposition came in and they first articulated the idea that standing was based on utilization of this track route, the City Council did pull the flight track data and did exactly the comparison that the Plaintiffs would have needed to do to show that Ms. Seskin had standing.

What I'm showing you now is a detail from the

Moussawi declaration, which is Document 39 in the record. And it shows you how often flights cross Garden City when they are between points east and all five of the relevant heliports here.

So, up in the upper left-hand corner, you have East 34th Street, it's about 16 percent; lower left, you have Downtown Manhattan, it's 28 percent; JRA, which is the West 30th Street heliport, which their study inexplicitly omitted, is the top center and that's 19 percent; and then you see JFK has about a 31 percent Garden City crossing rate and LaGuardia has a 5 percent crossing rate.

Now, their study which said which heliports are going to absorb which quantity of traffic if you were to divert all the traffic actually said that for the particular type of traffic that we would be talking about here, commuter traffic out to the Hamptons, that LaGuardia is the more attractive of the two because it is closer to midtown, it's closer to the Manhattan customer base that is currently being serviced by those Manhattan heliports.

So, what the data team did was they, under three different assumptions, they first took the percentages exactly as they were presented in the diversion study that the Plaintiffs put forth and said if you reassign those Manhattan flights to JFK and LaGuardia at that proportion that was in the diversion study, what would be the result?

And the result was -- let's see.

I apologize. This is the wrong slide. I'm going to just go back to the Moussawi declaration itself.

THE COURT: Go ahead.

MR. TAYLOR: But the long and short of it was -- I apologize, that's the wrong image.

Is it all right, your Honor, if I put this down?

THE COURT: You can take that out if it's not the right image, sure.

MR. TAYLOR: The conclusion was that under none of the three scenarios did the number of overflights of Garden City actually increase.

They took three scenarios. First, the followed the Plaintiffs' exact diversion study, and that put about 50/50 distribution to JFK and to LaGuardia. They also looked at a 60/40 distribution in favor of LaGuardia because but their study had said that LaGuardia would be favored for the customers who are currently using the Manhattan heliports. They also did one that distributed between the three Manhattan heliports because it's not really clear why the Plaintiffs didn't include West 30th Street in their diversion study. West 30th Street was in the complaint as one of the diversion sites and it's the largest flight volume between the five boroughs and the Hamptons today. So, the data team included one scenario where you put West 30th Street back in as well.

Under none of these scenarios was there an increase in overflights over Garden City.

Again, it is the Plaintiffs' burden to show that there's a nonspeculative basis to believe there'd be increase in these flights and --

THE COURT: I understand that. I'd also like to have both of those slides. Give them a number or letter and submit them so they can be part of the record.

All right?

MR. TAYLOR: Absolutely.

THE COURT: Anything else?

MR. TAYLOR: That's it.

THE COURT: Okay, Mr. Catterson, welcome.

MR. CATTERSON: Thank you, Judge.

THE COURT: Nice to see you again.

MR. CATTERSON: Always good to see you, Judge.

Because I'm old, I have to stand.

THE COURT: That's quite all right, I understand.

Make sure if you don't hear, we'll try turn up the sound.

MR. CATTERSON: And I will also try to take pity on the court reporter by speaking slower than I normally would.

THE COURT REPORTER: Thank you.

THE COURT: Thank you.

MR. CATTERSON: The City's position is that Local

Law 64 complies with ANCA because somebody will do the study. That's required under Part 161. And while the City claims that it won't be the FBO and the local law doesn't say it will be the FBO, their brief says otherwise: That the EDC can delegate that study to the FBO.

ANCA, of course -- I'll get into that in detail -- says exactly the opposite.

THE COURT: Excuse me a minute.

(Pause in proceedings.)

THE COURT: Thank you. Go ahead.

MR. CATTERSON: The City's position also is that because it does not dictate the result; in other words, that the regulation, Local Law 64, only takes place 180 days after the ANCA study is completed, that it complies with ANCA.

