Index No. 25-CV-4682 (NGG)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

EASTERN REGION HELICOPTER COUNCIL, VERTICAL AVIATION INTERNATIONAL, and VICTORIA SESKIN,

Plaintiffs,

-against-

THE CITY OF NEW YORK,

Defendants.

**DEFENDANT CITY'S SUPPLEMENTAL MEMORANDUM OF LAW ON STANDING AND RIPENESS**

***STEVEN BANKS***
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Nathan Taylor, Owanaemi Briggs, Aimee Lulich*
*Tel: (212) 356-2209*

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... ii

ARGUMENT ..... 2

POINT I ..... 2

NO PLAINTIFF HAS DEMONSTRATED AN INJURY IN FACT TRACEABLE TO LOCAL LAW 64 SO AS TO ESTABLISH STANDING ..... 2

A. Legal Standard ..... 2

1. Standing requires a concrete, imminent injury that is traceable to the challenged law and redressable by the Court ..... 2

2. The City's motion is fact-based, so plaintiffs bear the burden of proving standing by a preponderance of the evidence ..... 3

B. Plaintiffs Have Not Shown That They or Their Members Fly Any Local Law 64 "Covered Helicopters" ..... 4

1. Local Law 64 Excludes Stage 3 Equivalent Helicopters—Every Helicopter NYCEDC Found Operating at the Covered Heliports ..... 5

2. Plaintiffs bear the burden, identify no covered helicopter, and the record shows none ..... 8

3. Whether Local Law 64 covers Stage 3-equivalent vehicles is a question of law amenable to resolution on a Motion to Dismiss ..... 9

POINT II ..... 10

ERHC AND VAI HAVE NOT SHOWN STANDING TO PURSUE THE FEDERAL CLAIMS ..... 10

A. An association must prove that an identified member has standing in its own right ..... 10

**Page**

B. On a factual challenge, an association must come forward with evidence that an identified member faces an imminent injury from the law ....................12

C. Without a member with standing, ERHC and VAI cannot pursue Counts One through Three ....................16

POINT III .................... 17

THE SEQRA CLAIM SUFFERS FROM THE SAME DEFECTS ....................17

POINT IV .................... 17

PLAINTIFFS' PREEMPTION CLAIMS ARE SIMILARLY UNRIPE FOR REVIEW AND SHOULD BE DISMISSED ....................17

A. Legal Standard ....................17

B. Plaintiffs' Federal Preemption Claims are Constitutionally Unripe ....................19

C. Plaintiffs' ANCA Preemption Claim is Prudentially Unripe ....................19

1. Unfit for Judicial Review .................... 20

2. Neither party will endure hardship if a decision is withheld .................... 22

CONCLUSION .................... 23

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Abbott Labs. v. Gardner*,
387 U.S. 136, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)........18

*African Cmtys. Together v. Lyons*,
799 F. Supp. 3d 362 (S.D.N.Y. 2025)........14, 16

*Authors Guild, Inc. v. HathiTrust*,
755 F3d 87 (2d Cir 2014)........18, 20, 22

*Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*,
448 F.3d 138 (2d Cir. 2006)........12, 13

*Brooklyn Legal Servs. Corp. B. v. Legal Servs. Corp.*,
462 F.3d 219 (2d Cir. 2006), abrogated on other grounds by *Bond v. United States*, 564 U.S. 211 (2011)........19

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016)........3, 8, 13

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017)........16

*Citizens United to Protect Our Neighborhoods v. Village of Chestnut Ridge*,
98 F.4th 386 (2d Cir. 2024)........11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)........2, 3, 4, 9, 15, 16

*Conn. Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021)........11

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025)........13, 16

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)........10, 11

*Hedges v. Obama*,
724 F.3d 170 (2d Cir. 2013)........15, 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)........12, 16

*Katz v. Donna Karan Co.*,
872 F.3d 114 (2d Cir. 2017)........3

**Cases** **Pages**

*Lacewell v. Office of the Comptroller of the Currency*,
999 F.3d 130 (2d Cir. 2021)....................19

*Luckett v. Bure*,
290 F.3d 493 (2d Cir. 2002)....................3

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................2, 3, 4

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000)....................3

*Marchi v. Bd. of Coop. Educ. Servs.*,
173 F.3d 469 (2d Cir. 1999)....................22

*Moya v. U.S. Dep't of Homeland Sec.,*
*975 F.3d 120, 130 (2d Cir. 2020 ....................11*

*Murphy v New Milford Zoning Comm.*,
402 F3d 342 (2d Cir 2005)....................18

*Nat'l Org. for Marriage, Inc. v. Walsh*,
714 F.3d 682 (2d Cir. 2013)....................18

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003)....................18, 22

*New York Civil Liberties Union v. Grandeau*,
528 F.3d 122 (2d Cir. 2008)....................18, 22

*New York v. United States*,
505 U.S. 144, 112 S. Ct. 2408, 120 L. Ed.2d 120 (1992)....................22

*NY State Rifle & Pistol Assn. v. Cuomo*,
990 F Supp 2d 349 (WDNY 2013)....................22

*R.C. Archdiocese of NY v. Sebelius*,
907 F. Supp 2d 310 (EDNY 2012)....................22

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006)....................16

*Simmonds v. INS*,
326 F.3d 351 (2d Cir. 2003)....................18, 20, 22

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)....................8, 12

**Cases** **Pages**

*Thomas v City of NY*,
143 F3d 31 (2d Cir 1998)........20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)........3, 12, 16