Of course, local law says: Such restrictions shall not be implemented until 180 days after publishing and public comment period required by such procedure has commenced. In other words, it's the City's position that merely because they commenced the study, regardless of the outcome of the study, they can implement the regulations.

THE COURT: If they're required to follow a certain protocol that's enumerated in federal law but they cannot take steps to implement it until 120 days until it's completed, why is this matter ripe for the Court's consideration as to whether the injury, the alleged injury, should be foreclosed

and enjoined until after the study is conducted?

Isn't the study a condition precedent to the implementation of any restriction?

And wouldn't it be far better to await the outcome of the study than to rush to court in anticipation of the outcome of the study before the study has happened?

MR. CATTERSON: Normally, Judge, I would agree with you. Normally I would and say: Why don't we see what the study says?

The way Local Law 64 is written, though, the restrictions take place 180 days later, not: We will impose the restrictions depending upon what the study says.

Local Law 64 doesn't say that. This is lip service to avoid ANCA.

They learned -- there's no question they learned from Friends of East Hampton, the Second Circuit decision which blocked similar noise and access restrictions in the East Hampton airport.

THE COURT: Judge Raggi.

MR. CATTERSON: Judge Raggi's decision.

Of course, the same holding took place in Supreme Court Suffolk and in the Appellate Division when they tried to do it all over again.

ANCA requires you to conduct the study. I'm assuming that ANCA requires you to conduct the study in good

faith, that it's not a fool's errand, that it's not pro forma.

I'll get into the details of what that study requires. This statute is written so that the restrictions take place 180 days after they do the study. Period. It doesn't have any mention of what the effect of the study is, which is why it's a clever way to try and avoid ANCA.

I would suggest Congress didn't enact Part 161, that complicated statutory scheme about what's required in the study, merely to have a municipality pay lip service to it. It's incomprehensible to me that you can say: We'll do the study or the FBO will do the study, but the regulations take effect in 180 days.

THE COURT: Let me go back to that.

MR. CATTERSON: Yes, Judge.

THE COURT: I understand your position.

But if a study is completed and you have a full record of everything that was considered and the conclusions that were reached and then someone, an entity or entities or individuals, who would be adversely effected by the implementation of the restrictions decides that they want judicial review, they could then come to court. And it doesn't take 120 days for this Court to impose a preliminary or temporary relief if for good cause shown there is an issue that needs to be resolved judicially.

So, I'm just wondering, 120 days is a lot of time.

So here, we are sort of in the dark. We don't know what the study will show. We have information about what the EDC has ascertained and others have ascertained about flight routes and so on, but it's problematical to reach a conclusion without a full-blown explication of how the applicant -- in this case, the City or EDC -- arrived at their outcome.

Don't you think that that would be a better way of doing this than jumping in now?

MR. CATTERSON: Judge, were the statute not written this way, I would agree with you. And yes, of course, I agree with you that any plaintiff who is effected by the implementation of the regulations who believes that the study was just pro forma could come in on a TRO. I agree with you. I do.

I don't think that forecloses an attack based on how the statute is written today.

THE COURT: All right. Go ahead.

MR. CATTERSON: Lastly, the City takes an extremely interesting position on reply. And I know you know at least with regard to the ANCA claims it's a 12(b)(6) motion, not a 12(b)(1). And the City basically says on reply that really, really, no study is needed. Because under its own calculations, EDC's calculations, all current helicopter traffic meets or exceeds the Stage 3 certification requirements. In fact, they said it today.

Other words, the law imposes no restrictions on any currently operating helicopters based on EDC's interpretation of FAA data, that, of course, it never attached, that actually demonstrates the polar opposite of EDC's conclusions.

All of this is on a 12(b)(6) motion and I'll get into this in detail if you'll allow me, Judge.