**Statutes**

14 C.F.R. part 36........7

14 C.F.R. § 36.11(c)........7

14 C.F.R. pt. 36, app. H, § H36.305........10

14 C.F.R. pt. 36, app. H, § H36.305(a)(3)........7

14 C.F.R. pt. 36, app. J, § J36.305(a)(2)........7

79 Fed. Reg. at 12,040, 12,042........6

79 Fed. Reg. at 12,045........7

Admin. Code § 22-828........2

Admin. Code § 22-828(2)........1

Admin. Code § 22-828(3)........1

Admin. Code § 22-828(a)........4, 6, 7, 10

Admin. Code § 22-828(c)........10, 15, 21, 22

Fed. R. Civ. P. 12(b)(1)........1, 3, 8

Fed. R. Civ. P. 12(b)(6)........1

**Other Authorities**

LL 64 § 2........8, 12

LL 64 § 3........21

15 Moore, Federal Practice § 101.76 (2026)........19

Stage 3 Helicopter Noise Certification Standards, 79 Fed. Reg. 12,040, 12,040-41
(Mar. 4, 2014) (effective May 5, 2014)........6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

EASTERN REGION HELICOPTER COUNCIL,
VERTICAL AVIATION INTERNATIONAL, and
VICTORIA SESKIN,

Plaintiffs,

25-CV-4682 (NGG)

- against -

THE CITY OF NEW YORK,

Defendant.
---------------------------------------------------------------------- x

Defendant City of New York ("City"), by its attorney, Steven Banks, Corporation Counsel of the City of New York, respectfully submits this Memorandum of Law to address the Court's request for further briefing on the issues of ripeness and standing (Dkt. No. 41) and in further support of its motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

New York City Local Law 64 of 2025 ("Local Law 64") consists primarily of two statutory requirements subject to two distinct effective dates. Section 2, subdivision a of the Local Law, effective on January 1, 2026, requires the New York City Economic Development Corporation ("EDC") to submit yearly reports to the Mayor and City Council "detailing the percentage of flights by covered helicopters to or from a heliport that were non-essential flights during the previous calendar year." Ad. Code §§ 22-828(2) & 22-828(3). This provision is already in effect and in compliance with the law, NYCEDC recently issued its first report on helicopter operations covered under the statute. *See* Dkt. 38-1.

In contrast, the noise restriction at the heart of the instant case, which prohibits statutorily defined non-essential helicopter operations that exceed certain federally established noise

thresholds from two City-owned Manhattan heliports, does not take effect until at least December 1, 2029, and may only be implemented after compliance with the Airport Noise Capacity Act ("ANCA") procedures set forth in section 1 subdivision c of the Local Law. *See* Ad. Code § 22-828. In light of the delayed effective date, and the time-sensitive procedural requirements embedded in the local law, the Court seeks supplemental briefing as to whether the critical jurisdictional thresholds of standing and ripeness have been properly established.[1] As explained further below, Plaintiffs have failed to establish standing for either individual plaintiff Victoria Seskin as well as the trade association plaintiffs, their federal preemption claims are constitutionally unripe, and Plaintiffs' ANCA preemption claim is also prudentially unripe. Accordingly, the Complaint should be dismissed.

## ARGUMENT

## POINT I

## NO PLAINTIFF HAS DEMONSTRATED AN INJURY IN FACT TRACEABLE TO LOCAL LAW 64 SO AS TO ESTABLISH STANDING

### A. Legal Standard

#### 1. Standing requires a concrete, imminent injury that is traceable to the challenged law and redressable by the Court

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). An injury is not traceable to the defendant when it is "th[e] result [of] the independent action of some third

[1] Supplemental briefs are due simultaneously. If plaintiffs submit new member evidence with theirs, the City respectfully requests leave to respond within 14 days.

party not before the court," *Lujan*, 504 U.S. at 560 (quotation omitted), and the Supreme Court has declined "to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

**2. The City's motion is fact-based, so plaintiffs bear the burden of proving standing by a preponderance of the evidence**

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). A defendant may "make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading." *Id.* at 57. The City accordingly submitted the FAA's Helicopter Route Chart (Dkt. 31-8), two declarations analyzing flight-track data (Dkt. 32, 39), and NYCEDC's statutory report on covered helicopters (Dkt. 38-1). In response, plaintiffs "will need to come forward with evidence of their own to controvert that presented by the defendant." *Carter*, 822 F.3d at 57; *accord Katz v. Donna Karan Co.*, 872 F.3d 114, 119 (2d Cir. 2017). They may rest on the complaint only "if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Carter*, 822 F.3d at 57. Where the evidence conflicts, "the district court will need to make findings of fact in aid of its decision as to standing." *Id.* A fact-based Rule 12(b)(1) motion exists so the Court can resolve jurisdiction on evidence before reaching the merits or requiring discovery.

The Court "may refer to evidence outside the pleadings," and plaintiffs have "the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *accord Luckett v. Bure*, 290 F.3d 493, 496–97 (2d Cir. 2002). Each element must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)

(quoting *Lujan*, 504 U.S. at 561). That requirement applies to the supplemental SEQRA claim as much as to the federal ones, as plaintiffs acknowledge. Dkt. 33 at 20.

The question here is narrow: whether these plaintiffs have shown, with evidence, that this law will cause any increase in helicopter noise over a plaintiff's home, or any restriction on any member, that is concrete, imminent and traceable to the law rather than to the independent choices of others. *See Clapper*, 568 U.S. at 409, 414; *Lujan*, 504 U.S. at 560–61. The prior briefing in this case demonstrated that individual plaintiff Victoria Seskin, has failed to establish injury to confer standing. The Court has now asked for supplemental briefing on standing, including that of the trade association plaintiffs. Because they have similarly failed to show the likelihood of any injury, either to themselves or to their individual members, trade association plaintiffs also lack standing.