Nonessential flights. This is only relevant, the essential versus nonessential part, I suppose to the other claims, not particularly the ANCA claims. But included in the essential flights, are not governed by any restrictions, are news gathering organizations or film, television, or commercial photography production activities conducted for a commercial purpose.

So, that commercial purpose is exempt from Local Law 64. Every other commercial purpose is covered by Local Law 64.

THE COURT: That's an interesting issue.

MR. CATTERSON: Not for ANCA but for the other claims it is, Judge.

THE COURT: Right. I understand that.

MR. CATTERSON: I know, Judge, I'm going to dredge up memories for you.

THE COURT: I hope not.

MR. CATTERSON: Part 161, which it's easier to talk about it than the CFR number, but Part 161 is the

implementation regulations for ANCA that Congress passed. It requires, obviously, under 161, 5, the airport noise study, and it defines airport operators, airport proprietor. It's important to note that in 161, 203 -- those are the notice sections -- it says in 203(a) that the operator must provide an analysis of the proposed restrictions and provide that notice to the FBO.

In other words, the operator can't be the FBO because it would be providing notice to itself. It defines the operator as the proprietor, which is the City of New York.

They have to study the following, Judge.

First of all, they have to publish the restrictions, including a local newspaper and a prominent location. That's 203(b).

They have to make it available for notice and comments. That's 203(b) and (c).

They have to prepare a cost benefit analysis, 205(a), including a description of alternatives and their costs.

They have to commission a study of noise levels using federally prescribed methods. 205(b).

They have to promulgate the detailed notice to relevant stakeholders. 203(b).

Establish a public docket, that's 207.

And publish -- have the FAA publish in the Federal

Register the restrictions. That's 203(e).

Regulations on Stage 3 aircraft are -- restrictions on Stage 3 are obviously much more restrictive, as my adversaries have pointed out. But the interesting thing about the Stage 2 study is 205(c). It says at very end: Useful elements of an adequate analysis of noise or access restrictions on Stage 3 aircraft should be included.

In other words, the FAA envisions a comprehensive, detailed, and complex study. To our knowledge, no one has ever successfully completed a Part 161 study in the United States. It's extremely expensive and difficult to do. No one has ever done it.

The interesting thing is the argument raised in reply and I heard today is that the local law avoids the Stage 3 certification requirement by saying that they have to meet the noise level of Stage 3.

And the EDC, actually, the report annexed to the rebuttal, says essentially the same thing: That they -- well, I'll read it, Judge.

It's attached to their rebuttal, the EDC report, and it says: New York EDC is unaware of public information on which Stage 2 helicopters would meet Stage 3 noise limits.

In other words, they don't know.

Further, EDC does not have the means to independently make this determination.

In other words, they can't conduct the noise test. EDC says it.

However, EDC has obtained information presented by the FAA indicating which helicopter models meet Stage 3 noise levels and those that do not. EDC reserves the right to revise its assessment if new data emerges.

This isn't according to the EDC, this is the EDC interpreting FAA data that is not annexed to the report. It's not annexed to the rebuttal.

There's a reason for that: It's because the data sheet from 2014 which they are referring to, submitted -- I am assuming is the basis for EDC's examination, says the polar opposite of what analyst at EDC says.

And again, it's a 12(b)(6) motion and here I am arguing about what it means to be Stage 2 or Stage 3.

I would suggest, Judge, if they want to move on summary judgment on the claim, that's one thing. But to move to dismiss now, saying inexplicably that the law doesn't effect any operating helicopters in New York right now, well, then, why did you pass it if it doesn't effect any helicopters?

That all Stage 2 helicopters that are operating in New York are actually Stage 3 compliant, our view is that's false and EDC doesn't know what it's talking about. And as a consequence, there could never be an ANCA violation here

because the law doesn't restrict Stage 3 helicopters.

Here's the problem, Judge, and it's a problem of their own making: It is noise certification, noise levels, is an FAA term of art. It's not a colloquial expression.