### B. Plaintiffs Have Not Shown That They or Their Members Fly Any Local Law 64 "Covered Helicopters"

Every theory of injury in this case starts from the premise that Local Law 64 will operate as a "total ban on the vast majority of non-essential helicopter operations in Manhattan," Compl.¶¶ 11, 18. ERHC and VAI say their members "will be limited in conducting their current flights." Compl. ¶ 122. Ms. Seskin says she is "concerned" those flights will be displaced to JFK and LaGuardia. Compl. ¶¶ 234–37; Dkt. 33 at 22–23. Plaintiffs' diversion study assumes the same thing: that "the overwhelming majority of commercial passenger serving flights would no longer be permitted to operate." Dkt. 35-1 § 3.1.

The premise is wrong as a matter of statutory text, as the City has shown. Dkt. 30 at 20–21; Dkt. 37 at 4. The law restricts only "covered helicopters," and it does *not cover* any helicopter whose calculated noise levels, as published by the FAA, do not exceed the federal Stage 3 limits. Ad. Code § 22-828(a). Whether a helicopter is covered depends on how loud it is,

not on how it was certificated. Plaintiffs, who bear the burden on this motion, have not identified a single covered helicopter operating at either heliport. The only evidence in the record is the report of the agency that manages both heliports, and it found no covered helicopter operating from either. Dkt. 38-1 at 3.

**1. Local Law 64 Excludes Stage 3 Equivalent Helicopters—Every Helicopter NYCEDC Found Operating at the Covered Heliports**

Under Plaintiffs' reading, a helicopter is "covered" by Local Law 64, and so will be barred from non-essential flights out of City-owned heliports, if the FAA has certificated it as "Stage 2." *See* Dkt. 33 at 14 (arguing that the definition "necessarily refers to the calculated noise levels in appendices 10 and 11 to the advisory circular, where each aircraft is designated as stage 2"). The FAA lists those certifications in appendices 10 and 11 to FAA Advisory Circular 36-1H. *See* Dkt. 31-7. Under this reading, the law would "impose a total ban on the vast majority of non-essential helicopter operations in Manhattan." Compl. ¶ 11; *see also id.* ¶ 276 (alleging that the Manhattan tour industry "will be forced to shutter or move its operations"). That is especially so because, as Plaintiffs rightly allege, "most helicopters in current operation in the U.S. and in New York meet the thresholds of Stage 2." *Id.* ¶ 144.

If the City Council had meant simply to base coverage on whether a vehicle was certificated as Stage 2 or Stage 3, it easily could have done so. But official FAA certifications have not kept pace with actual helicopter noise levels. As plaintiff ERHC's own Chairman has acknowledged, "very few helicopters are certified under Stage 3 noise levels, however, several Stage 2-rated helicopters flying today are just as quiet, and could meet Stage 3 noise-certification requirements." Dkt. 30 at 21 & n.5. The FAA did not adopt a Stage 3 helicopter standard until 2014, when it adopted the noise certification standards in Annex 16, Volume I, Chapters 8 and 11 (Amendment 7) of the International Civil Aviation Organization (ICAO), "consistent with the

FAA's goal of harmonizing U.S. regulations with international standards." Stage 3 Helicopter Noise Certification Standards, 79 Fed. Reg. 12,040, 12,040–41 (Mar. 4, 2014) (effective May 5, 2014). And the new standard is "not retroactive": the rule "does not include any requirements to modify existing Stage 1 and Stage 2 helicopters." *Id.* at 12,042.

A helicopter certificated before 2014 stays Stage 2 unless its owner chooses to recertify it. *Id.*; 14 C.F.R. § 36.11(c). And the upgrade is available only through an application for a supplemental type certificate. 79 Fed. Reg. at 12,040, 12,042. In fact, the advisory-circular appendices that the law cites, as they appear in the record, are dated November 15, 2001, more than a decade before the Stage 3 standard even existed. *See* Dkt. 31-7 at 1, 7. Many of the vehicles listed there continue to be certificated as Stage 2 even though their calculated noise measurements, as they appear on the face of the circular, meet the later-enacted Stage 3 thresholds. *See* Dkt. 38-1 at 2. Nevertheless, unless their owners seek recertification, they remain officially Stage 2.

The City Council made a rational choice: rather than use the outdated certifications in the FAA circular as the primary classification, it chose to base coverage on whether a helicopter could meet Stage 3 thresholds, whatever its official certification.

Local Law 64 defines "covered helicopter" by exclusion:

> The term "covered helicopter" means a rotary-wing aircraft capable of vertical takeoff and landing. Such term does not include any helicopter with calculated noise levels, as indicated in appendix 10 or 11 to federal aviation administration advisory circular 36-1H, or any such successor document, that are not higher than the stage 3 noise limits for the maximum takeoff weight of such helicopter set by the federal aviation administration, pursuant to section H36.305 of appendix H or section J36.305 of appendix J to part 36 of title 14 of the code of federal regulations.