In other words, it's not me holding up my iPhone with a decibel reader saying: Oh, yeah, the helicopter, it's a Stage 3 helicopter.

That's not how it works.

It's set out plainly in the appendices to Part 161. It's Appendix H and Appendix J depending upon the weight of the helicopter --

I'm bringing you back, Judge, I know I am, to stuff you obviously wanted to forget.

-- it's not a colloquial expression. It is a very complicated formula to determine noise level for helicopters. Indeed, it doesn't even use decibels, it uses effective perceived noise level in decibels.

The FAA tells you that you measure whether you're Stage 2 or Stage 3 altitude, air temperature, barometric pressure, ambient noise, distance from the measuring point, along with 20 other factors. That's how the FAA gets to that level. There is no colloquial Stage 2 or Stage 3, despite them wanting that to save their description of who is using the heliports.

Finally and importantly on that point, every single

aircraft in the United States has a type certification. Every single operating aircraft. To get type certification is a multiyear process that is very expensive. So, every Sikorsky, every Bell, every helicopter operating in New York, has a type certification.

Under 36.805, the noise certification is baked into the pipe certification. You cannot pipe certificate an aircraft without a predetermined noise certification.

What does that mean?

Blade is a perfect example. Blade is a perfect example.

Blade, now Joby, has a fleet of mostly Bells they don't own. Not a single one of those Bells according to the FAA's own data, which I know they have access to, is a Type 3 certified helicopter. Not one of them. Most of them are old. They are all Type 2s.

As we sit here today, there is not a commercially available Type 3 certificated helicopter in the United States. Not one.

The way they avoid that problem, again, is: Well, it's not certification, it's noise level.

Noise level measured by who and according to what?

Again, it is an attempt to infuse ambiguity into a plain statute promulgated by the FAA and Congress.

THE COURT: How long do these -- you said that they

are old helicopters.

How old?

MR. CATTERSON: Some of those air frames are I'd bet around a dozen years old, maybe more. They're mostly Bells, at least Blade's are.

Apropos of nothing, Blade started to -- they had a big press release about an electric helicopter, they're going to change over their fleet to electric helicopters.

THE COURT: Well, they don't have electric helicopters.

MR. CATTERSON: Not a one, Judge, not a one.

THE COURT: It's clear they don't have electric helicopters based on what I've read.

MR. CATTERSON: Not a one.

THE COURT: I don't know if it's in the record, but they are all turbines.

MR. CATTERSON: Of course, that's how the statute started. They wanted to ban all helicopters except electric ones, and then some genius in City Council said: Oh, there aren't any.

THE COURT: Let me ask this, you really haven't responsible to the issue of your client or clients.

How do they have standing?

MR. CATTERSON: Judge, my clients are the two largest rotary aircraft associations on the East Coast.

They're two of the largest in the country.

THE COURT: They're membership associations?

MR. CATTERSON: They are membership associations.

THE COURT: So, they would have standing as members of an association?

MR. CATTERSON: Yes, Judge. Virtually every operator on the East Coast is in one of the two, virtually every one.

THE COURT: So, who are your clients again?

MR. CATTERSON: My clients are Vertical Aviation and I don't remember the one, Judge. I said it when I started.

Vertical Aviation and the other would be Eastern Region Helicopter Council. They are two largest rotary aircraft associations on the East Coast.

THE COURT: And Blade is a member of which one?

MR. CATTERSON: Blade is a member of East Coast, but Blade was just bought out by Joby, which is a west coast company.

THE COURT: I see.

MR. CATTERSON: I don't know if they still are.

THE COURT: You don't know if they still are.

MR. CATTERSON: I don't.

THE COURT: They are a major operator at 34th Street, I know that.

MR. CATTERSON: They are a major operator at

34th Street and the vast majority of flights, of course, are commuter flights. I say "commuter" loosely. It's if you're communicating to East Hampton or South Hampton, someplace like that.