Ad. Code § 22-828(a) (Dkt. 31-1 at 1–2). The exclusion works in two steps. First, it takes the

helicopter's calculated noise levels from the FAA's advisory circular, or any successor document:

- Appendices 10 and 11 to FAA Advisory Circular 36-1H (Nov. 15, 2001) list, model by model, the calculated noise levels of helicopters certificated under appendices H and J, respectively, to 14 C.F.R. part 36. Dkt. 31-7 at 1–2, 7–8.[2]

Second, it compares those levels with the Stage 3 limits for the helicopter's maximum takeoff weight:

- Appendix H to 14 C.F.R. part 36, "Noise Requirements for Helicopters Under Subpart H," sets takeoff, flyover and approach limits in section H36.305. The FAA added the Stage 3 limits to that section in 2014. 14 C.F.R. pt. 36, app. H, § H36.305(a)(3); 79 Fed. Reg. at 12,045.

- Appendix J, the "Alternative Noise Certification Procedure for Helicopters Under Subpart H Having a Maximum Certificated Takeoff Weight of Not More Than 7,000 Pounds," sets a single flyover limit in section J36.305, to which the FAA added a Stage 3 limit at the same time. 14 C.F.R. pt. 36, app. J, § J36.305(a)(2); 79 Fed. Reg. at 12,045.

In short, a helicopter is excluded from coverage if its "calculated noise levels," as published in the 2001 FAA circular "or any such successor document," are "not higher than the stage 3 noise limits" for a helicopter of its weight under appendix H or J. Ad. Code § 22-828(a). The Council therefore told the reader to take the noise levels of Stage 2-certificated helicopters and compare them to the Stage 3 limits. That instruction would make no sense if certification alone decided the question.

The Council's choice is confirmed by what it did not write. Had it meant to exempt only Stage 3-certificated aircraft, it could have simply written "[t]he term 'covered helicopter' means a rotary-wing aircraft capable of vertical takeoff and landing. *Such term does not include any Stage 3 helicopter*." This much simpler invocation of a defined federal term would accomplish exactly the policy Plaintiffs attribute to the Council without the need to cite to appendices in

[2] Every helicopter listed in both appendices, as they appear in the record, is designated Stage 2. Dkt. 31-7 at 1–2, 7–8 ("STAGE" column).

separate documents for noise levels and thresholds. But the Council instead wrote out a comparison of measured noise against numerical limits. Thus, Plaintiffs' insistence that their injury comes from a ban of all Stage 2 helicopters from city-owned heliports stems from a plain misreading of the statute, which does no such thing.

**2. Plaintiffs bear the burden, identify no covered helicopter, and the record shows none**

Read correctly, Local Law 64 does not ground the fleet that uses the heliports today. It keeps louder helicopters, those true Stage 2 vehicles louder than the Stage 3 limits, from flying non-essential trips out of the city-owned heliports after December 1, 2029. Every plaintiff's injury therefore depends on a fact plaintiffs must prove: that covered helicopters fly those routes now and will still be flying them then.

Plaintiffs have not even attempted to make such a showing. On a fact-based Rule 12(b)(1) motion they must "come forward with evidence of their own to controvert that presented by the defendant." *Carter*, 822 F.3d at 57. ERHC and VAI identify no member, much less a member who flies a covered helicopter. *See* Compl. ¶¶ 120–22; *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Ms. Seskin's theory needs covered helicopters to be displaced toward JFK and LaGuardia, but all she offers on which helicopters those would be are the same faulty assumptions underlying the claims of the trade association Plaintiffs. Dkt. 36. Plaintiffs' supposed "Diversion Study" assumes that 95–98% of all current operations are non-essential, and then assumes every one of those operations will be displaced with no consideration of "covered helicopters" whatsoever. Dkt. 35-1 at ii, §§ 3.1, 4.2.

The only evidence on the question points the other way. Local Law 64 requires NYCEDC, which manages both heliports, to report each year on non-essential flights by covered helicopters. LL 64 § 2. Its first report covers calendar year 2025. NYCEDC used FAA data

identifying which helicopter models meet Stage 3 noise levels. It found that only three models operating at the City's heliports have non-compliant vintages, and even these models meet Stage 3 thresholds for vehicles manufactured in other years:

| Model | Covered Production Years | Age on Dec. 1, 2029 |
|---|---|---|
| Sikorsky S-76 | 1993–1995 | 34–36 years |
| AgustaWestland AW109 | 1976–1989; 2001–2002 | 27–28 / 40–53 years |
| Eurocopter AS365 Dauphin | 1981–1994 | 35–48 years |

Dkt. 38-1 at 2.

NYCEDC then checked FAA registry data for the S-76, AW109 and AS365 aircraft the heliport operators reported. It concluded that it "is not aware of any covered helicopters operating at City-owned heliports during calendar year 2025." *Id.* at 3 & n.6. Plaintiffs offered no tail number, model or operator to the contrary.

The age of the covered variants matters independently. NYCEDC identified the only covered helicopters as airframes for the relevant models built between 1976 and 2002. For any plaintiff to be injured in December 2029, an operator would still have to be flying one of those decades-old aircraft, on non-essential trips, out of a City heliport. That is the kind of "highly attenuated chain of possibilities" that cannot support standing without evidence. *Clapper*, 568 U.S. at 410.

**3. Whether Local Law 64 covers Stage 3-equivalent vehicles is a question of law amenable to resolution on a Motion to Dismiss**

The Court inquired, at argument, whether anything in the legislation distinguishes Stage 2-certificated helicopters that meet Stage 3 levels from those that do not. The definition itself does: the exclusion turns on "calculated noise levels ... not higher than the stage 3 noise limits," not on certification. *See* Point I.B.1, *supra*. The law sets a noise ceiling for helicopters coming

into the market. It does not ground the fleet that is in place now.