THE COURT: They advertise that they have flights to Kennedy Airport.

MR. CATTERSON: They do, Kennedy and LaGuardia so you can avoid the traffic on the BQE or the Belt.

They are a large operator. Not my client directly, they are a large operator.

THE COURT: I see.

MR. CATTERSON: Let me just address the last -- at least the Federal Aviation Act.

The question is whether or not the statute involves air safety. My adversaries suggest to you that we only quote the statement of one City Council member. Unfortunately, I suppose, for the City's position is that council member, she is the bill's sponsor. She is the majority leader of the City Council. We quoted her statements at length in the complaint in Paragraphs 84, 86, 116, 198, 199. We then included excerpts from the committee report, which is entitled: Helicopter Noise and Safety.

All of the statements reflect that, politically or otherwise, helicopter accidents in New York, particularly the recent accident where the family was killed in a Bell that

crashed and upended, that provided ample political fodder for the passage of Local Law 64. Of course, discovery would disclose that. We've quoted a lot of it in the complaint --

THE COURT: This is the Speaker of the City Council?

MR. CATTERSON: She's the majority leader, Farias is the majority leader, And, importantly, she's also the majority -- we would call it the majority whip.

THE COURT: But the fact is there are dozens of council members who are co-sponsors of the legislation and which is understandable. And I have the greatest respect for the members of the City Council to represent the interests of their constituents. That's what they do.

MR. CATTERSON: I wholeheartedly agree with you, Judge.

The only question is, is the statute in its anodyne form merely noise regulation, in which case it's covered by ANCA. And the assertion that because of the airport proprietor exception they can enact their own noise regulations is completely put to bed by Friends of East Hampton.

The airport proprietor exception only works if you fully comply with ANCA. And Judge Raggi said that outright.

THE COURT: I've read it, I saw it, I read the decision.

MR. CATTERSON: Not even a question. So, the only

thing left then, at least on the FAA question, Federal Aviation Act question, is whether or not you articulate it enough on a 12(b)(6) motion to say that the motivation was also safety, not just noise.

THE COURT: I see your point. All right. Thank you.

MR. CATTERSON: Thank you, Judge. I appreciate the time.

THE COURT: Thank you very much.

MS. JONAT: Good afternoon, your Honor. My name is Jayme Jonat. I'm with Holwell Shuster & Goldberg. I represent Plaintiff Victoria Seskin.

If it's all right that I'm standing. I don't have as much gray hair as Judge Catterson, but I have a bit so I'm more comfortable here.

THE COURT: Go ahead.

MS. JONAT: I'm here today to address the City's motion to dismiss Count Four of the complaint, which alleges that the process by which they enacted this law and the law itself was arbitrary and capricious because they failed to comply with CECRA.

The purpose of CECRA is to ensure that government agencies look before they leap, that they evaluate the environmental consequences of their actions before those consequences become reality.

And at the outset, I want to make clear that the City is not challenging the merits of the CECRA claim, they don't even attempt to do so, and it's pretty obvious why: That's because the claim is very straightforward. The City enacted a law that would reshape helicopter operations across New York's airspace. It was, therefore, required to analyze the environmental consequences that might occur from those actions. But it did not. There was not a single environmental study that was conducted.

So, the only question that is before the Court today for purposes of the CECRA claim is whether my client, Ms. Seskin, is the right person to bring that claim. And I'll briefly explain why that is the case.

Ms. Seskin has demonstrated that she has a particularized nonspeculative risk of environmental harm and that is the standard for CECRA standing and Article III standing as well. There are sufficient allegations in the complaint and there are supporting material that we submitted with our opposition what shows that if Local Law 64 does ban nonessential helicopters from those two heliports, some portion of those flights will be diverted to JFK and LaGuardia. We have a diversion study that says as much.