No discovery is needed to determine what the definition means. Construing a local law is a question of pure statutory interpretation. The measurement the law calls for is not something the City or plaintiffs generate. It is the calculated noise data the FAA publishes for each certificated model, compared against limits the FAA has codified. Ad. Code § 22-828(a); 14 C.F.R. pt. 36, app. H, § H36.305; *id.* app. J, § J36.305. How NYCEDC applies that data to a particular aircraft in 2029 is an implementation question. If it ever matters, it can be raised by an operator whose aircraft is excluded, on a record showing how the law was applied to it. It is not a reason to find that these plaintiffs face injury today.

Finally, even if plaintiffs could identify a covered helicopter, that would not establish standing. A covered helicopter's operator faces no restriction until December 1, 2029. Even then, none applies until a Part 161 study has been published, its comment period has run, and 180 days have passed. Ad. Code § 22-828(c); LL 64 § 3. Each step adds a contingency to an injury that is already conditional. For Ms. Seskin, even if she could identify some subset of covered helicopters whose flights would be displaced, she would also have to provide a nonspeculative basis for believing that diversions would increase flights over Garden City—an assertion the City has already refuted. Dkt. 30 at 20–24; Dkt. 37 at 7–12.

## POINT II

### ERHC AND VAI HAVE NOT SHOWN STANDING TO PURSUE THE FEDERAL CLAIMS

### A. The Trade association plaintiffs do not have standing to sue on their own behalf, because they have not alleged any cognizable injury to their organizational interests

An organization suing on its own behalf "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*,

602 U.S. 367, 393–94 (2024). But until their November 23, 2026 supplemental briefing, the associations never even claimed any injury to themselves as organizations. The only harm the Complaint alleges is harm to their members, who, they allege "will be limited in conducting their current flights from City-owned heliports, resulting in loss of revenues, cancellation of scheduled services, and forced relocation." Compl. ¶ 122. An organization that is not directly regulated must show "an involuntary material burden on its established core activities." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173 (2d Cir. 2021); *accord Citizens United to Protect Our Neighborhoods v. Village of Chestnut Ridge*, 98 F.4th 386, 396 (2d Cir. 2024); *All. for Hippocratic Med.*, 602 U.S. at 394–95. Neither association attempted that showing in the Complaint, and their supplemental memorandum relies on case law that directly forecloses their claim of organizational standing.

Plaintiffs cite *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., ("CoreLogic")* for the proposition that impairment of "core business activities" can give rise to organizational standing. 167 F.4th 605 (2d Cir. 2026); *see* Pls.' Supp. Mem. (Dkt. 45) at 3. But the Second Circuit held that the organization in that case lacked standing, and the "core business activities" it described were the organization's own operations, not the business of its members. Significantly, in *CoreLogic,* the Second Circuit acknowledged that the Supreme Court in *Alliance for Hippocratic Medicine* recently "reject[ed] th[e] premise" that "an advocacy organization may establish standing by showing a frustration of mission and diversion of resources," *id.* at 618, the rule Plaintiffs advance from *Moya v. U.S. Dep't of Homeland Sec.,* 975 F.3d 120, 130 (2d Cir. 2020). An organization that "engages in advocacy and informational programming" does not suffer an injury to its "core business activities." *CoreLogic*, 167 F.4th at 618. Plaintiffs do not allege even a diversion of their organizational resources; they allege only

advocacy and outreach (Compl. ¶¶ 45–46, 109) and harm to unidentified members. But harm to an organization's members, without an "impairment of [the] organization's activities" does not confer organizational standing. Rather, an organization wishing to sue on behalf of its members must assert *associational* standing. Plaintiffs do not attempt that showing, and, for the reasons below, could not make it.

### B. On a factual challenge, an association must come forward with evidence that an identified member faces an imminent injury from the law

An association suing on behalf of its members must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The first requirement calls for "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498 (2009). On a fact-based motion, those allegations must be backed by evidence.

For purposes of standing, trade association plaintiffs rely on their members. But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431. The Court has "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers*, 555 U.S. at 499.

ERHC or VAI member are not inherently affected. VAI's 17,000 members "include both operators and suppliers," and ERHC describes itself as representing "helicopter pilots" generally. Compl. ¶¶ 45, 121. The Complaint does not allege that every member, or even most members, use the City's heliports. *See id.* ¶ 120.

At the pleading stage, an association need not generally name the injured member. *Bldg.*

*& Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 122 n.7 (2d Cir. 2025). *Building & Construction Trades Council* rejected a naming requirement "on a motion to dismiss, where standing is challenged based on the pleadings alone," but recognized that identification may be required where "the evidentiary adequacy of the [association's] standing allegations could be tested." *Bldg. & Constr. Trades*, 448 F.3d at 145. This motion tests exactly that. The City has not merely questioned whether the Complaint's allegations are sufficient. It has put in evidence that answers the allegation on which the associations' standing depends.