There are 50,000 operations a year just at those two heliports. And our expert estimates that 95 to 98 percent of those will get diverted. We're talking about thousands and

thousands of flights.

THE COURT: Let me ask you this: As a practical matter, looking at the Rand McNally of Long Island, Garden City is east of both LaGuardia and JFK Airports.

MS. JONAT: Correct.

THE COURT: So, any flights that are going from the Hamptons, let's say, to Manhattan now which end up at LaGuardia or Kennedy Airports will be the same flights that were going over Garden City previously.

So, there are no extra flights as far as Garden City is concerned, are there?

MS. JONAT: There are.

So, if you think about just one example, right, I wish this was true but I do not have one, but if I had a house in the Hamptons and I wanted to commute to New York City, I have a very important meeting, I would typically fly into East 34th Street. And, so, I wouldn't take necessarily the track route that's near Ms. Seskin's house. But now I need to fly somewhere else because I'm no longer allowed to fly to East 34th Street. Now I'm going to I fly to JFK and now I am going to take the track route because that's actually the more efficient route for me to take, right down the middle of the island.

But the problem, your Honor, is that the track route that is now being used by most pilots that are going that way

fly very low, as you observed earlier. They're flying something like 500 to 1,000 feet, so it's very low to the ground.

It's not just one scenario. They are going to be displacing thousands and thousands of flights a year. That's going to be changing origins, destinations, route incentives. The whole point is that that's what the study is supposed to do.

THE COURT: Isn't that speculative, though?

MS. JONAT: It's not speculative based upon what we submitted. I would submit, your Honor, that if you have thousands of flights which are going to be displaced -- and I think it's just, frankly, common sense for anyone who lives in New York City or works in New York City, that some of those flights are going be diverted to JFK and LaGuardia.

And an important point here is that there are no slots at JFK and LaGuardia. That's why they're so attractive, that's why we didn't consider West 30th where there are four slots. So, it makes sense that --

THE COURT: I'm sorry, West 30th has four slots?

MS. JONAT: That's understanding.

THE COURT: What does that mean?

MS. JONAT: So, there are only four spots for helicopters to fly into at a time, as opposed to --

THE COURT: Four landing spots.

MS. JONAT: Correct, correct, where there are none at JFK and LaGuardia.

So, we have our expert that says as much, but I also think it is common sense that some of these flights will be diverted to JFK and LaGuardia.

To your point, your Honor, we don't claim that every flight is going to get diverted to JFK or LaGuardia. And it's certainly true that sight-seeing tours would not have any reason to go over Garden City, that's for sure. It's also not necessarily the case that airport shuttles would go over Garden City.

But are some number of flights that are going to be coming from -- and it's not just the eastern end of Long Island, it's also Boston and other places that are going to travers across Long Island to get to where they need to go, whether that's JFK or LaGuardia. And that additional traffic will impact Ms. Seskin.

THE COURT: I'm going to ask a question of the defense.

This law doesn't prohibit sight-seeing helicopters over Manhattan, it just means that they have take off from someplace else; is that right?

MR. TAYLOR: That's correct, your Honor.

THE COURT: Like LaGuardia or like Kennedy or Newark or someplace else, I don't know where.

So, it's not a general noise abatement law, it's just a site-specific law.

MR. TAYLOR: So, the Plaintiffs' diversion study actually addresses the sight-seeing tours point specifically and finds that LaGuardia and JFK are pretty unlikely to be the point that sight-seeing tours are diverted to. Most of them will end up in New Jersey. But even if they did end up at JFK and LaGuardia, most of them want to see the Empire State Building. They're moth going to be going out to City.

THE COURT: I'm just wondering where these -- this isn't about generally airplane noise over heavily populated parts of New York City.

MS. JONAT: That's right, your Honor, but that's exactly why the law like CECRA exists, right, because you're supposed to be evaluating what the environmental impacts are on others.

THE COURT: I understand. But that's a state law.

MS. JONAT: Correct, correct.