NYCEDC, which manages both heliports and which Local Law 64 directs to report each year on non-essential flights by covered helicopters, compared FAA data identifying which models meet Stage 3 noise levels against FAA registry data for the aircraft the heliport operators reported. It concluded that it "is not aware of any covered helicopters operating at City-owned heliports during calendar year 2025." Dkt. 38-1 at 2–3 & n.6; LL 64 § 2. That finding contradicts the premise of the Complaint's only allegation of member injury: that members "will be limited in conducting their current flights." Compl. ¶ 122. Plaintiffs therefore "will need to come forward with evidence of their own to controvert that presented by the defendant," and the Court will "make findings of fact in aid of its decision as to standing." *Carter*, 822 F.3d at 57. An unnamed member cannot controvert NYCEDC's finding; only an identified member, flying an identified covered aircraft, can. Even *Do No Harm*, which reversed the dismissal of an association's claims, recognized that the way to cure an evidentiary shortfall is for the association to "identify its allegedly injured member or members by name" and for those members to "provide more detailed information." 126 F.4th at 122. At least one court applying an evidentiary standard has required the association to identify a member by name and nature of

injury in order to establish standing to seek preliminary relief. *See African Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 380 (S.D.N.Y. 2025) (no representational standing where neither organization identified "any affected member ... by name and case-identifying information setting forth his or her injury in fact").

Applied to Local Law 64, association plaintiffs must come forward with a specific member who can claim injury under the statute. That must be (i) an identified member that operates helicopters at a city-owned heliport (Downtown Manhattan or East 34th Street); (ii) who uses the heliports for non-essential flights as defined in Local Law 64; (iii) whose flights are on covered helicopters as defined in Local Law 64; (iv) who intends to continue the covered flights past December 1, 2029; (v) who can trace a concrete harm, such as lost revenue or cancelled service, to the Local Law.

The Complaint's entire account of member injury is three sentences long:

- ERHC's members "include helicopter tour operators, charter services, and commuter air carriers who regularly use the Downtown Manhattan and East 34th Street Heliports for non-essential flights." Compl. ¶ 120.
- VAI "has more than 17,000 members, which include both operators and suppliers in the vertical aviation industry." *Id.* ¶ 121.
- "As a consequence of the City's legislation, ERHC and VAI members will be limited in conducting their current flights from City-owned heliports, resulting in loss of revenues, cancellation of scheduled services, and forced relocation to more distant facilities." *Id.* ¶ 122.

Paragraph 120 alleges use of the two City heliports for non-essential flights. That covers the first two parts of the showing for a category of members. It says nothing about the third, fourth or fifth. No particular member or aircraft is identified, and Plaintiffs do not even allege that any member operates helicopters louder than Stage 3 limits—instead they read that exclusion out of Local Law 64, *see* Point I.B.1, *supra*. The injury in paragraph 122 is stated in the future tense and assumes the conclusion: that the law will "limit[] ... current flights." Read

correctly, the law limits current flights only by covered helicopters, and only after 2029. *See* Point I.B, *supra*.

Plaintiffs' opposition evidence adds nothing on these points:

- **The Smith declaration** comes from ERHC's board chair. It opines on regional routing and predicts that operators will relocate if "access to a heliport is restricted." Dkt. 35 ¶¶ 19–20. It identifies no member, no aircraft and no member's operations, and merely assumes the access restrictions it must prove.

- **The diversion study** does not count covered helicopters. It assumes that "[a]pproximately 95–98%" of current operations are non-essential and treats all of them as displaced, on the premise that "the overwhelming majority of commercial passenger serving flights would no longer be permitted to operate." Dkt. 35-1 at ii, § 3.1. This again assumes what must be proven.

The record does contain evidence on Local Law 64's coverage within the existing fleet, and it stands squarely at odds with plaintiffs' assumptions. NYCEDC's statutory report for 2025 found that only three models flying at the City's heliports have covered variants, and it identified no covered helicopter in operation. Dkt. 38-1 at 2–3. Plaintiffs offered nothing to contradict it.

Even a member flying a covered helicopter faces no restriction before December 1, 2029. It faces none until a Part 161 analysis has been published, its comment period has run and 180 days have passed. LL 64 § 3; Ad. Code § 22-828(c). Plaintiffs "must show more than that the statute covers their conduct to establish preenforcement standing." *Hedges v. Obama*, 724 F.3d 170, 201 (2d Cir. 2013). A future restriction on an airframe that may be retired or replaced before 2029 is not "certainly impending." *Clapper*, 568 U.S. at 409. And because, on NYCEDC's analysis, every covered variant was built between 1976 and 2002, any covered helicopter currently operating would be decades old, bringing the likelihood of its near-term retirement plainly at issue. Dkt. 38-1 at 2.

If a member claims it has already made changes to its operations in anticipation of future

restrictions, any costs must be traceable to the law itself, not to fear of a restriction that is not actually imminent or in the law. Just as Ms. Seskin cannot base her standing on speculative fears of future harms, presented without evidence they are actually likely, associational Plaintiffs "cannot 'manufacture standing'" from "present injuries incurred due to their expressed fears." *Hedges*, 724 F.3d at 204; *see also Clapper*, 568 U.S. at 416 (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

### C. Without a member with standing, ERHC and VAI cannot pursue Counts One through Three

An association may sue on its members' behalf only if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. Because ERHC and VAI have not shown that any member "would otherwise have standing to sue in [its] own right," they fail the first *Hunt* requirement. The Court need not reach the other two. *See Do No Harm*, 126 F.4th at 118; *African Cmtys. Together*, 799 F. Supp. 3d at 380. The defect reaches every form of relief they seek, each of which is a declaratory judgment. Compl. at 39 (prayer ¶¶ (a)–(c)); *TransUnion*, 594 U.S. at 431.

"[W]here ... multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). That rule does not supply standing here. The only other plaintiff on the federal claims is Ms. Seskin. Her claimed injury is the same on every count, and it fails for the reasons already briefed, Dkt. 30 at

19–25; Dkt. 37 at 7–12, and those in Point I.B above. No plaintiff has standing to pursue Counts One through Three, so the Court lacks jurisdiction over them.