THE COURT: It's something the state courts could deal with.

MS. JONAT: Yes, though the court would have supplemental jurisdiction over --

THE COURT: That's what I have on that one. I know that.

Go ahead.

MS. JONAT: The last thing that I'll say, your Honor, is that my adversary spoke about how they had their own data analysts who did all of the data analytics that you saw.

The first thing I would say is we obviously have not had a chance to even respond to that, we haven't had a chance to examine that. There are a lot of issues with what was done there, just to say the least, one of which is that he assumes that the same percentage of flights that will cross Garden City today is exactly the same percentage that will cross in four years, when all of these flights are displaced.

But putting all that aside, all that Ms. Seskin needs do at this stage in the proceeding is prove that there's a real risk, there's a real risk here based on what we have uncovered.

THE COURT: Thank you.

Any rebuttal, go ahead.

MS. LULICH: Very briefly, your Honor.

First, I just to want to make the point, the local law does not refer to certificated Stage 2 or certificated Stage 3 helicopters. That is a term that the Plaintiffs have introduced here in construing the law in a way that they allege it will have greater ramifications than it will.

What the face of the law defines as a covered helicopter again, as my colleague has already said, is that the calculated noise levels are not higher than the Stage 3

noise limits.

And it is not unusual for a local law to be written and for the agency that will be enforcing and implementing that law to provide clarification as to how they're interpreting it.

And EDC has said: We will be using the FAA's noise calculations to determine which helicopters are -- do not have calculated noise levels that are not higher than the Stage 3 noise limits.

I think that's an important distinction, so I just wanted to point that out to the Court.

The second issues is I also want to be very clear as to which portions of the legislative history that the complaint is quoting when discussing the -- when alleging that safety is an issue under the FAA preemption section. Because they are not cited in the complaint and that's probably because the committee report that is being referred to there is a committee report for laws that do not include the law that was passed.

It is the very first iteration of a group of seven both introductory bills and resolutions that related to helicopter -- various helicopter regulations. The committee report was issued on April 16 of 2024. None of those either resolutions or introductions included the text of what is now Local Law 64.

Thereafter, the local law that would become 64 of the bill was amended and was called Introduction 26-A, and that is the text of the law -- of the bill that was actually passed into law. And the committee report for that bill states specifically that its purpose is the regulation of helicopter noise. That committee report as well as the statement of purpose of the law are attached to our moving papers, under the declaration of our moving papers.

And I also note, yes, one council member who is one of the sponsors made some general statements where she referred to public health and safety. But to the extent the Court is going to consider those, we would just ask that the Court consider the entirety of the statements. I think they are only two pages long. They are in our Exhibit F starting at Page 49.

And, again, as we have noted and I'm sure I don't have to tell the Court, what one council member views a law as doing is really not dispositive where the face of the law and the stated purpose of the law that was actually passed makes clear that it is definitive regulation.

THE COURT: I think you made that clear the last time you spoke. I got it.

MS. LULICH: Thank you.

THE COURT: Anything else from you, sir?

MR. TAYLOR: Yes, your Honor.

So, we know that there is this category of Stage 3 equivalent vehicles. We actually quote in our brief the chairman of Petitioners, Jeffrey Smith, who said that very few helicopters are certified under Stage 3 noise levels; however, several Stage 2 rated helicopters flying today are just as quiet and could meet Stage 3 noise certification requirements. That's the Petitioners -- or that's the Plaintiffs.

THE COURT: They are the Plaintiffs.

MR. TAYLOR: That's the Plaintiffs who are saying this.

So, when you look at the way covered helicopters is defined in the statute, it simply can't be interpreted that it requires that Stage 3 certification. The language is not written that way.

So, the City Council is handing it to EDC to implement, and, ultimately, EDC has to be able to make its decision about how that statute is going to be implemented.

And we know what they're going to do.

THE COURT: Oh, you know what they're going to do.