## POINT III

## THE SEQRA CLAIM SUFFERS FROM THE SAME DEFECTS

The City's challenge to Ms. Seskin's standing to bring the SEQRA claim is fully briefed. Dkt. 30 at 19–25; Dkt. 37 at 7–12; Dkt. 32; Dkt. 38-1; Dkt. 39. The City does not repeat those arguments here. One point from this brief bears on the SEQRA claim and the City's standing arguments.

Ms. Seskin's supposed SEQRA injury, like the associations', presupposes that Local Law 64 will displace the helicopters flying today. The law reaches only covered helicopters, and plaintiffs have identified none. *See* Point I.B., *supra*. That belies her claim of injury before the geography and flight-data showings already before the Court are even implicated.

As the City showed on its motion, its evidence of individual plaintiff Seskin's lack of standing is material because it contradicts (i) the Complaint's allegation about where Ms. Seskin lives relative to helicopter traffic, Compl. ¶¶ 47, 233; *see* Dkt. 30 at 22–23; Dkt. 31-8; Dkt. 32 ¶¶ 19, 23–24; Dkt. 37 at 8; (ii) the premise that the local law will displace currently operating helicopters, *see* Dkt. 30 at 20–21; Dkt. 37 at 9; Dkt. 38-1 at 3; and (iii) the premise that, even if helicopters were displaced, the diverted flights would increase traffic over Ms. Seskin's home in Garden City, NY, *see* Dkt. 30 at 23–25; Dkt. 37 at 9–12; Dkt. 39 ¶¶ 28–38.

## POINT IV

## PLAINTIFFS' PREEMPTION CLAIMS ARE SIMILARLY UNRIPE FOR REVIEW AND SHOULD BE DISMISSED

### A. Legal Standard

Ripeness doctrine is derived from "Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, (2003). Thus the doctrine implicates two overlapping threshold criteria: constitutional ripeness, which has "its source the Case or Controversy Clause of Article III" and prudential ripeness which asks whether "the case will be better decided later and that the parties will not have constitutional rights undermined by the delay." *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003).

The constitutional ripeness inquiry mirrors the standing analysis in that "to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not actual or imminent, but instead "conjectural or hypothetical." *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688-89 (2d Cir. 2013); *see also New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008) ("Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.")

Determining whether a case is prudentially ripe is a two-prong inquiry where the Court considers 1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Authors Guild, Inc. v. HathiTrust*, 755 F3d 87, 104 (2d Cir 2014) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)); *see also Grandeau,* 528 F.3d at 131-32.The fitness prong of this inquiry "recognizes the restraints Article III places on federal courts," and "requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development." *Murphy v New Milford Zoning Comm.*, 402 F3d 342, 347 (2d Cir 2005). The "hardship to the parties" prong

requires Courts to "gauge the risk and severity of injury to a party that will result if the exercise of jurisdiction is declined. *Id.*

Here, due to Plaintiffs' lack of standing, their federal preemption claims are constitutionally unripe, whereas their ANCA preemption claims are prudentially unripe and should thus be dismissed.

**B. Plaintiffs' Federal Preemption Claims are Constitutionally Unripe**

As argued above in Points I.B and II.B, Plaintiffs lack standing to pursue their federal claims as they have failed to allege any concrete injury resulting from Local Law 64. This alone is fatal to the constitutional ripeness inquiry. *See Lacewell v. Office of the Comptroller of the Currency,* 999 F.3d 130, 149 (2d Cir. 2021) (finding plaintiffs' claims constitutionally unripe for same reasons set forth with respect to Article III standing); *see also Brooklyn Legal Servs. Corp. B. v. Legal Servs. Corp.,* 462 F.3d 219, 225 (2d Cir. 2006) ("Because [defendant's] ripeness arguments concern only [the] shared requirement" that "the [alleged] injury be imminent rather than conjectural or hypothetical, . . . it follows that our analysis of [defendant's] standing challenge applies equally and interchangeably to its ripeness challenge."), abrogated on other grounds by *Bond v. United States*, 564 U.S. 211 (2011).

Plaintiffs' scant allegations of harm are mere speculations about possible future consequences of Local Law 64 which are unsupported by the record. *See* Points I.B.2 and II.B, *supra*.

**C. Plaintiffs' ANCA Preemption Claim is Prudentially Unripe**

Plaintiffs' ANCA preemption claim is also prudentially unripe on the grounds that it would be better adjudicated after the ANCA process has been completed, which will further develop the factual record. Additionally, this delay in adjudication would not present any hardship to the parties.

**1. Unfit for Judicial Review**

The fitness prong of the prudential ripeness analysis asks "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." 15 Moore, Federal Practice § 101.76 (2026); *see also Authors Guild,* , 755 F.3d at 104–05 (fitness analysis is concerned with whether issues are contingent on unknowable future events). Certainty is central to the fitness inquiry. The ripeness doctrine protects the government from "judicial interference until a[] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties." *Thomas v City of NY*, 143 F3d 31, 34 (2d Cir 1998)(internal quotations omitted). Pursuant to this standard, "issues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Simmonds*, 326 F3d at 359.