MR. TAYLOR: We know how they've interpreted a covered helicopter because they put in their report that a covered helicopter need not be certificated as Stage 3 in order to be exempt as long as it meets the Stage 3 noise thresholds.

THE COURT: And how are we sure that the measurement

system for Stage 3 noise threshold will be met?

Is that a technical issue? Is it a term of art issue?

I mean, isn't that something that should be worked through in discovery so that you know what the protocol will be so that the Court can rule on summary judgment on whether the statute has the specificity that it requires to be clear to the Plaintiffs, to the business community, to the aviation community, and to the manufacturers of these aircraft?

MR. TAYLOR: Well, your Honor, I'm not sure that an ANCA suit is the right venue for that kind of challenge. Because what we know now is that the City Council has established these standards, it is has incorporated both the FAA circular that has the noise measurements and also the -- their regulations concerning what Stage 3 requirements are, and it tells EDC that it needs to compare the two.

And if the regulated community has an issue with the way that it's being implemented, there are any number of possible challenges that they could bring, but I don't think a facial challenge under ANCA is the way that you would challenge the way that EDC is implementing this local law.

THE COURT: Thank you.

Anything else?

MR. CATTERSON: If I may, Judge.

THE COURT: Briefly.

MR. CATTERSON: I promise, briefly, briefly, briefly.

The local law says this exactly: Does not include any helicopter with a calculated noise level as indicated in Appendix 10 or 11 to the FAA -- not capitalized -- advisory circular 361(h) or any such successor documents that are not higher than the Stage 3 noise limits for maximum takeoff whether such helicopter referenced in the two appendices, either below 7,000 pounds or above 7,000 pounds.

The local law specifically says the certificated noise levels by referring to the appendix. You can't divorce how the FAA measured it from the actual statute. The formula is logarithmic, my youngest associate here told me it's logarithmic, the formula. I can't figure it out, but the FAA has and they've established the noise limits.

As far the principal of one of my associations saying that several, several, Stage 2 helicopters meet the Stage 3 noise limits, he was speaking, of course, commercially. There are no certificated Stage 3 helicopters. Despite what the EDC has to say, it is absolutely completely false. He won't last five minutes in a deposition with me on this issue based on his report, whoever this analyst is.

Thank you very much, Judge.

THE COURT: Well, this has been exceptional. I want to thank everybody. I think you've all done an excellent job

here, despite the fact that the defense didn't put notations on their exhibits.

But you will send me notations on the -- three exhibits, is it?

MR. TAYLOR: That's right, your Honor.

THE COURT: Exhibit A, Exhibit B, and Exhibit C with a cover letter saying what they are so that's in the record as well.

But I really appreciate all of this debate about the issue on the motion. And it's going to be submitted and we'll take a look at everything very carefully.

I'm just wondering, could I have some additional briefing on ripeness and standing from the parties --

MR. CATTERSON: Of course, Judge.

THE COURT: -- at the same time?

MR. CATTERSON: Yes, Judge.

THE COURT: How much time would you like to do this?

MR. CATTERSON: How much time do you want to give me, Judge?

THE COURT: You want 60 days?

MR. CATTERSON: Perfect, Judge.

THE COURT: Would you like 60 days?

MS. BRIGGS: Yes.

THE COURT: Because I just think that I can't do anything unless I know that Plaintiffs really have standing

and whether there's ripeness. I asked that question at the beginning and I think I'd still like to have some briefing on it.

All right?

MS. LULICH: Your Honor, are you anticipating Plaintiffs filing and then us filing or just everyone on the same day?

THE COURT: You should both file it as soon as you can. I'm giving you 60 days because I know this is not your only case.

MR. CATTERSON: Thanks very much, Judge.

MR. METIN: Thank you for your time, Judge.

MS. LULICH: Thank you, your Honor.

THE COURT: Thank you. Have a nice day.

(Matter concluded.)