Here, Plaintiffs' ANCA preemption claim is unfit for judicial review because it is largely premised on Plaintiffs' suppositions as to how Local Law 64 shall be implemented and its alleged effects, before such suppositions can be confirmed by the law's application. Plaintiffs advance theories of conflict preemption by alleging Local Law 64 violates ANCA on the following grounds:

- Local Law 64 fails to comply with ANCA and its implementing regulations. Compl.¶ 195.
- It mandates the imposition of a restriction before the City has complied. (Compl..¶ 162)
- It constitutes an end-run around ANCA by paying lip service to federal statute while mandating a particular outcome. (Compl. ¶ 171),
- It impermissibly delegates the City's obligation to implement ANCA procedures onto local fixed base operators ("FBOs") and that such delegation conflicts with ANCA's requirements. (Compl. ¶¶ 11–12, 18–19, 26, 163, 178).

The uncertain and conjectural nature of Plaintiffs' ANCA preemption claim is further evidenced by Plaintiffs' allegations as to the City's future intentions under the law – without any basis for those allegations. Plaintiffs allege that the City has "no intention" of completing a

proper study under ANCA (Compl. ¶ 172); the City has given no indication that it "intends" to comply with ANCA (Compl. ¶ 177).

At this stage in the litigation, both parties have presented their arguments for and against preemption based on interpretations of the statutory text of both Local Law 64 and ANCA. However, were the Court to wait until after the December 1, 2029 effective date, the uncertainty inherent in Plaintiffs' allegations would be resolved. For example, rather than questioning whether the City impermissibly delegated its authority onto FBOs, the record would demonstrate if and how the ANCA procedural requirements were met. Relatedly, critical questions such as whether the challenged noise restriction would be implemented absent consideration of the ANCA study, would move from a theoretical legal analysis at this stage, to a more concrete factual development closer to the statutory effective date. As the issues raised by Plaintiffs' ANCA preemption claim would benefit from further factual development, they are presently unfit for judicial review.

Plaintiffs' preemption theories also rest on their premise that Local Law 64 will "impose a total ban on the vast majority of non-essential helicopter operations in Manhattan." Compl. ¶ 11. The City has shown that the premise misreads the statute, *see* Point I.B, *supra*, and the only evidence in the record is that no covered helicopter currently operates at either heliport. Dkt. 38-1 at 3. But to the extent Plaintiffs continue to dispute of the reach of the restriction, that reach is one of the things the forthcoming ANCA process will elaborate. No restriction may take effect until 180 days after a Part 161 analysis is published and made available for comment. Ad. Code § 22-828(c); LL 64 § 3. That analysis will necessarily account for which aircraft and operations the restriction affects, further developing the record, and potentially narrowing the

issues for any eventual challenge. And the Petitioners will have full opportunity to participate in that process.

**2. Neither party will endure hardship if a decision is withheld**

The second prong of the ripeness inquiry is whether and to what extent the parties will endure hardship if decision is withheld. *Simmonds*, 326 F3d at 359. In making the hardship assessment, "we ask whether the challenged action creates a direct and immediate dilemma for the parties." *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999); *Grandeau*, 528 F.3d at 134. ("The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds*, 326 F.3d at 360; *Grandeau*, 528 F.3d at 134; *Authors Guild*, 755 F.3d at 105.

Hardship is present "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *R.C. Archdiocese of NY v. Sebelius*, 907 F. Supp 2d 310, 334-335 (EDNY 2012); *see also Nat'l Park*, 538 U.S. at 809 (claim not ripe because regulation at issue did "not command anyone to do anything or to refrain from doing anything[,] . . . subject anyone to any civil or criminal liability," nor create "legal rights or obligations"). In instances where the challenged law is yet to go into effect, the issue is deemed ripe for review where plaintiff had to take action to avoid the consequence of a provision with an impending effective date. *See New York v. United States*, 505 U.S. 144, 175, 112 S. Ct. 2408, 120 L. Ed.2d 120 (1992); *NY State Rifle & Pistol Assn. v. Cuomo*, 990 F Supp 2d 349, 379 (WDNY 2013) ("Plaintiffs have sufficiently demonstrated that the impending effective date for the law imposes a direct and immediate dilemma, as Plaintiffs must prepare to comply with the law's new requirements."). Here, by contrast, no plaintiff must act now to avoid the law's consequences. The restriction reaches only covered helicopters, NYCEDC found none operating at the City's heliports, and no restriction can apply before

December 1, 2029 and the completion of the Part 161 process. Dkt. 38-1 at 3; Ad. Code § 22-828(c).

As argued throughout this memorandum, Plaintiffs have failed to show any imminent and concrete injury. As such, the challenged action does not create a direct and immediate dilemma for the parties. The injuries alleged are stated in the future tense and evidence future potential harms insufficient to establish hardship here. Local Law 64 limits current flights only by covered helicopters, and only after 2029. *See* Point I.B, supra. Any concerns about present harms are further belied by NYEDC's report which concluded, "it is not aware of any covered helicopters operating at City-owned heliports during calendar year 2025." Dkt. 38-1 at 2–3 & n.6.

Accordingly, the considerable uncertainties and future contingencies implicit in Local Law 64, balanced against the lack of hardship to the parties if adjudication was delayed, weigh in favor finding the issue of ANCA preemption prudentially unripe for review.

## CONCLUSION

For the foregoing reasons, defendant City respectfully requests that this Court grant its motion to dismiss the Complaint for lack of jurisdiction on the basis of standing and ripeness, and deny the relief requested therein, together with such other and further relief as this Court deems just and proper.

Dated: November 23, 2026
New York, New York

Steven Banks
Corporation Counsel of the City of New York
*Attorney for Defendant*
100 Church Street
New York, New York 10007
(212) 356-2369

By: /S/*Nathan Taylor*
Nathan Taylor
Owanaemi A. Briggs
Aimee K. Lulich
Assistant Corporation Counsels